# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DION STARR,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| ) | |
| **COUNTY OF LOS ANGELES, LOS** ) | |
| **ANGELES COUNTY SHERIFF'S** ) | **CASE NO. CV 08-00508 GW (SHx)** |
| **DEPARTMENT, SHERIFF LEROY** ) | |
| **BACA, IN HIS INDIVIDUAL** ) | [Hon. George H. Wu] |
| **CAPACITY, DEPUTY MAYBET** ) | |
| **BUGARIN, DEPUTY JOSE** ) | **DECLARATION OF** |
| **GARIBAY, SGT. MICHAEL INGE,** ) | **GEORGE SULLIVAN** |
| **LT. ALFRED GONZALEZ, CAPT.** ) | |
| **JOHN CLARK** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

I, George Sullivan, declare that if called as an expert witness in this case, I would competently testify to the following:

## I. Introduction

1.      I have been retained as a Corrections Consultant and available Expert Witness in the above captioned Case. Attorneys for Plaintiff have asked me to carefully study documents provided to me and, on the basis of those documents and my over 54 years' experience in the corrections profession, to express my opinions with respect to issues of concern in the above cited Case.

2.      Attached EXHIBIT A lists the documents and publications which I own or have received and studied and which I deem relevant to matters in this Case.  As the basis for formulation of my opinions expressed herein, I

have relied upon the documents and publications listed in EXHIBIT A, and on my education, training and over 54 years' work experience in the corrections profession.

## II. Witness' Background, Experience and Qualifications

1.      In both Federal and State Courts I have been accepted as an expert in the management and operations of correctional facilities and jails. After graduating from high school in May 1949, I served 4 years with the U.S. Navy during and in the Korean War. My career in Corrections began on April 3, 1955 as a Correctional Officer at the Oregon State Penitentiary (OSP).  Between October 10, 1955 and December 26, 1962 (7+ years), I served at OSP as an Inmate Counselor with a caseload of 525+ inmates, including 75-100 women inmates, writing Case History Summaries and Progress Reports and managing the housing/custody/classification/work assignments/self-improvement programs and counseling needs of my caseload. During those 7+ years I attended Willamette University, Salem, Oregon as a work/study student majoring in sociology/psychology. I graduated on June 3, 1962, receiving a Bachelor of Arts Degree.

2.      At OSP between December 26, 1962 and July 5, 1967 (4 years, 6 months) I served as Deputy Warden in charge of Inmate Treatment Programs and Chairman of the Classification Committee. The Penitentiary Women's Unit was assigned under the authority and supervision of my office. During 1964 a 200 bed Women's Correctional Facility was newly constructed just outside the walls of the Oregon State Penitentiary. I was assigned to bring the new institution into operational existence in 1965, and it remained under my authority and supervision to July 1966 when its first full time female Superintendent was selected and assigned.

3.      On July 5, 1967 I was transferred to the Oregon State Correctional Institution (OSCI) as Assistant Superintendent in charge of Inmate Treatment Programs and Chairman of the Classification Committee: I held that position until August 16, 1969 (2+ years). On August 16, 1969 I was appointed Superintendent/Warden of the Oregon State Correctional Institution and held that position until December 31, 1984 (15 years, 4

months), when I retired from Oregon Corrections after 30 years service. Between January 7, 1985 and October 1, 1987 (2 years, 9 months) I served as Warden of the Penitentiary of New Mexico. From February 13, 1989 to January 20, 1994 (5 years), I served with the Colorado Department of Corrections as Deputy Director in charge of Statewide Prison Operations, (20-correctional facilities); Statewide Parole Services; Statewide Community Corrections Programs; Inmate Classification System; Religious Programs and Food Service Operations, all of which included women inmates.

4.     Attached as EXHIBIT C is my Curriculum Vitae/Personal History Résumé. The last four pages of EXHIBIT C are a listing of the 178 adult correctional facilities I have toured/audited throughout my career. In October 1978 I was trained as a "consultant/examiner" "Auditor" to conduct audits of jails and adult correctional facilities, measuring the facilities' levels and quality of compliance with the Manual of Standards for Adult Correctional Institutions[1] (prisons) and/or the Manual of Standards for Adult Local Detention Facilities [2](jails). The Standards contained in these Manuals are commonly referred to as "ACA Standards". These Manuals of Standards are maintained current through biennial promulgation of a Standards Supplement.[3]  In conducting those audits, I represented the American Correctional Association and the Commission on Accreditation for Corrections.

5.     By use of an (*) those last 4 pages of EXHIBIT C also identify the 106 county, state and federal penitentiaries and correctional facilities of the United States and federal correctional institutions of Canada which I have Audited. Sixty (60) of those audits were formal "Accreditation Audits" requiring written Audit Reports to the Commission on Accreditation for Corrections. Such audits were conducted by teams of 2, 3, or 4, selected

---

[1]`See EXHIBIT A, Reference Item #1 & #2.

[2] See EXHIBIT A, Reference Item #3.

[3] See EXHIBIT A, Reference Item #4 &#5.

corrections professionals who served as "Visiting Committees". I served as Chairman of those Visiting Committees in 58 of those 60 audits.

6.      An audit is a comprehensive, intrusive analysis of an institution's Policies; Procedures; Practices; Staff Training Programs; Physical Plant Conditions; Programs providing Medical Care, Food Services, Religious Services, Education, Vocational Training, Visiting/Mail; Productive Work; Institution Security Operations including the institution's Segregation Units and Use of Force practices; and Quality of Life Conditions for inmates and staff. All such are measured against requirements of established national, professional Correctional Standards. Standards presented within the various Manuals of Standards are promulgated by the American Correctional Association in cooperation with the Commission on Accreditation for Corrections. The Standards are considered by the Corrections Profession to be "state-of-the-art correctional practices and guidelines for improvement". Obviously, they are not presented as defining nor establishing "constitutional minima" for detention/correctional institution or jail operations. The Federal Bureau of Prisons, most U.S. States and Correctional Services of Canada Operations cite 3rd Edition January 1990 ACA Standards and 4th Edition January 2003 ACA Standards as References, as relevant, in their Policies/Procedures.

