UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DION STARR,<br><br>        Plaintiff,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, et al.,<br><br>        Defendants. | **CASE NO. CV 08-00508 GW(SHx)**<br><br>**[HON. GEORGE WU]**<br><br>DECLARATION OF LT. ROGER A. CLARK |

I, Roger A. Clark, declare that if called as an expert witness herein, I would competently testify to the following:

**Documents Reviewed:**

1. I received and studied hundreds of pages and many documents provided to me for review regarding Deputy Garibay, Deputy Bugarin and Sgt. Inge. These documents include the following:

   a. January 27, 2006, incident report regarding Mr. Starr, including injury reports; depositions of Deputies Bugarin, Garibay, Solano, Montez, Magadan Martinez, Sgt Michael Inge, Lt. Alfred Gonzalez, Capt. John Clark, Dion Starr and exhibits thereto; Title 15 logs, deputy check logs, watch commander daily log, discipline records for inmate Sandoval and

Veloz; housing logs for Row A and B in module 2400, multiple policies and procedure at LASD, the District Attorney Final Report (August 2004) including minutes of February 2006 countywide criminal justice; coordination committee, and a D.A. report regarding inmate at LASD; pertinent excerpts from the U.S. Department of Justice, Civil Rights Division, Office of the Assistant Attorney General, Washington, DC 20035 "CRIPA Investigation Of Mental Health Services in the Los Angeles County Jail"; page excerpts from "Memorandum Of Agreement Between The United States And Los Angeles County, pertinent reports from Semiannual reports from Special Counsel Merrick J. Bobb and from Sheriff Baca's attorneys; the Office of Independent Review; and Staff Police Assessment Resource Center (PARC), involving inmate on inmate violence and lax discipline January 1, 2004 through June 1, 2007; pertinent reports from the Special Counsel to Los Angeles County on inmate on inmate violence and racial riots; classification problems and problems in the jails and lax discipline November 1, 2003 through December 1, 2007.  I further performed a site inspection of Module 2400, 2400 B row and the cells, and of module 2700 (isolation).

b. I also considered the following POST documents:  POST Learning Domain # 1, "Leadership, Professionalism, and Ethics;"  POST Learning Domain # 2, "Criminal Justice System;" POST Learning Domain # 5, "Introduction to Criminal Law;" POST Learning Domain # 20, "Use of Force;" POST Learning Domain # 30, "Preliminary Investigations;" and POST Learning Domain #31, "Custody."

**My Qualifications for Reviewing this Case:**

2. I am a twenty-seven year veteran of the Los Angeles County Sheriff's Department (LASD).  I was hired on December 1, 1965, and I retired from active service on March 31, 1993.  My career included six years at the rank of Deputy Sheriff, six

1    years as a Sergeant, and fifteen years as a Lieutenant.  I hold a California POST
2    Advanced Certificate, and I am a graduate of the POST Command College (class
3    #5).

4  3. During the course of my service with the department I had a wide range of duties
5     including jail deputy, patrol assignments as a field officer, field supervisor, station
6     watch commander and commanding officer.  I was a field training officer while
7     assigned as a patrol deputy and trained new officers in POST and department
8     approved apprehension techniques and emergency procedures.

9  4. Among other assignments as a Sergeant, I helped organize the Sheriff's
10    Department's Emergency Operations Bureau as one of four sergeants assigned to
11    that bureau.  As such, I helped to develop training material and departmental
12    orders regarding the proper police response to a wide range of emergencies,
13    including demonstrations.  During that time, I also participated in the planning for
14    the annual Rose Bowl Parade, and, as the assigned Personnel planner, wrote much
15    of the Operational Plan for that major event.

16 5. As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles
17    County Sheriff's Department's Patrol School which taught the POST accepted
18    investigation and apprehension methods.

19 6. During my assignment as the Administrative Lieutenant of the Department's
20    Reserve Forces Bureau, I supervised the training of reserve officers at our Reserve
21    Training Academy who were also taught proper investigation, apprehension
22    methods and emergency procedures.  I also lectured the Reserve Academy on the
23    POST syllabus: "The Legal and Moral Use of Force and Firearms."

