UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

| | |
|---|---|
| DION STARR, ) | |
| ) | |
|     Plaintiff, ) | |
|   vs. ) | Case No. CV08-00508 |
| ) |     GW (ShX) |
| COUNTY OF LOS ANGELES; LOS ) | |
| ANGELES COUNTY SHERIFF'S ) | |
| DEPARTMENT; SHERIFF LEROY ) | |
| BACA, IN HIS INDIVIDUAL AND ) | |
| OFFICIAL CAPACITY; DEPUTY ) | |
| GARIVAY BUGARIN; DOE ) | |
| FEMALE DEPUTY RODRIGUEZ; ) | |
| DOE MALE DEPUTY RODRIGUEZ; ) | |
| AND DOES 1 THROUGH 10, ) | |
| INCLUSIVE, ) | |
|     Defendants. ) | |
| _____ ) | |

DEPOSITION OF MICHAEL INGE
AUGUST 27, 2008
LOS ANGELES, CALIFORNIA

REPORTED BY:   KRISTIN VARGAS, CSR NO. 11908, RPR
OUR FILE NO:   08-4474

EXHIBIT 23

1  A  Immediately following the incident, we
2  probably did receive information.
3  Q  But you don't remember?
4  A  No, ma'am.
5  Q  And maybe that information came and maybe it
6  didn't because you don't remember anything about it;
7  right?
8  A  That's true.
9  Q  Okay.  So maybe no information came at all,
10  right, because you don't remember?
11  A  That's possible.
12  Q  All right.  Now, you have no memory of
13  anybody getting killed in Floor 2000; right?
14  A  That's not what I said.  I said that I have
15  a memory of an individual being killed in the jail and
16  that I don't recall at this time that it was on the 2000
17  Floor.
18  Q  Okay.  Do you recall at any time other than
19  this time that it was on 2000 Floor?
20  A  I don't understand.
21  Q  Well, you said "I don't recall this time,"
22  meaning now today that it was on 2000.
23  A  Right.
24  Q  At any point prior to today, did you know
25  that it was on 2000 Floor?

119

1        Q    Sir, you didn't even approve this report.
2    So presumably you didn't see it; correct?
3        A    Yes, ma'am.
4        Q    All right.  So how do you know if any policy
5    was broken or not?
6        A    Well, because I have reviewed the report
7    here several times.
8        Q    Okay.  Excluding today at the time of the
9    incident, did you undertake any action to find out who
10   had been -- who opened the gate if it wasn't DeLaTorre?
11       A    No, I did not.
12       Q    Now, if at the time the gates were opened,
13   they were not opened because it was pill call, would you
14   then want to know who opened the gates at the time of
15   this incident?
16       A    I would want to know more so why they were
17   opened.  And if they were opened without a reason that
18   had merit, then I would be interested in knowing who
19   opened them.
20       Q    Why would you be interested then?
21       A    Because if they were opened for no reason,
22   then we have potentially created a harmful situation
23   without necessity.
24       Q    Okay.  Now, who belongs in Module 2400B?
25       A    I don't understand what you mean.

1       A   I don't know that that's what the policy
2   was. I'm not familiar with that.
3       Q   Okay. You would defer to somebody familiar
4   with that policy?
5       A   Sure.
6       Q   Okay. Fair enough. Because you don't know?
7       A   No, I am not familiar with any such policy.
8       Q   Okay. Did you ever hear that, when trustees
9   were on the freeway cleaning up the floors and bathrooms
10  and whatever, that gates should not be opened when
11  trustees were in the freeway cleaning up?
12      A   As we talked about before on this issue, I
13  have heard that with respect to the fact that it makes
14  it much easier for the trustee to do his job if he
15  doesn't have a bunch of people out there in the way.
16          As far as a policy which requires them not
17  to do that, no, I do not.
18      Q   Okay. It also would be a safety concern
19  that a broom a trustee is holding or using to clean up
20  not be used as a weapon, thus trustees should not be in
21  the freeway when the gates are opened. That would be
22  also an issue of control, wouldn't it?
23      A   Well, it seems more the control issue is of
24  the broom or the potential weapon, rather than the
25  trustee.

```
1       Q   Right, because they could grab the broom
2   from the trustee and hit him; right?
3       A   Yes.
4       Q   So you don't want to have a trustee with a
5   broom or two or three trustees with brooms hanging
6   around in the freeway when inmates are coming out of
7   their cells for purposes of security and safety?
8       A   I don't agree.
9       Q   Okay.  Would you let trustees stand in the
10  freeway with brooms and sticks for -- mops or
11  whatever -- when pill call is made and all the inmates
12  can come out of the cell?
13      A   Yeah.
14      Q   That would be a concern to you?
15      A   Not a concern over any other concern I had
16  in there, no, ma'am.
17      Q   Okay.  And, sir, you had no concern as to
18  whether these gates were open when trustees were in the
19  freeway, do you?
20      A   Well, I have due regard for the safety of
21  everybody there at all times.  But does it heighten my
22  concern because the trustees are on the freeway, no, it
23  does not.
24      Q   In this case, sir, did you ever learn any
25  information that trustees were on the freeway when
```

