UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DION STARR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) NO. CV08-00508 |
| | ) |
| COUNTY OF LOS ANGELES, LOS ANGELES | )    GW (SHx) |
| COUNTY SHERIFF'S DEPARTMENT, | ) |
| SHERIFF LEROY BACA, IN HIS | )    VOLUME I |
| INDIVIDUAL AND OFFICIAL CAPACITY, | ) |
| DEPUTY GARIVAY BUGARIN, DOE FEMALE | ) |
| DEPUTY RODRIGUEZ, DOE MALE DEPUTY | ) |
| RODRIGUEZ, AND DOES 1 through 10, | ) |
| Inclusive, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

DEPOSITION OF JOHN H. CLARK
Los Angeles, California
Friday, October 24, 2008

REPORTED BY:    STEVEN W. CORNWELL, CSR NO. 7193, RPR
OUR FILE NO:    08-4497

16:23:59 1  the time, what his classification level and his

16:24:05 2  particular Penal Code charge, I can't speak to that.

16:24:07 3  But that's what this would lead you to believe.

16:24:10 4      Q   Okay.

16:24:10 5          This says that the sergeant was disciplined;

16:24:12 6  right?

16:24:12 7      A   Yes.

16:24:12 8      Q   Not just talked to; right?

16:24:14 9      A   Right.

16:24:15 10     Q   It wasn't just that it was a chat and then

16:24:17 11 it was written in some book and purged in a year.

16:24:21 12 The discipline remains in his folder; right?

16:24:24 13     A   Yes.

16:24:24 14     Q   And he was disciplined for knowing that a

16:24:28 15 drug dealer was an actual trustee?

16:24:30 16     A   Yes.

16:24:31 17     Q   So at least learning this information, you

16:24:34 18 as the incoming sergeant know that there is a concern

16:24:39 19 and a problem with allowing --

16:24:42 20         MR. PAZ:  Incoming captain.

16:24:44 21         MS. MERCADO:  Captain.

16:24:47 22         THE WITNESS:  It's all right.

16:24:47 23 BY MS. MERCADO:

16:24:47 24     Q   You as the incoming captain know that at

16:24:50 25 least there now is a problem with allowing a trustee

ALVARADO COURT REPORTERS          197

16:24:52 1  who is a drug dealer, should not be a trustee, there

16:24:56 2  is a problem with classifications of trustees; right?

16:25:00 3      A  Yes.

16:25:00 4      Q  And you know that there is a problem with

16:25:06 5  custody assistants improperly letting a trustee go

16:25:12 6  into the day room without reporting it; right?

16:25:15 7      A  Yes.

16:25:17 8      Q  And then you coming in you also know that

16:25:20 9  now there are systematic recommendations and policies

16:25:23 10  that are going to take corrective measures as against

16:25:26 11  those particular defects in the system; right?

16:25:28 12     A  Correct.

16:25:34 13     Q  Okay.

16:25:34 14         THE VIDEOGRAPHER:  Counsel.

16:25:35 15         MS. MERCADO:  We will change now.  We will

16:25:38 16  change tapes right now.

16:25:40 17         THE VIDEOGRAPHER:  Going off the record.

16:25:41 18  The time is 4:25 p.m. on October 24th, 2008.  This is

16:25:46 19  the end of video number two of the continuing

16:25:49 20  deposition of John Clark.

16:25:52 21     (Brief recess.)

16:33:21 22         THE VIDEOGRAPHER:  We are on the record.

16:35:49 23  The time is 4:35 p.m. on October 24th, 2008.  This is

16:35:54 24  the beginning of tape number three of the deposition

16:35:55 25  of John Clark.

ALVARADO COURT REPORTERS          198

16:40:05  1   Q   Do you know what I'm talking about?

16:40:06  2   A   Crime scene tape?  Yeah, like you see on TV

16:40:10  3   or something, yes.

16:40:10  4   Q   Crime scene tape.  When you put on crime

16:40:10  5   scene tape and you do a search of that particular

16:40:13  6   row, that's a different kind of search?

16:40:16  7   A   Correct.

16:40:17  8   Q   Now, when you do a matrix search, you dot it

16:40:20  9   -- you note it in the matrix schedule?

16:40:23  10   A   Correct.

