

### TRAINING ISSUES – CUSTODY DIVISION TRAINING UNIT

The Custody Division Training Unit and Custody Support Services have reviewed this matter in terms of training issues and needs.

- Most employees and supervisors assigned to the facility are not aware of the correct policy regarding safety checks, inmate counts, and inmate workers.

_____  8/4/04
ALLAN SMITH, LIEUTENANT           DATE

### MEDICAL ISSUES - MEDICAL SERVICES

Captain Rod Penner, Doctor John Clark, Chief Medical Physician, and Helen Hud, RN, have reviewed this matter for compliance with proper medical protocols and community standards. No medical issues associated with this matter were identified.

THERE ARE NO RECOMMENDATIONS CONCERNING MEDICAL SERVICES.

_____  8-9-04
ROD PENNER, CAPTAIN               DATE

_____  _____
JOHN CLARK, CHIEF MEDICAL PHYSICIAN   DATE



## CUSTODY DIVISION LEGAL ADVISOR

Mr. Victor Wright, Custody Division Legal Advisor, has reviewed this document, and approved its distribution to the responsible parties.

_____   8/30/04
VICTOR WRIGHT, LEGAL ADVISOR        DATE

## QUARTERLY REVIEW

This matter is subject to a quarterly Mortality Review after receipt and review of the autopsy report.

Reviewed by:

_____   9-1-04
DENNIS A. CONTE, COMMANDER         DATE
CUSTODY OPERATIONS DIVISION

_____   10/12/04
MARC L. KLUGMAN, COMMANDER         DATE
CORRECTIONAL SERVICES DIVISION

_____   9/22/04
JOHN L. SCOTT, CHIEF               DATE
CUSTODY OPERATIONS DIVISION

_____   10-13-04
CHARLES M. JACKSON, CHIEF          DATE
CORRECTIONAL SERVICES DIVISION

*Custody Support Services, telephone: (213) 893-5102  fax: (213) 613-4780*                     Page 4

COLA/LASD 02201

## COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT
## PERSONNEL INVESTIGATION
### (ADDENDUM)

obtained from an employee. He said the focal inmate of this group was Inmate ███████ (Bk# ███████).

 I.A.B. Note: Inmate ███ is one of the inmates identified in Deputy McCoy's flyer (Exhibit-HH).

Sergeant Looney said it was also brought to his attention that Inmate Lee and Inmate ███ were having sums of money deposited and released from their inmate accounts by persons with Asian surnames and, at times, by the same person. Sergeant Looney said this bolstered his belief that there was a connection between Inmate ███ and group of Black Inmates which he was investigating.

Sergeant Looney said his interest in interviewing Inmate ███ was for the purpose of gathering intelligence which could possibly lead him to the employee who was smuggling narcotics into the jail.

Sergeant Looney's recollection of the interview of Inmate Lee was different than that of Deputy McCoy. Sergeant Looney said Inmate Lee did not admit to selling narcotics or being a leader among the Asian inmates. He said Inmate Lee said he simply purchased narcotics from the Black inmates for his personal use and that by being a trusty, he had easier access to obtaining the narcotics.

Sergeant Looney said Inmate Lee agreed to work as an informant for him in an attempt to learn who the involved employee was.

Sergeant Looney said Inmate Lee was returned to his housing location, in Module 2300 and allowed to continue to be a trusty. He said after a few weeks he had a second interview with Inmate Lee. He said Inmate Lee failed to provide him with any information. He said he believed Inmate Lee was not genuinely attempting to obtain information. He said during the second interview, Inmate Lee became defensive and said he had no further interest in working with Sergeant Looney. He said Inmate Lee said he was going to "roll himself up," so that Sergeant Looney and Deputy McCoy would stop focusing on him.

Sergeant Looney said when the second interview ended, it was his belief that Inmate Lee was no longer a trusty.

**Custody Assistant Escamilla** was re-interviewed. She was accompanied by her representative, Vanise Wallace. Custody Assistant Escamilla was shown the flyers created by Deputy McCoy. She said she had never seen them before. She said she started working in Module 2100 in September, 2003. She said prior to that date she was

**MURDER OF KI CHUL HONG**     -7-     IV2108787

COLA/LASD 05988

## COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT
## PERSONNEL INVESTIGATION
### (ADDENDUM)

Deputy McCoy provided copies of two informational flyers he created about narcotics trafficking on 2000 Floor. Both flyers name Inmate Lee as a narcotics trafficker and provide his picture. The flyers are dated July 13, 2003, and July 15, 2003. Deputy McCoy provided a copy of the flyers (**Exhibit-HH**).