7.      I have been a Professional/Gold Card Member of the American Correctional Association for the past 47 years. I have worked closely with the American Correctional Association and the Commission on Accreditation for Corrections as Standards for Adult Correctional Institutions have evolved and matured. I served on a Task Force which developed an "Accreditation Facility Performance Inventory" questionnaire to assess changes in Institution conditions, or improved working conditions and quality of life for staff and inmates, as a result of involvement in the Accreditation process.

8.     I served on a Commission on Accreditation/American Correctional Association Special Task Force to develop Accreditation procedures for Maximum Security Correctional Facilities, at the then Maximum Security United States Penitentiary, Marion, Illinois.

9.     An American Correctional Association publication titled PROTECTIVE CUSTODY was developed by a Task Force of nationally recognized corrections professionals. I was privileged to serve on that Task Force as Coordinator of Research and Data for the Western United States.

10.     As the Manual of Standards for Adult Correctional Institutions progressed from its First Edition Publication to the Second Edition, I served on the Resource Committee to advance the Manual. I was assigned to submit recommendations for revision/updating of five (5) chapters of the Manual: Chapters on Food Services, Sanitation and Hygiene, Medical and Health Care Services, Inmate Rights, Inmate Rules and Discipline. My recommendations were all adopted and those five (5) Chapters were published in the 2nd Edition and have, with very minor changes, continued into the current 2003 4th Edition.

11.     I have also served as a Professional Corrections Consultant and Expert Witness, conducting operational reviews of jails and correctional facilities on behalf of the United States Department of Justice, Civil Rights Division; Law Enforcement Assistance Administration; the National Institute of Corrections; several State and County Departments of Corrections; private correctional corporations; private attorneys and law firms; and at the requests of Executives having Facility oversight authority. Consequently, I am familiar with and have personal knowledge and experience with Federal, State, County, City and private correctional facilities, throughout the United States and into British Columbia, Canada.

12.     I consider myself competent to render opinions as to the duties, responsibilities, policies and operations required of Correctional Facilities and Jails, such as the Los Angeles County Jail, Los Angeles, California.

### III. Documents, Experience, Knowledge Bases for Opinions

1.      My opinions in this case are formed on the bases of my education, knowledge, training, research, lecturing, audits of jails, correctional facilities and penitentiaries, careful review/study of documents and references listed in EXHIBIT A, relevant laws, and my over 54 years' career experiences in corrections operations and management.

### IV. Exhibits

1.      I do not currently plan the use of any Exhibits in Deposition or at Trial in this Case.

### V. Highlighted, Relevant, Salient Factors of The Case

1.      As listed in Exhibit A, I have received and studied hundreds of pages and many documents provided to me for review.  These documents include incident reports provided by LASD staff and taken after Mr. Starr's stabbing on January 27, 2006; depositions of Deputies Maybet Bugarin, Jose Garibay, Dep. Solano, Dep. Montez, Dep. Magadan, Dep. Christina Martinez, Sgt. Michael Inge, Lt. Alfred Gonzalez, Capt. John Clark, Dion Starr and exhibits thereto; pertinent policies and procedures, central jail training bulletins, and orders; data of major disturbances at the MCJ, data of inmate on inmate assaults at MCJ between March 2003 through February 1, 2006; data analysis of the watch commander's daily activity log for the period of January 2004 through June 2006, regarding inmate on inmate major assaults at MCJ; volumes of Death Reviews including incident reports and investigations related to inmates who have been killed in the County Jail between June 2002 and February 27, 2006, due to failure to provide reasonable security; insufficient monitoring; supervisors' failures to train and supervise; data of inmate on inmate assaults, data of major incident , and  data analysis of Watch Commander Log relevant to inmate on inmate violence for time periods pertinent to this incident.

2.      I have reviewed documents regarding the beating of William S. McNamera, numerous documents regarding the death of Ramon Gavira; page excerpts from the U.S. Department of Justice, Civil Rights Division, Office of the Assistant Attorney General, Washington, DC 20035 "CRIPA Investigation Of Mental Health Services in the Los Angeles County Jail"; page excerpts from "Memorandum Of Agreement Between The United States And Los Angeles County, California Regarding Mental Health Services At The Los Angeles County Jail"; many reports from Semiannual reports from Special Counsel Merrick J. Bobb and from Sheriff Baca's attorneys; the Office of Independent Review; and Staff Police Assessment Resource Center (PARC), involving inmate on inmate violence and lax discipline January 1, 2004 through June 1, 2007.

3.      I have also reviewed reports from the Special Counsel to Los Angeles County on inmate on inmate violence; racial riots; classification problems in the jails and lax discipline November 1, 2003 through December 1, 2007; and a series of reports of civil cases settled by the County of Los Angeles obtained from the County's public reports of settlements of inmate on inmate violence; pertinent Commission on Police Officers Standard Training (POST); Office of Independent Review (OIR) reports pertinent to these issues; an August 2004 Report of the County of Los Angeles District Attorney regarding inmate on inmate violence due to lapses of security at the county jail; Minutes of the Countywide Criminal Justice Coordination Committee 2-15-06;  Los Angeles Times Newspaper Articles; and a number of other reports as referenced herein, involving supervisors and deputies.