24 7. During the last five and one-half years of my career, I commanded a specialized
25    unit known as the North Regional Surveillance and Apprehension Team
26    (NORSAT), which was created to investigate, locate, observe and arrest major
27    (career) criminals.  I held this position until my retirement from the Department on
28    March 31, 1993.

8. Criminals investigated and arrested by NORSAT included suspects involved with homicide, robbery, kidnaping, extortion, burglary, and major narcotic violations. Arrests frequently occurred in dynamic circumstances including while serious crimes were in progress.

9. My unit also conducted major narcotics investigations including undercover narcotics buys, buy - busts, and reverse stings. We frequently deployed at the request of investigative units such as Narcotics which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilo quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars. We invariably arrested suspects as the result of these surveillance or apprehension operations. Dynamic entries into residences were within our capabilities. However, the decision to do so was always weighed against other, much more desirable and less dangerous methods of arrest and seizure. Additionally, a complete investigation of the location to be entered and all occupants was mandatory.

10. During the first three months of my command of NORSAT, the unit had three shooting incidents. Since that time, and over the next five years of my command, NORSAT established a remarkable record of more than two thousand arrests of career criminals without any shots fired - either by my officers or by the suspects whom we arrested. Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension.

11. This record of excellence was accomplished through proper tactics, management and supervision of personnel, training in correct apprehension methods and adherence to the moral and ethical standards endorsed by California POST and my Department. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

12. As a result of my position and record as the commanding officer of NORSAT, I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remains in force today, without change, and includes the basic standards and considerations investigative officers must comply with in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

13. I was a Watch Commander and a Lieutenant, among other things, I responded to, investigated and reported on officer involved shootings. I have also been assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

14. I have qualified and testified as an expert in many cases both in state and federal courts regarding jail procedures and jail administration in matters involving claims of inmate on inmate violence, jail security, investigations of crimes committed in jails and supervision of custody personnel. As well as working at Men's Central Jail, I have conducted site inspections of the Men's Central Jail many times since my retirement from LASD and did so in this case.

15. I testified as an expert on police procedures, police tactics, use of force, methods of arrest, investigative procedures, shooting scene reconstruction, jail procedures and jail administration, and police administration in California Courts, Washington State Courts and Federal Courts in California, Texas, Colorado, Indianapolis, and Washington. I have testified before the Los Angles Police Department Board of Rights, and the Harris County (Texas) Grand Jury. I have also submitted written opinions in matters before Alaska, Idaho, North Carolina, Pennsylvania and Wyoming Federal and State Courts.

16. I have testified numerous times regarding the standards taught to every POST certified officer regarding the purpose, methods and limits of the use of force by the police. I have never been excluded as an expert on any matter for which I have been retained.

**Overview of Events.**

**Deputy Jose Garibay.**

17. On January 27, 2006, Deputy Garibay was assigned to monitor module 2400 B Row control booth. His duties were inmate security and safety, watching and listening to the inmates, doing security checks and to document any occurrences of significant events in the module "Title 15" book.

18. Deputy Garibay controlled access and egress to Row B by standing in the control booth gate and opening gates with a series of levers and electric switches. (I personally attended an inspection of this module and booth.) All defendants knew of prior incidents of inmate on inmate violence and killings at Men's Central Jail (MCJ). Deputy Garibay was informed of a killing in Module 2400 day room in November 2005.

19. This morning, Deputy Garibay was working the a.m. shift assigned to the 2400 B Row gate control booth. He saw numerous inmates (he does not remember how many) seeking to enter Row B, whom he assumed to be inmate workers. They were all Hispanic. He opened Row B gate and allowed them to enter without checking their wristband for identification. Once he let the inmate workers in, from the control booth he was able to look down the entire row and visually monitor the activities of the inmates.

20. However, he did not monitor the activities of the inmates nor does he recall how long they were unsupervised in B Row. He testified that he had no information of how Starr was attacked "because when the incident occurred he was not physically there." (Garibay Deposition p. 78:15-17.) He also testified that it was he who opened the cell gates.