163

1    A    No.
2    Q    And let me correct that by saying this is
3    not a statement that Mr. Starr gave. You have not seen
4    any statement given by Mr. Starr, have you?
5    A    No, ma'am.
6    Q    You don't know whether or not anyone ever
7    questioned Mr. Starr about this incident, do you?
8    A    I don't know at this time, no.
9    Q    Okay. You don't know whether they took a
10   statement or not because the report would have gone up
11   to somebody else in the investigative unit and then they
12   are responsible, not you?
13   A    That's correct.
14   Q    All right. You don't know if the
15   investigative unit ever went and took a statement from
16   Mr. Starr; right?
17   A    No.
18   Q    You don't know if they ever took a statement
19   from anyone involved in this incident; right?
20   A    No, ma'am.
21   Q    Now, when there is an investigation and
22   statements are taken from witnesses, the investigators
23   are wise enough to tape record those statements;
24   correct? That's the usual procedure; right?
25   A    That is the practice that some investigators

1  use.

2    Q   Yes, because if they just write what the
3  witness said, they are just interpreting what the
4  witness says.  We don't know what the witness says.  We
5  just know how the deputy put it down; right?

6    A   I assume it could be perceived that way,
7  yes.

8    Q   Okay.  So as far as we know anyway, from
9  this report, Deputy Martinez was told by Mr. Starr
10  because she wrote it here in her handwriting that he was
11  attacked.  As far as we know, it was Starr who was
12  attacked according to her statement; right?

13    A   According to what is written here, yes,
14  ma'am.

15    Q   Okay.  If it were true that it was Mr. Starr
16  who was attacked and stabbed 25 times and he was not an
17  aggressor, sir, isn't it true that in the vernacular of
18  criminal conduct, et cetera, that would be an attempted
19  murder?

20    A   Well, not necessarily, no, ma'am.

21    Q   They were just stabbing him 25 times to stab
22  him.  That's not an attempted murder?

23    A   It's definitely an assault with a deadly
24  weapon.

25    Does it rise to the level of attempted

171

1   walking around at any time, a deputy can say, "Let me
2   see who you are," look at the wristband and look at the
3   I.D.; correct?
4       A   Yes, ma'am.
5       Q   And that tells the deputy where that person
6   belongs; right?
7       A   That's correct.
8       Q   Like in a nanosecond, a deputy would know
9   where an inmate belongs; right?
10      A   Well, essentially.  The deputy would have to
11  take the information off the wristband and then compare
12  it to a computer record or log.
13      Q   Or the deputy might work there every day and
14  kind of have an idea after ten or twenty days who
15  belongs where; right?
16      A   Yes, ma'am.
17      Q   If a deputy allows a person who is not a
18  trustee to go into a row where he is not to be living,
19  that would be against rules, policies, procedures?
20      A   Yes, ma'am.
21      Q   All right.  All right.  When you went to
22  sergeant school, did you receive any training and
23  information on ongoing racial violence going on in the
24  jail before you were to be placed there as a sergeant?
25      A   No.

1      A   No, ma'am. I don't have anything to add.
2      Q   Okay. Did you request that any of your
3   deputies or custody assistants get any further training
4   on how to carry on their duties during the day shift
5   under your watch in Module 2400 after the Cochran
6   killing in the day room of 2400?
7      A   Not that I recall, ma'am, no.
8      Q   Did you request that your deputies under
9   your watch have any training or get any information on
10  how they must carry out their duties and
11  responsibilities after the incident that is at issue
12  here on January 27, 2006?
13     A   Not that I recall, no, ma'am.
14     Q   Okay. And you do not remember taking any
15  action to reprimand any of the deputies on duty during
16  the day shift on or about November when Mr. Cochran was
17  killed in the day room of 2400?
18     A   No, ma'am, I don't.
19     Q   And you didn't take any corrective actions
20  after Mr. Cochran was killed in the day room of 2400 to
21  ensure that deputies complied with performing all of
22  their duties and responsibilities to reduce the amount
23  of inmate-on-inmate violence going on in Module 2400?
24     A   I continue to supervise the deputies and
25  expect them to perform their duties as directed.

253