16:40:23  11   Q   When you do a search in a crime, where do

16:40:25  12   you note the search that you do for a crime scene or

16:40:29  13   after somebody has been stabbed 25 times?

16:40:31  14   A   You note it in the crime report.

16:40:33  15   Q   And what do you note in the crime report

16:40:37  16   regarding the search that takes place at a crime

16:40:41  17   scene?

16:40:41  18   A   You should note what -- that you conducted

16:40:44  19   one, where -- you know, the detail of what and where

16:40:48  20   you conducted and what you found, if anything.

16:40:51  21   Q   And do we have to know who did that

16:40:54  22   particular crime search?

16:40:54  23   A   Yes.

16:40:55  24   Q   Why?

16:40:56  25   A   It's accountability for evidence and if

ALVARADO COURT REPORTERS          203

16:41:01  1  there was evidence found or if there was a question

16:41:03  2  about what, you know, was found or not found, at

16:41:06  3  least you would be able to identify responsibility.

16:41:09  4      Q   And that is a policy and procedure with

16:41:12  5  which whoever is doing the search in a crime scene

16:41:15  6  has to comply with?

16:41:18  7      A   Yes.

16:41:18  8      Q   Okay.

16:41:18  9          And that's part of the process of performing

16:41:21  10  a proper crime investigation?

16:41:24  11      A   Yes.

16:41:24  12      Q   Okay.

16:41:27  13          And at the Sheriff's Department every time

16:41:29  14  that there is a crime within the jail and there is a

16:41:35  15  designated crime scene area, there is an inspection

16:41:40  16  that follows; correct?  Of the area.

16:41:43  17      A   Depending on the circumstances of the crime,

16:41:45  18  yes.

16:41:46  19      Q   Okay.

16:41:48  20          And what happens to that crime investigation

16:41:53  21  inspection report?

16:41:55  22      A   Well, the crime report itself, like you had

16:41:58  23  an example there of the SHAD 49, it would be

16:42:01  24  documented in that or in supplemental reports to that

16:42:05  25  SHAD 49.

ALVARADO COURT REPORTERS          204

16:42:06  1     Q   It would be attached to the SHAD 49?

16:42:10  2     A   Well, normally what would happen is if the

16:42:12  3  deputy writing the original report didn't do it, he

16:42:15  4  might note that Deputy Clark did a search, see his

16:42:20  5  supplemental report for the search results.  And at

16:42:24  6  some point that whole package under that same file

16:42:28  7  number those things would be collected together.

16:42:30  8     Q   Okay.

16:42:30  9        And so if I want to know who did the search

16:42:33  10  at a particular crime scene, I look for the report

16:42:36  11  from that person who did the search, attached to the

16:42:37  12  SHAD 49 somewhere?

16:42:38  13     A   In some sequence, yes.

16:42:40  14     Q   Okay.

16:42:44  15        And if we go to page seven, still on the

16:42:49  16  examination of the Prendergast murder, one of the

16:42:57  17  accountability issues that we find is that they

16:43:01  18  couldn't even identify who the employees responsible

16:43:05  19  were because different people do different things in

16:43:07  20  the jail.  Do you see that?  No LASD personnel --

16:43:11  21     A   Which one are you at?  Four?

16:43:12  22     Q   We are on page seven, accountability, number

16:43:14  23  one.  No LASD -- number four.  No LASD personnel were

16:43:18  24  disciplined because the responsible employee could

16:43:23  25  not be identified.

ALVARADO COURT REPORTERS          205

16:45:16  1  going to put the onus on the supervisors to insure

16:45:19  2  that there was preservation of crime scene in a

16:45:22  3  custodial setting; right?

16:45:24  4      A   Yes.

16:45:25  5      Q   So in a case of -- in any case like

16:45:28  6  Prendergast his sergeant would be responsible to make

16:45:31  7  sure that he preserves the crime scene?

16:45:33  8      A   Correct.

16:45:33  9      Q   We are not going to have it -- we are not

16:45:34  10  going to have the custody deputy be the one in charge

16:45:37  11  of that.  We are going to make sure that we have a

16:45:40  12  person responsible in a crime scene to preserve the

16:45:43  13  crime scene?

16:45:43  14      A   Correct.

16:45:49  15      Q   All right.