Deputy McCoy said he could not specifically recall if or when he showed the flyers to anyone on the 2000 Floor, but reiterated that notwithstanding the flyers, he personally told the 2000 Floor staff about his concerns and information regarding Inmate Lee on several occasions.

Deputy McCoy was asked if he knew why Inmate Lee was still allowed to be a Trusty, given what was apparently common knowledge about his narcotics trafficking. Deputy McCoy said he had concerns about it, but could do nothing more about it. He said he conveyed information to his peers and supervisors. He said the generally held attitude by his peers was that if they did not see Inmate Lee involved in the trafficking of narcotics, they discounted the authenticity of the information and allowed him to continue working as a Trusty because he was a "good worker."

Deputy McCoy said to his knowledge no supervisor ever intervened and prevented Inmate Lee from being utilized as a trusty.

**Sergeant Glen Looney** was interviewed on June 22, 2004. The interview occurred in Men's Central Jail. Sergeant Looney said he was the Special Project Sergeant at Men's Central Jail. He said he reports directly to the Captain and operations staff. He said his duties include the preliminary inquiry and review of allegations of employee misconduct, in order to determine if investigation by Internal Affairs Bureau or Internal Criminal Investigations Bureau is warranted. He said a great deal of the allegations he looks into concern employees who are possibly bringing narcotics, tobacco, or other contraband into the jail. He said one of the primary tools he uses in conducting his inquiries is Inmate Informants.

Sergeant Looney said he recalled interviewing Inmate Lee. He said he interviewed Inmate Lee twice. He said one interview occurred on July 19, 2003. He said he did not recall when the second interview occurred. He said he did not recall if the July 19 interview was the first or the second interview.

Sergeant Looney said he learned about Inmate Lee from Deputy McCoy. He said Inmate Lee was of specific interest to him because he (Lee) reportedly purchased his narcotics from the Black inmates. Sergeant Looney said at that particular time he was conducting an inquiry into a group of Black inmates who he believed were selling narcotics which they

**MURDER OF KI CHUL HONG**        -6-        IV2108787

# MEN'S CENTRAL JAIL 2000 FLOOR NARCOTIC MONEY TRAIL

COLA/LASD 06055

#7   1                    N #7      9

Both inmate   and    n have had large amounts of money deposited and withdrawn from their inmate accounts on a regular basis.

Current as of July 13, 2003



## TRAINING RECOMMENDATIONS

Custody Support Services has reviewed this incident in terms of training issues in relation to security and have identified the following issue:

- Most employees and supervisors assigned to the facility are not aware of the correct policy regarding safety checks, inmate counts, and inmate workers.

   An administrative investigation conducted by Internal Affairs Bureau (I.A.B. Case number IV2108787) revealed that personnel questioned regarding safety checks, inmate counts, and inmate worker policies were not aware of the correct policy. As such, it is recommended that supervisors brief personnel on the above noted policies.

*Custody Support Services, telephone: (213) 893-5102  fax: (213) 613-4780*

## COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT
## PERSONNEL INVESTIGATION

of his time is spent in his office. He said he typically is on the various floors of the jail, for one reason or another, three or four times per week.

Lieutenant Olson said no inmate count is routinely conducted on Day shift. He said he is not aware of any process or procedure which is conducted on Day shift to reconcile inmate count or housing locations. Lieutenant Olson was shown a copy of the section from the Custody Division Manual which addresses inmate counts (Exhibit-I / CDM 5-05/010.00). The policy mandates that each custody facility, with the exception of Inmate Reception Center, conduct an inmate count each shift everyday. The lieutenant said he was unfamiliar with the policy. He said regardless of the wording of the policy, no inmate count is conducted on Day shift. He was also shown a copy of the Men's Central Jail unit order which addresses inmate count procedures (Exhibit-I / 3-01-010). He said he cannot specifically remember ever seeing the policy, although he said he likely has. He said he was unfamiliar with the specifics of the policy.