## VI. Brief Summary of Relevant Facts In This Case - County, LASD and Sheriff Baca's Duties

1.      The County of Los Angeles and the Los Angeles County Sheriff's Department are the public entities ultimately responsible for the operation of the County's jail.  The Sheriff of Los Angeles County (Sheriff Leroy D. "Lee" Baca), is charged, by California law, as the Executive Manager over all of the County's Detention Facilities.  The responsibility for managing and

operating a County Jail in California is clearly placed, by law, upon the County Sheriff, on behalf of the County.   The Sheriff is required by statute to take charge of and keep the County Jail and prisoners of the Jail, and is answerable for the prisoners' safekeeping.  (See Cal. Government Code, Section 26605, 26610, and Penal Code Section 4006.)  The Sheriff has *sole and exclusive statutory duty,* which mandates his responsibility for the Los Angeles County Jails.  The Sheriff cannot pass off or otherwise delegate his statutory duties or responsibilities.

2.      The Sheriff can and needs to delegate assignments and activities to subordinate staff for the efficient and effective management of the County's Detention Units.  In making such delegations of assignments and activities, the Sheriff, nevertheless, cannot delegate his responsibility for performance.  He has a duty and responsibility to supervise his Executive Managers, Commanders, and Deputies and to ensure that they are: (a) supervising their charge area; (b) learning of and monitoring existing problems; (c) fixing or curing existing problems; and (d) assuring that they are reporting back all significant issues in the operations of the Detention Facilities.  He is responsible: (e) to ensure training takes place; (f) ensuring LASD compliance with resolving the problems and conditions in the jail causing constitutional violations as set forth and described in the Department of Justice DOJ 1997, findings under their authority under the CRIPA federal law; (g) LASD compliance with the Memorandum of Agreement (MOA); and ensuring allegations of misconduct by deputies are investigated to comply with his law enforcement obligation.

## VII.  Brief Summary of the Attack on Dion Starr in his Cell

1.      Deputy Garibay was on duty on January 27, 2006 in housing module 2400, Row B, Cell 9.  His duties were first and foremost providing inmates security and ensuring inmates don't harm others, themselves or deputies.  To fulfill his duty to provide security, he had to conduct hourly row checks of cells and inmates, filling out Title 15 book to report any occurrences in the module or a row, watch (visually) and listen to the inmates.  His duty

was also to open the row's entrance security gate and individual cell doors from his location in the control booth, and to know who is walking in and out of the row and/or cells.

2.      Deputy Garibay was aware of the incident in November 2005, when an inmate (Chadwick Shane Cochran) was killed in this same module 2400 by being stomped to death by Hispanic gang members.  He knew this to be a major incident of which custody staff was aware.

3.      Sometime in the morning hours he was in the gate control booth cage and apparently, without checking the wristband identification bands, he opened the row and allowed three or more inmates into the row and although from his duty position he was able to look down the entire row and see what was going on, he testified "at the immediate moment I was not looking down the row at the trustees."  He stated although he was solely responsible for Row B, that he did not supervise the inmates he let into the row, he did not recall how many trustees he allowed into Row B or how long the inmates were unsupervised in Row B before the incident happened.  It appears that he left his post unattended after opening the Row B gate and the cell gates where Starr was located as he stated he had no knowledge of how the attack on Starr occurred "because when the incident occurred he was not physically there."

4.      Mr. Starr who was in cell #8 (with Kelly, an African American and two Hispanics - one Sandoval) stated that he saw the Hispanic gang members gather in front of his cell door talking in Spanish to the Hispanics in his cell and in the cell next to his.  Then the cell 7, 8 and 9 gates began to open and the three Hispanics in the Row rushed into his cell saying, "Mayate, mayate," (meaning "nigger" in Spanish), and "kill them, kill them," as Starr immediately began screaming "help" and "deputy, they're killing us, help,... deputy."  Starr was overcome by about 5 Hispanics and others who joined from cells 8 and 10.  Although he covered his face and head, he was stabbed in the head, back, face and torso 23 times (medical records).  His cell mate Kelly was also stabbed many times in the head and neck area.

During a period of five to seven minutes Starr continued crying out for help and trying to protect himself.

5.      Deputy Garibay stated that he heard somebody yell "help" or "deputy" he called for "415" and within seconds deputies responded to the hallway and began to take control of the situation.  Immediately the inmates were ordered to get down on the ground, or handcuffed, and all inmates immediately complied and did not defy officers.  Starr was apparently already laying on the ground, handcuffed, lying face down on the floor.  He was very injured and in pain, and one of his Hispanic attackers was very close to him still trying to kick him.  Starr began to move away from him and wanted to get up to avoid being kicked, when suddenly Deputy Bugarin said "nigger I told you to stay down" as she kicked him directly on his nose.

6.      Deputy Garibay stated his duty was to open the gates and he was the Row B control booth deputy.  Because Garibay was the person who opened the gates to the row and cells, was the person in charge, his duty was to prepare a report of what he observed and heard.  He did not, nor did he recall reporting to anybody what he did and observed of the attempted murder.  The incident report and injury report was prepared by a deputy Christina Martinez who was not present at the time of the incident as was Garibay.  He was aware Row B was a crime scene because somebody had been stabbed and the area should have been protected to properly collect evidence and take pictures and take the names of witnesses.  However none of this was done.

## Sgt. Inge, Floor Sergeant on Duty

1.      Sgt. Inge was the 2000 Floor Sgt. on duty at the time of the attempted murder of Mr. Starr.  He responded to the crime scene and although he was on duty during the stabbing incident, he did not approve the incident report for accuracy- it was approved by Sgt Lam who was not on duty at time of incident.  Sgt. Inge directed the deputies to speak to the inmates involved in the attack and conduct an investigation, but he took no action to investigate if this was an attempted murder.

2.     Sgt. Inge did not take any action to determine who opened the cell gates and testified that he would not necessarily have wanted to know who opened gates.  He never saw or reviewed the report of the stabbing incident. He would have been responsible for approving reports from February 27, 2006, the date of the incident and reviewed it for the first time at his deposition August 27, 2008.