21. Mr. Starr, an African American, was in his Module 2400 Row B-cell 9. He had never been involved in violence nor been disciplined. He stated that he saw the Hispanics gather in front of his cell door talking to the other Hispanics in the adjacent two cells. When the cell gates opened, the Hispanics in the row rushed

|    |     |                                                                                                                                                                      |
|----|-----|----------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 1  |     | into his cell and he and his cell mate began to yell for help. They were joined by                                                                                   |
| 2  |     | Hispanics from the two adjacent cells who used "shanks" (sharpened metal                                                                                             |
| 3  |     | stabbing instruments) and stabbed him 23 times and also attacked and stabbed his                                                                                     |
| 4  |     | African American cell mate.                                                                                                                                          |
| 5  | 22. | Deputy Garibay heard somebody yelled "help" and he broadcast a "415."                                                                                                |
| 6  |     | Numerous custody personnel arrived, including Sgt. Inge the 2000 Floor sergeant,                                                                                     |
| 7  |     | and instructed the inmates to get down on the floor. They obeyed and all were                                                                                        |
| 8  |     | handcuffed without further incident.                                                                                                                                 |
| 9  | 23. | As the deputy in charge of 2400 B Row, it was Deputy Garibay's responsibility to                                                                                     |
| 10 |     | prepare the report of his participation, observations and activities before, during                                                                                  |
| 11 |     | and following this stabbing incident, and to document it in the Title 15 log. He                                                                                     |
| 12 |     | failed to do so and his sergeant failed to order him to do so. He has no memory of                                                                                   |
| 13 |     | reporting in any manner his participation, observations and activities.                                                                                              |

**Deputy Maybet Bugarin**

|    |     |                                                                                                                                                                      |
|----|-----|----------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 15 | 24. | When Dep. Bugarin arrived at Row B, the incident had already happened and no                                                                                         |
| 16 |     | more assistance was needed. "Everything was okay." She saw the inmates                                                                                               |
| 17 |     | already handcuffed and lying on the floor, (Depo 40:24-25 and 41:8-12), She did                                                                                      |
| 18 |     | not handcuff anybody, (41:11-12, and remembers seeing Plaintiff lying on the                                                                                         |
| 19 |     | floor injured with stab wounds. (B:33:25 to 34:1-2).                                                                                                                 |
| 20 | 25. | Mr. Starr testified while he was handcuffed and lying on the floor prone and face                                                                                    |
| 21 |     | down with all of the attackers around him, one of his attackers tried to kick him,                                                                                   |
| 22 |     | and he lifted his head and wanted to move away, and just then Dep. Burgrin                                                                                           |
| 23 |     | kicked him in the face, while saying, "Nigger" get down. Starr testified that Dep.                                                                                   |
| 24 |     | Bugarin wrongfully and maliciously kick him to his face and nose for no reason,                                                                                      |
| 25 |     | and that her kick to his face was intentional and not an accident. (Depo Starr **)                                                                                   |
| 26 |     | Dep. Bugarin testified that she may have had contact with Plaintiff, but she just                                                                                    |
| 27 |     | doesn't remember and her mind is empty of any recollection. (B 45:22-24.). On                                                                                        |
| 28 |     | the day of this incident, she was wearing "Denner work boots" (Depo B 46:3-15.),                                                                                     |

1  which are steel toe boots.
2  26.  Defendants' Injury Report indicates that Starr was "bleeding from the nose and mouth." (defs exhibit J 1013) Dep. Bugarin testified that she was one of the movement persons who would be responsible for moving Plaintiff and she would have interaction with him. (B 79:10-17.) Mr. Starr alleges that after he returned from the hospital to jail on January 27, 2006, he was put on isolation for no reason, and that Deputy Bugarin denied him access to medical care for his nose. During this time, Deputy Bugarin saw him there and said he was there pending a sergeant review (which Plaintiff never got). She testified that isolation is called "the hole because it jams up your stomach. It is just four walls. It is small. .... and you get no privileges." (B 68:21-24) The only persons Mr. Starr could "talk to whoever else might be down the way in the hole." (b 69:21-22.)
3  27.  On February 2, 2006, he was seen at the clinic and he reported, "I have a broken nose, I was kicked in the face by custody." (Def's Exh. K p. ). Mr. Starr alleges that thereafter he had to obtain a Court Order to get further care for his nose. On 2/7/06, he got and Order: "Starr has a broken nose and needs medical treatment." (Exh. 20) On 2/9/06, @ 12:52, a nurse noted that "Deputy Bugarin was notified again that inmate needs to be taken to the clinic to be evaluated by Dr. Vyden." The records reflect that Starr was not taken to the clinic until the following day 2/10/06, @ 2:27 p.m., "the deputy kicked me in the nose 14 days ago. I told the nurse about it but nobody listens to me. My nose is getting worse and I can't breathe". The clinician noted: "redness and swelling noted on the nostrils. Patient breathes [sic] through the mouth." (Def K 1195)