16:45:49  16          And when we go to the Alvarado murder, which

16:45:55  17  also was before you got there, one of the things that

16:45:58  18  all of these incidents serve as a purpose, the reason

16:46:01  19  we investigate them and we pick out what

16:46:01  20  accountability and what the problems are is because

16:46:05  21  they are learning measures by which we can take

16:46:05  22  corrective measures in the jail --

16:46:07  23      A   Correct.

16:46:08  24      Q   -- to insure they don't repeat themselves

16:46:12  25  over and over and over; right?

ALVARADO COURT REPORTERS            208

16:46:13   1      A   Correct.

16:46:15   2          And just as a point of clarification --

16:46:15   3      Q   Yes.

16:46:15   4      A   -- Alvarado didn't occur in MCJ.

16:46:17   5      Q   Where did it occur?

16:46:19   6      A   IRC.

16:46:20   7      Q   You are right.  But there -- I said MCJ.  I

16:46:23   8  am understanding --

16:46:24   9      A   Okay.

16:46:24   10     Q   -- IRC because it is right adjacent --

16:46:27   11     A   Correct.

16:46:27   12     Q   -- to it.

16:46:27   13     A   Correct.

16:46:27   14     Q   But the Inmate Reception Center is adjacent

16:46:30   15  to the Central Jail?

16:46:33   16     A   Correct.

16:46:35   17     Q   But at the time they treated them like two

16:46:35   18  different -- sort of like two different facilities.

16:46:36   19     A   They are two different commands, right.

16:46:38   20     Q   Correct, two different commands.  Thank

16:46:42   21  you.  Okay.

16:46:42   22          And with Alvarado, although it was at the

16:46:46   23  IRC, again, one of the -- one of the problems we

16:46:52   24  found in Alvarado was that there was, again, a lapse

16:46:58   25  of supervision of the safety rows.

ALVARADO COURT REPORTERS          209

16:47:47  1        THE WITNESS:  I don't have independent

16:47:49  2   knowledge of that.

16:47:50  3        MS. MERCADO:  Fair enough.  And he calls it

16:47:51  4   inaccurate reporting.  I tell my kids, it's a lie.

16:47:53  5        Okay.

16:47:59  6     Q   So let's just go to the Faye murder, page

16:48:04  7   nine.  There's on page nine the Faye murder also --

16:48:10  8   there is an accountability issue, that the deputy was

16:48:12  9   disciplined for failing to keep cell gates closed per

16:48:16  10  policy.  See that?

16:48:17  11     A   Yes.

16:48:18  12     Q   And the lieutenant was disciplined for

16:48:19  13  failing to insure that a use of force report had been

16:48:22  14  documented?

16:48:24  15     A   Yes.

16:48:24  16     Q   Okay.

16:48:26  17        So at least we know from the Faye death that

16:48:29  18  even lieutenants are failing to report and insure

16:48:32  19  that reports of use of force were documented.  And

16:48:35  20  then the other problem being, again, that deputies

16:48:38  21  have a lapse of insuring the security of the gates;

16:48:43  22  right?

16:48:44  23     A   In this instance, yes.

16:48:46  24     Q   All right.

16:48:46  25        So it appears that so far anyway from all of

ALVARADO COURT REPORTERS          211

16:48:48  1   these murders there seems to be a lapse by deputies

16:48:51  2   in insuring the reasonable security of inmates.

16:48:54  3   Would you agree with that?

16:48:56  4        A   Yes.  It's been identified in these

16:48:59  5   particular homicides.

16:49:01  6        Q   All right.

16:49:01  7            And I believe that you will agree that at

16:49:04  8   least as reflected in page 10 and 11 in the Tinajero

16:49:07  9   case there were similar lapses of security which were

16:49:11  10  the moving force of inmates reaching Mr. Tinajero and

16:49:19  11  killing him.

16:49:20  12       A   Yes.

16:49:20  13       Q   All right.

16:49:22  14           And in Tinajero particularly there was the

16:49:28  15  concern that this guy Pineda, P-i-n-e-d-a, had been

16:49:33  16  able to somehow maneuver his way through different

16:49:38  17  points where his wristband should have been checked.

16:49:41  18  And he ended up where Mr. Tinajero was and he killed

16:49:45  19  him.

16:49:45  20       A   Correct.