Lieutenant Olson said it was his understanding that line personnel are to conduct safety checks of all modules on an hourly basis, although some areas of the jail require more frequent checks. The lieutenant was shown a copy of the Men's Central Jail unit order relating to safety, security, and fire prevention checks (Exhibit-H). He said he was familiar with the policy.

Lieutenant Olson said he has no direct involvement in the selection of inmate workers. He said it is his understanding that inmate workers who worked in areas such as the kitchen are selected and assigned by the P.P.O. office. He said he was uncertain how module trusties on 2000 floor were selected, but that the individual modules were responsible for selecting their trusties. The lieutenant was shown a copy of the Men's Central Jail unit order relating to the selection of inmate workers (Exhibit-J). He said he did not recall ever seeing the policy and was unfamiliar with it.

Lieutenant Olson said at the time of this incident he was unaware the control panel doors and locks in the old-side modules were in any state of disrepair. He said to his knowledge there was no problem with them and nothing was ever brought to his attention suggesting different.

Lieutenant Olson was shown a copy of the Men's Central Jail unit order dealing with preventative maintenance (Exhibit-N). He said he was familiar with the policy and his description of the manner in which jail personnel report such problems was consistent with the policy.

**There was no Supervising Line Deputy** on PM shift, 2000 Floor, on the day of Inmate Hong's Murder.

**MURDER OF KI CHUL HONG**           -36-                    **IV2108787**

COLA/LASD 05519

## COUNTY OF LOS ANGELES SHERIFF'S DEPARTMENT
## PERSONNEL INVESTIGATION
### (ADDENDUM)

Deputy McCoy provided copies of two informational flyers he created about narcotics trafficking on 2000 Floor. Both flyers name Inmate Lee as a narcotics trafficker and provide his picture. The flyers are dated July 13, 2003, and July 15, 2003. Deputy McCoy provided a copy of the flyers **(Exhibit-HH)**.

Deputy McCoy said he could not specifically recall if or when he showed the flyers to anyone on the 2000 Floor, but reiterated that notwithstanding the flyers, he personally told the 2000 Floor staff about his concerns and information regarding Inmate Lee on several occasions.

Deputy McCoy was asked if he knew why Inmate Lee was still allowed to be a Trusty, given what was apparently common knowledge about his narcotics trafficking. Deputy McCoy said he had concerns about it, but could do nothing more about it. He said he conveyed information to his peers and supervisors. He said the generally held attitude by his peers was that if they did not see Inmate Lee involved in the trafficking of narcotics, they discounted the authenticity of the information and allowed him to continue working as a Trusty because he was a "good worker."

Deputy McCoy said to his knowledge no supervisor ever intervened and prevented Inmate Lee from being utilized as a trusty.

**Sergeant Glen Looney** was interviewed on June 22, 2004. The interview occurred in Men's Central Jail. Sergeant Looney said he was the Special Project Sergeant at Men's Central Jail. He said he reports directly to the Captain and operations staff. He said his duties include the preliminary inquiry and review of allegations of employee misconduct, in order to determine if investigation by Internal Affairs Bureau or Internal Criminal Investigations Bureau is warranted. He said a great deal of the allegations he looks into concern employees who are possibly bringing narcotics, tobacco, or other contraband into the jail. He said one of the primary tools he uses in conducting his inquiries is Inmate Informants.

Sergeant Looney said he recalled interviewing Inmate Lee. He said he interviewed Inmate Lee twice. He said one interview occurred on July 19, 2003. He said he did not recall when the second interview occurred. He said he did not recall if the July 19 interview was the first or the second interview.

Sergeant Looney said he learned about Inmate Lee from Deputy McCoy. He said Inmate Lee was of specific interest to him because he (Lee) reportedly purchased his narcotics from the Black Inmates. Sergeant Looney said at that particular time he was conducting an inquiry into a group of Black inmates who he believed were selling narcotics which they

**MURDER OF KI CHUL HONG**      -6-      IV2108787

COLA/LASD 05987

RECEIVED

DEC 1 0 2004

## SETTLEMENT AGREEMENT

EMPLOYEE RELATIONS

This Agreement is entered into between the Los Angeles County Sheriff's Department, hereinafter referred to as "Department," and Sergeant Glen Looney, Employee Number 184854, hereinafter referred to as "Grievant."