3.     Sgt. Inge stated that he has no role in how trustees are selected for a particular module and knew nothing about a policy that trustees should not be inside a row when cell gates are opened.  This conflicts with LASD policy and the testimony of Capt Clark which requires the selection of inmate workers (trustees) to be approved in writing in the Daily Activity Log (UDAL) by the sergeant on duty because of security issues: the policies resulted from prior incidents.  He was aware that each inmate wears a wristband which tells the deputy the inmate's housing location and deputies can compare a wristband to computer or log.  He confirmed that if a deputy allows a person who is not a trustee to go into a row where he is not living, that would be against the LASD rules, policies and procedures.

4.     Sgt. Inge was present when deputies got control of this incident, and when Dep. Bugarin took control of Mr. Starr.  Mr. Starr states that Sgt. Inge and all the deputies present saw Dep. Bugarin kick him in the face.  Sgt. Inge did not investigate Mr. Starr's complaint.   Although this incident happened on his watch, he never questioned Starr about this incident.   He stated that it was his duty to investigate a deputy who is accused of kicking an inmate in the face and nose while handcuffed, a serious charge as it is a crime and it would be dereliction of duty not to investigate.  He also knew of ongoing concern at LASD about problems with deputies not reporting things so that their other deputy friends do not get into trouble.

5.     Sgt. Inge learned about inmate on inmate attacks "through casual conversations by people who worked [at the jail]."  247:11-13.  However, he never received any information from Sheriff Baca or other supervisors informing him of incidents of ongoing racial violence at jail or the killings at

the jail. Before he started working as a Sergeant at the jail he did not receive any information on what was occurring in the jail concerning inmate on inmate violence; nor did he know whose responsibility it would be to provide him, as an incoming sergeant, information about violence at the 2000 floor re: inmate on inmate violence and how to curb and prevent it and he never asked for any information.

6.      After he returned to the jail from the hospital, although Mr. Starr had not committed any crime, Sgt. Inge had him sent to the isolation module, and subsequently failed to comply with Mr. Starr's right to due process.  Mr. Starr frequently requested to be removed from isolation, but was left there for three months.  During this time period, Mr. Starr continued complaining to others that Deputy Bugarin had kicked his nose.  Sgt. Inge, who was Bugarin's supervisor during this incident, failed to take any action in this regard, omitting and ignoring Starr's right not to be in isolation and to be heard in his grievance against Bugarin.

## Lt. Gonzalez, Watch Commander on Duty

1.      Lt. Gonzalez the Watch Commander was present at the jail when Plaintiff was attacked.  As W/C his responsibility was to review reports as they came in to make sure that the sergeants and deputies were doing their jobs: to hold his subordinates accountable he would require witness/deputies to document their observations and properly fill out the reports involving inmate attacks.

2.      Lt. Gonzalez reviewed and signed the incident report of the attack on Starr, and he further documented in the watch commander's log that the incident required hospitalization of inmates.  He knew this required reporting to Capt. Clark, but the record is void of any such reporting compliance.

3.      Lt. Gonzalez did not inquire into why Garibay did not report the attempted murder in the Title 15 log; he did not inquire into Sgt. Inge's failure to discuss the incident with Dep. Garibay; he did not inquire into Sgt.

Inge's failure to discuss the incident with Mr. Starr; he did not inquire into
Sgt. Inge's failure to determine why the cell gates were opened with three
inmates in the row, of which only one was a designated trustee, a second
lived in a different housing area, and a third went unidentified; or, Sgt.
Inge's failure to monitor or supervise the security lapses of Dep. Garibay
that allowed the armed attackers to enter the row and Plaintiff's cell.

4.     Nor did Lt. Gonzalez determine if Sgt. Inge had approved the
selection of trustees; did not review the Title 15 log to ensure the incident
was properly recorded.  When he approved the incident report, he knew
Mr. Starr had been stabbed on multiple occasions and was desirous of
prosecution and had identified the perpetrator, but Lt. Gonzalez did not
follow up with the Jail Investigative Unit nor request an interview of Mr.
Starr to determine if the crime of attempted murder should be prosecuted.

5.     Lt. Gonzalez knew of ongoing racial tensions at this facility as he had
been employed there for years when other inmates had been killed due to
security failures by deputies and sergeants who had permitted
unauthorized inmates to enter, unmonitored, through the many gate
checkpoints in 2000 floor, in modules 2400 and other modules in 2000, and
through the row gates onto the cell gates.  (Prior death reviews: Tinajero,
Cochran, did not receive any communications from Sheriff BACA or anyone
from LASD re: racial, inmate on inmate violence, or any training sessions
organized by LASD.)

## Captain John Clark, Facility Commander

1.     Captain John Clark was the Facility Commander at the jail when
Plaintiff was attacked.  His duties included to know of problems in the
facility and to ensure that his subordinate lieutenants and sergeants are
taking appropriate corrective action in situations caused by lapses in
security.  His duties included talking to them about the policies and
procedures and making sure that safety of deputies and the inmates was a
paramount concern of subordinate lieutenants and sergeants when they
were walking the floors and doing their supervisory duties.  The sergeants

were to do shift training with their people on a variety of policies, including Title 15 deputies.

2.      In this case of the attempted murder of Starr, Capt Clark could not recall what he did regarding the supervisory performance of Lt. Gonzalez and Sgt. Inge or the security lapses caused by Garibay, although he signed the incident report and the injury report prepared by Christina Martinez.  He testified that the Title 15 logs must identify significant incidents within a module, such as an attempted murder with significant injuries, or an inmate taken to the hospital.  He should have been called/advised by Lt. Gonzalez and he would have to report the incident to his commander. He had previously counseled Lt. Gonzalez that his responsibilities were not being met, but that report was purged after a year.