**Floor Sergeant Inge.**

28.  Sgt. Inge was the 2000 Floor sergeant present and the immediate supervisor who responded to the incident in Row B. As he was present it was his duty to approve the incident report, to ensure all evidence was preserved, however he failed to do so. The incomplete incident report was approved by the next shift sergeant, who

|   |   |   |
|---|---|---|
| 1 |     | was not present during this incident. |
| 2 | 29. | Sgt. Inge took no steps to determine who opened the B Row gate and cell gates, |
| 3 |     | why the unauthorized Hispanic inmates where inside the row.  He testified that he |
| 4 |     | would not necessarily have wanted to know who opened gates.  He never |
| 5 |     | discussed the incident with Deputy Garibay or Bugarin. |
| 6 | 30. | Sgt. Inge failed to supervise his subordinate Deputy Garibay for failing to follow |
| 7 |     | LASD policy and procedure that inmate worker trustees should not be on a row at |
| 8 |     | the time any cell gates are to be opened.  Sgt. Inge failed to follow policy which |
| 9 |     | required the sergeant on duty to approve in writing, in the Title 15 log, the |
| 10 |    | selection of inmate workers trustees. (Exh. Policy 5) Contrary to Sgt. Inge, both |
| 11 |    | Lt. Gonzalez and Capt. Clark testified that an inmate selected to be a trustee had to |
| 12 |    | be screened for security classification level and approved in writing by the |
| 13 |    | sergeant.  An inmate accused of murder could not be a trustee. |
| 14 | 31. |  Sgt. Inge was not aware of basic policies although he testified that it was his duty |
| 15 |    | to know them (the policy indeed), (Exh 3) instead, contrary to policy he allowed |
| 16 |    | his deputies to select the trustees, failed to take any corrective measures with Dep |
| 17 |    | Garibay for abandoning his post. (Exh 3 -) |
| 18 | 32. | Sgt. Inge failed to supervise Deputy Garibay to determine why he failed to check |
| 19 |    | inmate wristbands of the persons he let into the B Row (all of whom were housed |
| 20 |    | in Row A).  He acknowledge that LASD policies and procedures require that a |
| 21 |    | deputy should not provide access to anyone who is not housed on that row. |
| 22 | 33. | Mr. Starr states that when he was kicked, Sergeant Inge was present and observed |
| 23 |    | Dep. Bugarin kick him in the face.  Sgt. Inge had a duty to investigate his |
| 24 |    | subordinate and prepare a use of force report as mandated by policy. (Exh 4) |
| 25 | 34. | It was his duty to be "hands on" when an attempted murder occurs on his watch |
| 26 |    | and to question everyone involved or be present as the questioning occurs and to |
| 27 |    | insist that a thorough investigation be conducted.  Because he failed to question |
| 28 |    | Mr. Starr, he was unable to investigate the conduct of Deputy Bugarin, and her |

1  conduct went unreported.  He also knew of ongoing concern at LASD about
2  problems with deputies not reporting things so that their other deputy friends do
3  not get into trouble, yet he failed to fulfill his duty to questioned the persons
4  involved in this incident.

**Opinions:**

1. Deputy Garibay was assigned to monitor the gate control booth of module 2400, Row B, and allowed entry to unauthorized and dangerous inmates who were not assigned to that area of the jail.  Two of the inmates (Veloz and Gascon) had been given "Trustee" worker status in violation of policy.  Another (Cisneros) had absolutely no authorization to enter the row at all because he was housed elsewhere.  Additionally Gascon was a high risk inmate and could not be given "Trustee" status because he was incarcerated on a murder charge.  These actions violated LASD policy and procedure, created a danger for all the inmates in Row B and violated LASD policies and POST Standards.