16:49:46  21       Q   So in Tinajero they also identified lapse of

16:49:46  22  deputies' failure to secure the areas that they were

16:49:51  23  responsible for; right?

16:49:53  24       A   State that again.

16:49:55  25       Q   I will rephrase it.

ALVARADO COURT REPORTERS          212

16:49:58 1        A deputy was disciplined in the Tinajero

16:50:01 2  case for failure to request a reclassification of

16:50:07 3  Pineda?

16:50:08 4        A   Yes.

16:50:08 5        Q   So there was a classification problem with

16:50:11 6  Pineda; right?

16:50:12 7        A   According to this, yes.

16:50:14 8        Q   According to this he was -- he should have

16:50:15 9  been classified as "Red E" and he wasn't.  And so,

16:50:17 10  therefore, he -- this guy was walking around the

16:50:19 11  jail.  Do you see that?

16:50:21 12        A   Yes.

16:50:21 13        Q   All right.

16:50:22 14        And the sergeant was disciplined for his

16:50:24 15  failure to identify the mistakes in the Pineda

16:50:27 16  reclassification.  See that?

16:50:30 17        A   Yes.

16:50:31 18        Q   All right.

16:50:33 19        And the training sergeant was counseled for

16:50:36 20  his failure to possess working knowledge of LASD

16:50:41 21  inmates classification system.  You see that?

16:50:44 22        A   Yes.

16:50:44 23        Q   All of these conducts resulted in a lapse of

16:50:47 24  reasonable security to inmates, which was the moving

16:50:50 25  force and precipitating factor which ended up causing

ALVARADO COURT REPORTERS          213

16:50:54 1 one inmate to kill another.  You would agree with

16:50:57 2 that?

16:50:57 3     A   As identified in this report, yes.

16:51:00 4     Q   Yes, sir, as identified in the report.

16:51:04 5         And if you turn to page 11, another reason

16:51:16 6 why Tinajero was killed, Roman numeral three on top

16:51:20 7 of the page, was "Due to the Monitoring Failures and

16:51:24 8 Inadequate Procedures With Regard to the Escorting of

16:51:27 9 Inmates, Pineda Was Able to Enter Tinajero's Cell

16:51:32 10 Unchallenged."  Do you see that?

16:51:34 11     A   I do.

16:51:34 12     Q   According to this report, somebody, some

16:51:37 13 deputy, allowed Pineda to enter Tinajero's cell;

16:51:42 14 right?

16:51:42 15     A   Correct.

16:51:42 16     Q   And that's a lapse of reasonable security to

16:51:47 17 the inmates; right?

16:51:47 18     A   According to this, yes.

16:51:47 19     Q   According to this report that's what caused

16:51:51 20 Tinajero's death.

16:51:53 21     A   Well, those things contributed to it.

16:51:55 22     Q   Correct.

16:51:56 23         You would agree those were precipitating

16:52:01 24 factors to his death?

16:52:03 25     A   It would appear to be from this report, yes.

ALVARADO COURT REPORTERS         214

16:53:08   1      Q   So that you can take corrective measures

16:53:11   2   immediately?

16:53:11   3      A   Correct.

16:53:12   4      Q   And you would want to know about those

16:53:14   5   things because you are not going to put up with these

16:53:15   6   continued lapses of failure of deputies to provide

16:53:17   7   reasonable security to inmates; right?

16:53:22   8      A   Correct.

16:53:22   9      Q   And, again, in the Tinajero case as in some

16:53:27   10   of the prior cases, number four indicates according

16:53:31   11   to this report that there was insufficient monitoring

16:53:34   12   of Tinajero's cell during the five hours that Pineda

16:53:38   13   was in the cell.  That would be a lapse of security

16:53:42   14   by deputies, failure to go and --

16:53:47   15      A   Correct.

16:53:47   16      Q   -- check?

16:53:47   17      A   Correct.

16:53:47   18      Q   So as -- from what we know of to Tinajero's

16:53:51   19   killing now and all of these murders is, that there

16:53:54   20   seems to be a problem of deputies failing to really

16:53:58   21   keep their eyes and supervise what's going on on

16:54:01   22   their particular watch; right?

16:54:03   23      A   As identified in these particular incidents,

16:54:06   24   yes.