The Department and Grievant are parties to this dispute and desire to settle all issues involved in the Letter of Intent dated August 11, 2004, (IAB No. 2108787) upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, the Department and Grievant for and in consideration of the mutual covenants contained herein, agree as follows:

1. The Department will, upon execution of this Agreement, reduce the intended fifteen (15) day suspension to a two (2) day suspension. The Letter of Imposition shall contain the same charge as the Letter of Intent.

2. The Department will, upon execution of this Agreement, hold the two (2) days in abeyance.

3. The Grievant understands that if he becomes the subject of a founded investigation involving a similar violation of the Manual of Policy and Procedures, and that if the event resulting in the founded investigation occurred within the twelve (12) month period of the date of execution of this Agreement, the two (2) day held in abeyance shall be imposed. In addition, the Grievant understands that he will be subjected to additional discipline for each and every founded violation of the Department's Manual of Policy and Procedures.

4. Both parties agree and understand that the Grievant's records will reflect that the two (2) day suspension was imposed and may be used for the purposes of demonstrating "progressive discipline."

5. The Grievant agrees to withdraw his grievance and waive any and all further administrative or judicial remedies with respect to the Letter of Imposition and the modified discipline, and also waives any administrative or judicial remedies with respect to any imposition pursuant to paragraph three (3), above.

6. The parties further agree that this Settlement shall not be considered, cited, or used in future disputes as establishing past precedent or past employment practice.

COLA/LASD 05339

**RECEIVED**

MAR 08 2007

EMPLOYEE RELATIONS

## SETTLEMENT AGREEMENT

This Agreement is entered into between the Los Angeles County Sheriff's Department, hereinafter referred to as "Department," and Custody Assistant Esperanza Escamilla, Employee No. 441878, hereinafter referred to as "Grievant."

The Department and Grievant are parties to this dispute and desire to settle all issues involved in the Letter of Intent dated August 13, 2004, (IAB No. 2108787) upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, the Department and Grievant for and in consideration of the mutual covenants contained herein, agree as follows:

1. The Department will, upon execution of this Agreement, reduce the intended three (3) day suspension to a written reprimand.

2. Further, the Department will issue the Grievant a written reprimand that contains the violation of Manual of Policy and Procedures Section 3-01/050.10, Performance to Standards, specifically as it relates to Safety, Security, and Fire Prevention. A copy of that written reprimand is attached as Exhibit A to this Settlement Agreement. The Grievant accepts the reprimand and understands that a copy will be placed in her personnel file.

3. Both parties agree that the alleged violation of Manual of Policy and Procedures Section 3-01/030.10, Obedience to Laws, Regulations and Orders, shall be deemed unfounded.

4. Both parties agree that the alleged violation of Manual of Policy and Procedures Section 3-01/50.10, charge 2, Performance to Standards, shall be deemed unfounded.

5. The Grievant agrees to withdraw her grievance and waive any and all further administrative or judicial remedies with respect to the Letter of Imposition and the modified discipline.

6. The parties further agree that this Settlement Agreement shall not be considered, cited, or used in future disputes as establishing past precedent or past employment practice.

7. In consideration of the terms and conditions set forth herein, Grievant agrees to fully release, acquit and forever discharge the County, and all present and former officers, employees and agents of the County, and their heirs, successors, assigns and legal representatives from any and all liability

COLA/LASD 05282

2

whatsoever for any and all claims arising out of or connected with the employment relationship between the County and Grievant concerning the subject matter of the grievance referred to herein.

8. The Grievant further agrees to relinquish and expressly waives all rights conferred upon her by the provisions of California Civil Code Section 1542, which reads as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in her favor at the time of executing the release, which if known by her must have materially affected her settlement with the debtor."

9. The date of the last signature placed hereon shall hereinafter be known as the "date of execution" and the "effective date" of this Agreement.

10. The parties agree that the foregoing comprises the entire Agreement between the parties and that there have been no other promises made by any party. Any modification of this Agreement must be in writing.

I have read the foregoing Settlement Agreement, and I accept and agree to the provisions contained therein and hereby execute it voluntarily and with full understanding of its consequences.

For the Sheriff's Department:

Date: 02-22-07            Date: 2/27/07

_____   _____
Esperanza Escamilla,      Sammy Jones, Chief
Custody Assistant

COLA/LASD 05283