3.      Contrary to Sgt. Inge, both Lt. Gonzalez and Capt. Clark testified that an inmate selected to be a trustee had to be screened for security classification level and approved in writing by the Sergeant.  An inmate accused of murder could not be a trustee.  This policy change went into effect in 2005 (Exh. 56 - Minutes of the County criminal Justice Committee of February 15, 2006), and Sgt. Inge was not aware of the policy.  Yet, one of the trustees noted in the Title 15 logs as a trustee was inmate Gascon, who was charged with murder .Sgt. Inge was required to sign the Title 15 log approving inmate trustee workers for his shift, but he did not.

4.      Part of Capt. Clark's duty was to attend death reviews for incidents, such as an inmate being murdered at his facility.  The death reviews were attended by upper command staff and many other LASD and OIR representatives to determine what had happened, whether any policies or procedures were violated and what, if any, corrective measures were to be taken to avoid future repeats of incidents.  He would also review the homicide investigations of the murders.  Some of his other duties were to review Government Code claims of injuries or deaths occurring at the jail, and any lawsuit complaints, and to investigate and take corrective measures for meritorious claims.

5.     At the time he became captain of the facility, he met with his predecessor and with his superiors and became informed of the facility history.  The following is a brief summary of a few examples of the cases from which Capt. Clark had notice of the ongoing monitoring and ongoing supervisory problems at the jail, and the issues raised in the investigations of these cases.[4]

6.     Capt. Clark and Lt. Gonzalez agree that the importance of being informed of incidents of violence and inmate on inmate violence in their facility, provides the supervisors with notice of ongoing facility problems requiring corrective intervention.  The following killings over a period of years, for example, provided them and Sheriff Baca notice that corrective measures in lapses of supervision and monitoring of inmates was ongoing and unremedied.

**Internal Notices of LASD Failures of Lapses of Security, Failure to Supervise and Investigate:**

**July 2002, Ramon Gavira (2000 Floor)**: is a precursor beating and death at the MCJ 2000 Floor. Mr. Gavira was arrested for DUI, on July 6, 2002, and in LASD custody on July 9, 2002.  Although intake screening at LASD ordered he be placed in a pill module to receive medication, treatment and psychotherapy, Instead, he was housed in 2000 floor. On July 11, 2002, he had a court appearance and was ordered released from custody, but for unknown reasons, he was again taken to the 2000 floor.  His body was discovered late that night in an isolation cell (2700-26) hanging.  According to forensic evidence on autopsy, he had been severely beaten over approximately two days before his death, had three broken ribs, severe bruising throughout his body.  The homicide investigation interviewed inmate witnesses who specifically reported seeing deputy Anel Manriquez using excessive force on Gavira and being present before he allegedly committed suicide, as well as two unidentified trustees were in the row. It was disputed whether he committed suicide or was murdered.  (Of note, on

---

[4] These are discussed in greater depth below.

August 13, 2002, forty (40) top LASD and COUNTY employees attended Gavira's Death Review, including the Office of Independent Review (OIR), Messrs. Gennaco and Jones.)  No investigation of the deputy alleged misconduct or the cause of the severe beating was investigated.  However, the December 2007, OIR's public report stated that it first was asked to investigate the Gavira matter after May 2006.

**The Hong Murder – October 2003 – (location 2000 Floor):** On October 21 2003, inmate Ki Hong ("Hong") was killed by three inmates who entered the dayroom where Hong was housed.  Inmate Hong was stabbed, beaten and strangled to death approximately 1½ hours after he arrived at his housing in Men's Central Jail. (OIR Homicide Report, p. 14).  Inmates Lee and Cho allegedly killed him while inmate Chung acted as lookout and while the other 57 inmates housed in the dayroom undoubtedly looked on. This was the first of five inmate-on-inmate killings that occurred in the jail system over a six month period. Four of the killings occurred in the Men's Central Jail, and one in the Inmate Reception Center next door.  Numerous violations were noted:

**Reported Violations:**

- Inmate Lee was not eligible to be an Inmate Worker and should have been removed from that status when information that he was a suspected drug dealer was discovered. (Id. at 4)
- Inmate workers Lee, Chung and Cho were not supervised or accounted for following their early morning work shift. (Id. at 5, 15.)
- The control panel providing access to the dayroom was not properly secured. It is unclear whether the door covering the control panel was left open or closed. However, even if closed, the panel is vulnerable to a persistent inmate.(Id at 5, 16.)
- Adequate safety checks were not made of the inmates housed in the dayroom. (Id. at 5, 17).
- An inadequate evening inmate wristband count was performed. (Id. at 5, 18).
  Of note, this investigation revealed that inmates in the 2000 Floor were reporting large amounts of money going in and out of their inmate accounts, that drugs were being sold on that Floor and that

supervisors were trying to discover the identity of the employee that was bringing the drugs to these inmates.

**The Prendergast Murder – December 2003:** Inmate Prendergast was beaten periodically over several hours from about 6:00 p.m. December 6, 2003, to early next morning by inmates Newell and Ferman, two of his three cellmates. (OIR Homicide Report, p. 18). Newell and Ferman had been drinking  "pruno" before they attacked and had shown irritation when Prendergast exhibited strange behavior and talked to himself.  Numerous violations were noted:

**Reported Violations:**
• 	The evening wristband count was not properly conducted. (OIR Homicide Report, Id. at 6, 19.)
• 	Custody personnel did not search the cell row frequently enough. (Id.);
• 	Custody personnel misrepresented events in their reports;
• 	The crime scene should have been preserved after homicide bureau was called in. (Id. at 7, 20)
• 	Suspect inmate Newell should not have been released from jail without notice to homicide bureau. (Id. at 7, 21)

**The Alvarado Murder – December 2003:** On December 9, 2003, inmate Mario Alvarado, aka Victor Cortez, was killed in a holding cell at Custody Line Inmate Reception Center ("IRC"). (OIR Homicide Report, p. 21). He had previously been housed at the Men's Central Jail ("MCJ") and was awaiting transfer to the Pitchess Detention Center ("PDC"). A short time after he arrived at the IRC Custody Line holding cell, which contained 40 inmates, he was attacked by one or more other inmates, who punched and kicked him until he lost consciousness and continued to beat him afterward. Two Transportation Services Bureau ("TSB") deputies failed to see Alvarado's dead body because it was partially concealed under clothes and trash behind a three-foot privacy wall in a toilet area. Apparently, they called out his name from the list, but when Alvarado did not respond, they apparently assumed he had never been placed in the cell. Approximately

seven hours after his assault, and killing, a worker inmate cleaning the cell discovered his body and notified IRC deputies.