2. When Deputy Garibay opened the Row B security gate, from his location in the gate control booth cage he was able to see down the entire row to observe the activities of the three or more individuals he let into the row.  Although he was solely responsible for security of Row B, he failed to supervise the inmates in the row, he did not recall how many trustees he allowed into B Row, why he opened the cell gates, or how long the inmates were unsupervised inside Row B because he abandoned his post and went elsewhere in the module while the trustees were left unattended inside Row B.  This violated LASD policy and procedure, created a risk of danger for all the inmates in Row B, and provided the opportunity for the attack that occurred on Mr. Starr.

3. Deputy Garibay then compounded his previous errors and inexplicitly and apparently without looking down the row or shouting warning that the cell gates would be opened, he opened the gates to cells 8, 9, 10, (which included the cell, #9 where Mr. Starr was housed), in front of which the Hispanic gang members had

Page -10-

1 | gathered.  They entered the cell and attempted to murder Mr. Starr and another
2 | African American person in the cell by stabbing them numerous times.  Deputy
3 | Garibay's conduct violated LASD policy and procedure, and POST standards and
4 | violated Mr. Starr's constitutional right to reasonable security and safety.

5 | 4. It is uncontested that Deputy Garibay had left his post in the control booth after opening the cell gate where Mr. Starr was located.  He therefore did not even know that the stabbing of Mr. Starr and his cell mate was occurring "because when the incident occurred [he] was not physically there." (Deposition Garibay, p 78:15-17).  His abandonment of his post at such critical time was a violation of policy and procedure, POST Standards and violated Mr. Starr's constitutional right to reasonable security and safety (as taught by POST).

5. When Deputy Garibay heard somebody yell "help" or "deputy" he summoned assistance and deputies respond to the area immediately.  Deputies instructed inmates to get down and all inmates complied, they then handcuffed all the inmates, including Mr. Starr.  Mr. Starr was lying on the floor, face down and handcuffed.  He had been stabbed 23 times.  Although handcuffed, one of his attacker's tried to kick him.  As Mr. Starr raised his head and top torso to move from the attacker, Deputy Burgrin kicked him in the face as she said, "nigger" get down causing injury to nose.  This was a gross violation of LASD policy and procedure and POST Standards.  It was also a violation of Mr. Starr's right to not be subject to excessive force.  Deputy Bugarin admitted in her deposition testimony that if she had kicked Mr. Starr as described, such would be unconstitutional and criminal conduct.  Deputy Bugarin did not report her use of force, which is a violation of policy.

6. Sergeant Inge who was the Module 2400 floor sergeant at the time of the attempted murder of Mr. Starr failed to affirmatively approve or disapprove in writing the selection of inmate worker trustees stated in the Title 15 log (as Gascon was accused of murder and should never have been designated as a

trustee).  He failed in his duties as the supervisor in this regard.  As stated above, the lack of supervisor oversight created the opportunity for unauthorized inmates to be assigned "Trustee" status and allowed them to roam at will in the module.  This was the enabling cause of the attack on Mr. Starr that occurred.

7. Sergeant Inge's actions in this instance are consistent with a long standing practice of lax supervision, failure to adequately investigate a major crime, failure to approve the incident report for accuracy, failure to speak with any of the victims (including Mr. Starr), failure to secure the area of the attempted murder to secure and identify evidence, failure to video tape the area, and failure to take action to investigate the incident as an attempted murder.

8. Sergeant Inge failed to determine who opened the gate to Row B and three cell gates which provided the opportunity for the attack on Mr. Starr in his cell.  He failed to ask Deputy Garibay any questions about how and why he let the three inmates into Row B with ascertaining their identification.  Although Deputy Garibay was the person in charge of Row B, and who opened the gates to Row B and the cells, it was his duty to prepare a report of what he observed and heard.  However Sergeant Inge failed to require the necessary report from Deputy Garibay.  No report was ever prepared by Deputy Garibay.

9. Mr. Starr states that Sgt. Inge was present and saw when Deputy Bugarin kick him while he was handcuffed on the floor.  As such he had a duty to ensure a use of force report was prepared and to investigate a deputy who is accused of a crime.  His failure to question Mr. Starr about his accusation and investigate is dereliction of duty, violated LASD policy and procedure and as a result, Sergeant Inge and LASD failed to assess the use of force which could lead to having the same misconduct repeated again and again.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on October 15, 2009, at Santee,

Page -12-

California.

_____
Roger A. Clark