16:54:06   25      Q   As identified in these reports.  Do you have

ALVARADO COURT REPORTERS          216

17:29:04 1  brought back from the roof.  And I think there was

17:29:07 2  a -- as part of this investigation there was some

17:29:11 3  discussion of the communication between the roof

17:29:15 4  deputies and the module deputies.  And I think that

17:29:22 5  was one of the areas that was addressed and, again, a

17:29:26 6  discussion to try to improve.

17:29:27 7      Q  I see.  Now, up to that point in time when

17:29:29 8  the Mr. Cochran gets killed in the day room, having

17:29:35 9  somebody jump on his head, up to that particular

17:29:40 10  point in time had you looked into how many killings

17:29:47 11  had occurred in the 2000 floor prior to you coming

17:29:53 12  on?

17:29:55 13      A  Well, as we talked about before, there was

17:29:57 14  the review of those homicides that I had been made

17:30:01 15  aware of through prior briefings, OIR report of

17:30:06 16  those.

17:30:06 17      Q  Okay.  My question is a little different.

17:30:09 18      A  Okay.

17:30:09 19      Q  Did you ever, sir, as the captain look into

17:30:12 20  to how many killings occurred in IRC, how many

17:30:17 21  killings occurred in this particular floor, 2000

17:30:20 22  floor?  Did you ever take note of how many of all of

17:30:23 23  those killings were taking place in the 2000 floor?

17:30:28 24      A  Well, I think, again, I think I had the

17:30:30 25  information available as to where they had occurred.

ALVARADO COURT REPORTERS        248

17:30:32 1    Q   Okay.

17:30:37 2        Well, I want you to just tell me what, if

17:30:40 3  anything, did you tell your watch commander with

17:30:42 4  regards to how many killings were happening

17:30:44 5  specifically on the 2000 floor.

17:30:49 6    A   I'm not sure I understand your question.

17:30:56 7  You mean, as far as --

17:30:56 8    Q   Let me rephrase it.

17:30:58 9    A   Okay.

17:31:00 10   Q   Did you after you learned of the Cochran

17:31:01 11 killing which occurred on your watch, when you were

17:31:05 12 on vacation, when you returned did you ever look to

17:31:13 13 see where all of these killing were taking place in

17:31:13 14 the jail?  Maybe you didn't, maybe you did.  I don't

17:31:16 15 know.  Did you?

17:31:16 16   A   Again, like I said, I had knowledge of the

17:31:19 17 recent ones in the recent years --

17:31:21 18   Q   Okay.

17:31:22 19   A   -- what had occurred.

17:31:23 20   Q   Sir, did you ever take note that maybe half

17:31:28 21 of the killings were happening in the 2000 floor?

17:31:28 22   A   I think that's a fair statement, that there

17:31:31 23 was -- of the murders that occurred, that they

17:31:34 24 were -- the majority of them were on the second floor.

17:31:37 25   Q   Right.

ALVARADO COURT REPORTERS          249

17:31:38 1        Did you ever say to your watch commander,

17:31:43 2  "Lieutenant Gonzales, what's happening in the 2000

17:31:47 3  floor that half of the killings going on in this jail

17:31:51 4  are happening in that floor?"  Did you ever discuss

17:31:53 5  with him to find out why most of the killings, half

17:31:58 6  of them, were happening in the 2000 floor?

17:31:59 7      A   I think we had discussions of that sort with

17:32:02 8  the lieutenants and sergeants and trying to look at

17:32:05 9  what -- what was going on there, what were some of

17:32:11 10  the causal factors as we tried to make -- take

17:32:15 11  corrective action.

17:32:17 12      Q   Did you discuss that with Sergeant Inge,

17:32:20 13  "hey, your floor is having most of the killings going

17:32:22 14  on.  What's happening there?"

17:32:23 15      A   Again, it would only have been, like I said,

17:32:25 16  in a general discussion maybe not with him.  I don't

17:32:27 17  remember one particularly with him.  But there -- I

17:32:34 18  don't recall a particular discussion with him

17:32:37 19  specifically.

17:32:37 20      Q   Did you ever ask the Office of Independent

17:32:39 21  Review to look and find out what is going on that the

17:32:43 22  2000 floor has the majority of these killings going

17:32:47 23  on?  Did you ever OIR to look into that?

17:32:51 24      A   No.