**Reported Violations:**

- Hourly safety checks were not performed or documented at IRC (Id. at 7, 22);
- Due to failures to accurately account for inmate Alvarado's movement from MCJ to the Custody Line IRC Holding Cell where Alvarado's assault occurred, Alvarado's body was not found until seven hours after he was assaulted (Id. at 8, 24); and,
- Placing high numbers of inmates inside the Custody Line IRC Holding Cell where Alvarado was assaulted may have blocked the deputies' view of the assault (Id. at 8, 26).

**Beating of Jose Beas - December 13, 2003 (2000 Floor):** Beas was beaten in his cell in module 2600 and left with brain damage and in a coma: again, lapses of monitoring and security were contributing factors. Inmates Ahmad Burrell, Rory Fontanelle, and Aaron Cunningham were attacked over a three day period, sustaining serious injuries, Burrell was attacked in his housing dorm twenty-four (24) times, resulting in serious and permanent injuries.

**The Faye Murder – January 2004 (2000 Floor):** On January 12, 2004, inmate Kristopher Faye was stabbed to death by several inmates with jail-made knives on the lower tier of his module after he lowered himself down from the upper tier balcony and attempted to use the phones. (OIR Homicide Report, p. 27). Faye was black; the alleged attackers were Hispanic. Fighting ensued between the two racial groups which resulted in a racial disturbance.

**Reported Violations:**

- Allowing all cell gates in the module to remain open increased the danger of violence and was in violation of LASD policy (Id. at 9, 27);
- The use of O.C. spray to quell the disturbance was a use of force that required reporting (Id. at 9, 28); and,
- Inmates of high and low security designation were improperly mixed in the Module (Id. at 9, 28).

6c03f66b09579350

**The Tinajero Murder – April 2004 (2000 Floor):**On April 20, 2004, inmate Raul Tinajero was killed in his cell in the Men's Central Jail, allegedly by inmate Santiago Pineda. Based on the investigative report, fourteen (14) LASD employees were found to have violated various LASD policies and were disciplined. (Office of Independent Review Report on the Los Angeles County Jail Homicides ("OIR Homicide Report"), Fall 2004, p. 29).

**Reported Violations:**

- Due to monitoring failures, Pineda was able to improperly leave his cell without being detected (Id. at 10, 31);
- Due to monitoring failures and inadequate procedures with regard to the escorting of inmates, Pineda was able to enter Tinajero's cell unchallenged (Id. at 11, 33);
- There was insufficient monitoring of Tinajero's cell during the five hours that Pineda was in the cell (Id. at 11, 34);
- There was inadequate follow up when Pineda was found in a restricted area, in particular the failure to write a disciplinary report against Pineda and on two prior occasions, allegations of inmate misconduct against Pineda were inadequately addressed (Id. at 11, 35);
- The Training Sergeant at Central Jail was unfamiliar with the most basic of LASD policies (Id. at 12, 37);
- On at least two occasions, Pineda was designated as an inmate worker (Id. at 13, 38); and,
- Insufficient attention to the subsequent housing of inmates involved with these proceedings. (Id.)

6.      Capt. Clark agrees that in "Tinajero case there were similar lapses of security which were the moving force of inmates reaching Mr. Tinajero and killing him"  (Clark Deposition  p. 212:7-12.)

7.      Capt. Clark agrees that  these lapses in security resulted in lapse of reasonable security to inmates which caused the killing of Tinajero.  He also agrees that it is the duty of lieutenants and sergeants to make sure that staff is complying with OIR recommendations and policies.  He agreed

that he needs to know the recommendations and policies to stop continued lapses of failure of deputies to provide reasonable security to inmates.  He agrees that these cases indicate insufficient monitoring and of deputies failing to keep their eyes open and supervise activities going on during their particular watch. Another problem Capt. Clark identified was that inmates were not being properly disciplined for wrongful conduct so that they don't continue committing wrongful conduct.  That is what happened in this case.

8.     As in Hong and Tinajero, here, Sgt. Inge was not familiar with basic policies and procedures in his floor .  (For example, Sgt. Inge did not know the policies regarding selection of inmate workers, the fact that he was mandated to approve such selection and to document his approval in the Title 15 logs.)  Capt. Clark testified that it is a custody captain's job to know of problems to make sure sergeants and lieutenants are taking appropriate corrective action in lapses of security.

**McNamera Beating- June 7, 2005**: a deputy (Timothy Schultz) was assigned to a staff station to monitor and supervise four housing units, each of which was holding 70 inmates.  He admitted to abandoning his assigned post (as had his colleague in the adjacent module), during which time a number of violent Hispanic jail gang members repeatedly attacked Sean McNamera over an extended period of time directly in front of Schultz's empty observation station, in full view of approximately 65 other pre-trial detainees.  Shultz could have  called for a back-up or a prowler to replace him, but did not do so.  McNamera suffered permanent brain damage and multiple other injuries and is totally disabled.  As in this case there was no administrative investigation into why the deputy caused this lapse in security, and his sergeant and lieutenant never questioned Schultz or reported how or why the deputies had abandoned their posts.