17:32:51 25      Q   Did you ever ask anybody above you, your

ALVARADO COURT REPORTERS        250

17:37:20  1    Q   And what was the purpose of that to you as a

17:37:23  2  captain?

17:37:23  3    A   Well, to -- again, to assess where there

17:37:27  4  might be problem areas or something that needs to be

17:37:30  5  addressed whether it was with a individual deputy or

17:37:33  6  with a -- you know, a particular function that we

17:37:35  7  had, a particular procedure we had that we might look

17:37:38  8  at to see if we could do something different to help

17:37:39  9  mitigate an issue.

17:37:43  10    Q   Sir, when you learned of the Cochran killing

17:37:46  11  and you realized that it was yet another killing in

17:37:49  12  the 2000 floor, did you ever discuss with your

17:37:55  13  superiors that maybe something is going on in this

17:37:59  14  jail that we should call in an external investigator

17:38:03  15  like the FBI or somebody else to find out why all of

17:38:07  16  these lapses of security continue to happen in the

17:38:11  17  2000 floor?

17:38:25  18    A   No.

17:38:25  19        MS. MERCADO:  Off the record for a minute.

17:38:27  20        THE VIDEOGRAPHER:  Going off the record.

17:38:29  21  The time is 5:38 p.m.

17:38:32  22        (Brief recess.)

17:44:25  23        THE VIDEOGRAPHER:  We are back on the

17:44:27  24  record.  The time is 5:44 p.m.

17:44:33  25  BY MS. MERCADO:

ALVARADO COURT REPORTERS          255

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA


| | |
|---|---|
| DION STARR, | ) No. CV 08-00508 |
| | )     GW(SHx) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| COUNTY OF LOS ANGELES; LOS ANGELES | ) |
| COUNTY SHERIFF'S DEPARTMENT; SHERIFF | ) |
| LEE BACA, in his individual capacity, | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |


VOLUME II OF THE

VIDEOTAPED DEPOSITION OF CAPT. JOHN CLARK

NOVEMBER 12, 2008

LOS ANGELES, CALIFORNIA


ALVARADO COURT REPORTERS

525 S. Trona Avenue     2420 W. Carson Street, #210
West Covina, CA 91791     Torrance, CA 90501
Off: (626) 938-0042     Off: (310) 224-5174
Fax: (626) 915-5148     Off: (310) 787-1024


Natie Flores Alvarado, CSR No. 9016

08-45

1   identified that needed it, we discussed those and the

2   need to make sure that, again, those were being complied

3   with.

4       Q   Who was going to follow through with insuring

5   that the corrective actions indicated were actually

6   implemented and taking place?

7       A   Well, again, it would be me, relative to my

8   inspections.  The Lieutenants and Sergeants all had

9   responsibilities, as supervisors, to make sure that the

10  corrective actions were being done and being -- and that

11  they were being followed.

12      Q   Okay.  Were these corrective actions -- I

13  imagine that this was -- these corrective actions were

14  really pertinent and very important; correct?

15      A   Yes.

16      Q   Because they were intended to take corrective

17  measures to prevent future incidents from reoccurring;

18  right?

19      A   Right.

20      Q   So I take it these corrective actions and what

21  was expected to be done was documented somewhere;

22  correct?

23      A   Yes.

24      Q   Where?

25      A   That I'm not sure.

302

ALVARADO COURT REPORTERS

1  Lieutenant?

2      A   Uh-huh.

3      Q   -- with Lieutenant Gonzalez -- he was the Watch

4  Commander, or Lieutenant Lamb, who was also a Watch

5  Commander -- regarding what their -- what they had to be

6  doing to ensure that these new corrective measures were

7  implemented?

8      A   Well, with both Sergeants and Lieutenants, not

9  specifically Gonzalez or Lamb, the issues -- And I had

10  monthly staff meetings with Lieutenants, quarterly staff

11  meetings with the Sergeants, and we discussed those

12  issues, a variety of issues, those being part of that,

13  relative to -- Corrective actions would have been

14  discussed.

15      And there would have been -- I would have made

16  sure they understood what was expected of them; that

17  they were out doing their inspections and making sure

18  that the corrective actions were being followed.

19      Q   And what you have just described for me is what

20  you generally did; correct?

21      A   Yes.

22      Q   Do you have any memory of what you actually did

23  do with regards to corrective measures after

24  specifically the Cochran killing in the 2400 day room?