**Cochran Murder-November 16, 2005: (2000 Floor)**:  Mr. Cochran was found in 2400 day room, three months and two weeks prior to Mr. Starr (the same module as Mr. Starr's attempted murder on February 27, 2006). Cochran, a mentally ill inmate was left unattended in a locked day room with violent Hispanic gang members classified as "high risk".  Deputies

responsible for the safety and security of these inmates failed to check his red wristband identification. It was found that again deputies abandoned their supervision responsibilities leaving the inmates locked behind a windowless door for over 20 minutes while Cochran was beaten with feet, fists, and trays.  The deputy control booth was 10 feet from this room, and Cochran and other inmates were screaming for help. The deputy booth, against policy, had been abandoned: the Floor Sergeant had failed to train and to monitor her subordinates.

9.     Capt. Clark agreed it was LASD policy that a module officer has to be in the cage.  He stated that the practice and requirement is "there is always somebody in the cage."  There are other prior incidents of monitoring failures of deputies and sergeants in the 2000 floor, of which Capt. Clark would have known. Clark knew that <u>half of the killings</u> in the Men's Central Jail (MCJ) occurred in the 2000 floor.  (Depo Capt. Clark p. 248; 249:20-24.)  However, he did not know why and he never requested an external investigator on lapses of security in 2000 floor.

10.     Capt. Clark also knew that the general issue throughout all these killings was a lapse of security – "a personal lapse of somebody not doing what they were supposed to do - they were derelict in performing their duties."  As of 2005 he was aware of the racial tension at MCJ.

11.     Lt. Gonzalez approved the Incident Report in the Starr matter, and he documented it in his Watch Commander Log, but he took no further action to determine how another lapse of security had occurred under his watch, and in the very module where just two months prior the jail had another killing (Cochran) also due to deputies and sergeants failing to provide reasonable security to the inmates.  Lt. Gonzalez was informed about prior similar incidents.

### Review of Past Warnings of Repetitive Serious Constitutional Violations and Lax and Lapses in Supervision

1.      I have reviewed many formal evaluations of operations of the Sheriff's Department presented to the County of Los Angeles, L.A.S.D. and Sheriff Baca, which, in my opinion, support my conclusion that the County, LASD, Sheriff Baca, Captain Clark and Lt. Gonzalez have permitted and condoned and ratified practices of deputies by:

- tolerating and condoning a pattern of lax discipline that results in
- continued incidents of inmate on inmate attacks, physical abuse and mistreatment of inmates; and,
- tolerating and condoning a pattern of lax discipline that results in physical abuse/mistreatment of inmates.

## 1997, DOJ'S CRIPA Report Established That the Jail Violates the Inmates Constitutional Rights[5]

 **(A)** A Report by the U.S. Department of Justice, Civil Rights Division, Washington, DC, entitled: "Regarding CRIPA, Civil Rights of Incarcerated Persons Act, Investigation of Mental Health Services in the Los Angeles County Jail"dated September 5, 1997.  This report began with investigations in August 1996, by the DOJ Civil Rights Division into the conditions at MCJ because inmates were complaining about mental health and "access to medication."

**(B)** The DOJ'S CRIPA Report's findings and conclusions established that mental health care at the jail violated the inmates' constitutional rights.  It found "unconstitutional conditions exist at the Los Angeles County Jail," including abuse of mentally ill inmates by sheriff's deputies working in the jail; abuse by correctional staff; abuse by other inmates; and **does not adequately investigate allegations of such abuse when it occurs**." For example it reports that "Two female deputies" had beaten an inmate, but despite the evidence no investigation was done.

## The CRIPA Report Leads to Baca Agreeing to and Signing the "Memorandum of Agreement"(MOA)

---

[5] The CRIPA Report is available upon request.

**(C)** The follow-up document to the U.S. Department of Justice' CRIPA Report entitled: "Memorandum of Agreement Between the United States and Los Angeles County Regarding Mental Health Services at the Los Angeles County Jail"("MOA") was developed under threat of a lawsuit by the DOJ. County, and Baca personally, signed the agreement to address the violations of constitutional rights of inmates and agreed to the MOA with the DOJ. The MOA states at ¶43: Allegations of abuse of mentally ill inmates or inmates in mental health housing **shall be promptly and thoroughly investigated**."

**(D)** Following are a few Examples of Summary Information reported to The County, LASD and Sheriff Baca by Los Angeles County Special Counsel Merrick J. Bobb; Office of Independent Review; and by Staff Police Assessment Resource Center (PARC).
http://www.parc.info/los_angeles_county_sheriffs_department.chtml )

**The Los Angeles County Sheriff's Department, 18th Semiannual Report (August 2004):** describes an increasing level of inmate violence in the jails (p. 27). The rate of disturbances found to be troublingly high in 2003 remained so through March of 2004. (Id.)

•**Report by the District Attorney of the County of Los Angeles (August 2004):** The District Attorney reported that the inmate workers in the housing modules are selected by deputies assigned to the module in which they are housed.  Although there were standardized qualifications/restrictions placed upon the inmates, the unit policy is seldom, if ever, utilized, resulting in no uniformity in selection process of module inmate workers (trustees). The result was that in "most cases the module inmate worker makes "recommendations" to be affected by influential inmates housed upon the module row, thus rendering the inmate worker selected more answerable to the demands of the inmate leaders than ….to the deputies in charge of the module."
•    that  housing module workers be selected in the County Jail System;
•    standards and procedures be adopted to identify dangerous inmates and preclude them from being inmate workers;

- that the housing module inmate workers be housed with the inmate workers in the "9000 floor";
- all inmate workers be escorted to and from work;
- that inmate workers be clothed in green jumpsuit like any other inmate worker.

On February 15, 2006, the LASD reported that it had accomplished changes in policy in 2005, which included the following:  (Exh 55)

- that inmate workers must be screened and approved by the floor sergeant;
- screening consist of reviewing the inmate's current security level and discipline history in jail;
- disqualifying factors were prior assaults, serious acts of insubordination; and a security level 8 and 9;
- this information must be logged daily;
- variations from guidelines required Watch Commander approval at the permanent rank of Sergeant or above;
- Unit Commanders have discretion to make the criteria more restrictive but not less restrictive;
- Inmate workers cannot be used as messengers of sensitive inmate information.