25      A   Relative to speaking to Lieutenant Gonzalez

308

ALVARADO COURT REPORTERS

1   but that would be the thought process, yes.

2       Q    And it's an assumption based upon your

3   experience and working there that that's the general way

4   that the management --

5       A    Correct.

6       Q    -- of the jail works; correct?

7       A    Correct.

8       Q    So it isn't that you're getting it out of thin

9   air?

10       A    No.

11       Q    All right.  Now, during our last session, and I

12   think today -- No, maybe not today -- you mentioned that

13   this incident occurred during pill call.  Remember that?

14       A    That's my recollection from reading the

15   incident report.

16       Q    All right.  And did you ever look to see, while

17   you were Captain, if indeed this incident had taken

18   place during pill call?

19       A    I wasn't aware of this incident until it was

20   brought to my attention for this deposition.  I didn't

21   have recollection of it.

22       Q    Okay.  While you were Captain nobody ever

23   informed you of this incident?

24       A    Not that I recall, no.

25       Q    And if we wanted to know if they informed you

317

ALVARADO COURT REPORTERS

1    of this incident, we would request e-mails or other ways

2    to find out if anybody gave you notice of this incident?

3        A    Or that -- Yes.  Or I think you had the copy of

4    the logs before.

5        Q    Okay.  If this was a major incident, you should

6    have received a report about this incident, right,

7    somewhere through some channel?

8        A    Yes.

9        Q    Particularly, because in 2000, there had been

10   so many killings that had gone on, you should have been

11   informed by your subordinates of what was going on;

12   right?

13       A    Yes.

14       Q    And if this was a major incident and an assault

15   with a deadly weapon, your subordinate Lieutenant or

16   Sergeant or deputies had a duty and responsibility

17   affirmatively to inform you about that; correct?

18       A    If they felt it reached that level, yes.

19       Q    So it was up to them to decide whether or not

20   they would report a major incident where somebody --

21   where there was an attempted murder?

22       A    Yeah, depending on the facts that they had

23   available to them at the time.  If they believed it was

24   a major incident, they should have reported it to me.

25       Q    Okay.  Sir, if it was a major incident because

318

ALVARADO COURT REPORTERS

1    and not report that allegation, that somebody committed

2    a crime against Mr. Starr to anybody else?

3        A   No.

4        Q   So you just can't send the guy who stabbed

5    somebody to isolation for 90 days, and then that's it,

6    nothing else is done; right?

7        A   Well, two questions there, I think.  Isolation,

8    meaning discipline --

9        Q   Yes.

10       A   No.  No.  The other half of your question was

11   whether -- if he had -- they had stabbed someone or

12   something, I think it was --

13       THE WITNESS:  Can you read that over again.

14       Q   BY MS. MERCADO:  Let me just rephrase it to

15   save time.

16       A   Okay.

17       Q   If an inmate accuses another inmate of stabbing

18   him, such as Mr. Starr accuses Veloz of stabbing him --

19       A   Correct.

20       Q   -- you would require that at the least that

21   allegation go to an investigative unit to find out if a

22   crime occurred or not; correct?

23       A   Based on the information that was provided in

24   the first report, and this one that we're talking about

25   here --

352

ALVARADO COURT REPORTERS

1    Q   Yes, sir.

2    A   -- there would have been information that some

3    follow-up investigation could have been done.

4    Q   And should have been done, correct, sir?

5    A   Yes.

6    Q   Okay.  And failure not -- to do it is a

7    violation of those rules that we talked about?

8    A   Yes.

9    Q   Okay.

10    A   Yes.

11    Q   And if the perpetrator just merely was given

12    60 days in isolation, that would not be -- that's not

13    what the rules and regulations would indicate; correct?

14    A   If the --

15    Q   In other words, there's an accusation --

16    A   Yes.

17    Q   -- that Mr. Veloz stabbed me, and if that

18    person is merely sent to isolation, that's not how it

19    works in the jail.  It goes to some investigative unit

20    to investigate whether or not a crime occurred or not;

21    right?

22    A   Yes.  There's a bail schedule for the inmate

23    incident.  The criminal process is a separate entity of

24    that and would be looked at separately.

25    Q   Okay.

353

ALVARADO COURT REPORTERS