**The Los Angeles County Sheriff's Department, 21st Semiannual Report (March 2006):** In 2002-2003, the Department had nearly 100% untrained and undervalued staff, resulting in a lackluster training program for custody deputies (p. 52) The Office of Independent Review Public Report on Los Angeles County Jail Homicides, Reported a String of Inmate on Inmate Murders, Due to Lapses or Lack of Monitoring and Lack of Supervision (PublicRpt-LACOJail-Homicides-Fall04pdf) http://www.laoir.com/Reports.html – which reported the string of killings  (as described above), which also gave notice of ongoing security lapses.

1.     I have reviewed reports by Office of Independent Review: Oversight Report 1st Quarter 2007, (IAB-Master-Chart-1stQt2007.pdf), dating pre this incident and after this incident.  These reports continue to give notice to

LASD, Sheriff Baca and the County of Los Angeles, of deputies abandoning their posts, failing to properly classify, failing to monitor, falling asleep, not following procedures, failing to conduct timely security checks, deputies left inmates unsupervised, including deputy use of excessive force, and deputies encouraging inmate on inmate fights.

2.     I reviewed the results of a summary of the inmate on inmate major incidents of violence at MCJ produced in discovery in this case.  Of note, Capt. Clark reported in his deposition that he and LASD knew that half the killings at the MCJ occurred in the 2000 Floor, but he did not know why.

3.     **Review of Data:** This history, findings and reports, coupled with Facility Automated Statistical Tracking System (FAST) data tracking inmate major incidents of assaults for the time period of March 23, 2003 through February 1, 2006 at MCJ, reveals that of the total number of jail-wide incidents, 24% occurred in the 2000 floor; coupled with Capt. Clark's testimony that he knew that 50% of the killings occurred in the 2000 floor; the Watch Commander's Daily Activity Log for the time period January 2004 through June 2006, referencing inmate major assaults at MCJ, reveal that 33% of the total were occurring in the 2000 floor; is particularly troubling as the records, reports and investigative findings indicate that the problems are endemic, repetitive and remain unabated.

## VIII.  SUMMARY OF OPINIONS

1.     Based upon my experience in doing audits of many state and county custody facilities, on behalf of either private or government entities, this is a staggeringly unacceptable number.  And when viewed from the perspective that in the incidents of *Gavira, McNamera,* and in this case, the incident was not reported at all, the gravity of the continuing failures of the supervisors at the MCJ in Los Angeles County to enforce the policies, procedures, orders, and findings of government agencies, the District Attorney, and including their own investigative bodies, is shocking, and clearly shows deliberate indifference to the safety and welfare of the jail detainees.

2.     Los Angeles County, LASD and Sheriff Baca had been informed and placed on notice of continuing conditions which directly contributed to the severe beating and stabbing of Mr. Starr.   Language within the excerpted and cited paragraphs of the various Reports, which directly describe continuing lapses of security and failures to investigate and take appropriate action to train, supervise, reprimand or discipline not only line staff, but more importantly, the sergeants, lieutenants and captains working in the jails, has been underscored to highlight direct relevance to this case concerning Mr. Starr.

3.     The reports by Special Counsel Merrick Bobb, of his attorneys at OIR, and PARC, gave the County, LASD and Sheriff Baca clear notice of reported endemic, ongoing violations, practices, policies, of the existence of conditions which created potential violations by his staff, and which led to inmate-on-inmate violence, resulting in many murders and brutal beatings. The reports gave him notice that the incidents resulting in deaths and brutal beatings, which included gang related killings and beatings, many times occurred due to deputies abandonment of their assigned positions, failure of deputies to timely monitor, and the failure of supervisors to supervise their deputies and to take corrective measures.

4.     These ongoing and unabated problems reveal that the County, LASD and Sheriff have a custom of tolerating inmate on inmate violence, caused by lax supervision; a failure to train line personnel in reasonable security procedures and a practice of not investigating; not disciplining deputies and supervisors; not ensuring training regarding corrective measures are enforced.   Most troubling, despite these explicit warnings and notices, Sgt. Inge, Lt. Gonzalez and Capt. Clark all testified in deposition that the Sheriff did not undertake any actions before this case to direct his facility supervisors or lieutenants to target the ongoing patterns and practices stated above.

5.     The County, LASD and Sheriff's failures to investigate, institute new policies and procedures, to ensure compliance with corrective measures, or

to discipline, condones, ratifies and encourages the ongoing violations and dereliction of duty and wrongful conduct to go unabated, and results in the dereliction of the entity's duties and responsibilities.  Sheriff Baca, is the policy maker for the County Jails and LASD: he has the responsibility to take corrective and remedial actions, and to ensure that his staff is following his directives.

6.      The failures of Lt. Gonzalez and Capt. Clark to investigate the Starr incident; to take corrective measures, and to discipline Deputy Garibay and Sgt. Inge for dereliction of duty for not knowing the most basic policies and procedures regarding inmate security, which in this case resulted in yet another beating and stabbing of an African American man, demonstrates a disregard for the security and safety of inmates which they were mandated by law  to protect and keep safe.  By their failure to take such minimal measures they are the link which allows the inmate on inmate violence at LASD to continue.  Their failure to discipline Dep. Bugarin for not reporting her use of force and for using excessive force when an inmate was handcuffed on the floor, further reflects their failure to supervise their subordinates.  This is most troubling, considering that both learned of this incident through the chain of command, and both knew of the ongoing history of inmate on inmate violence particularly in the 2000 Floor, and both failed to take any action to investigate this incident.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is correct and based upon my personal review and knowledge of the facts stated herein.

Executed on October 15, 2009, in Salem, Oregon.

/s/ George E. Sullivan

George Earl Sullivan