Sonia M. Mercado (SBN: 117060)
**SONIA MERCADO & ASSOCIATES**
5701 West Slauson Ave., Suite 202
Culver City, CA 90230
Telephone:   (310) 410-2981
Facsimile:   (310) 410-2957
E-mail: soniamer2002@yahoo.com

R. Samuel Paz (SBN: 62373)
**LAW OFFICES OF R. SAMUEL PAZ**
5701 West Slauson Ave., Suite 202
Culver City, CA 90230
Telephone:   (310) 410-2981
Facsimile:   (310) 410-2957
E-mail: samuelpaz@msn.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DION STARR | CASE NO. CV 08-00508 GW(SHx) |
| Plaintiff, | [HON. GEORGE WU] |
| vs. | ERRATA PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION OF ISSUES |
| COUNTY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, SHERIFF LEE BACA IN HIS INDIVIDUAL CAPACITY, et al., | DATE:          October 29, 2009 |
| | TIME:          8:30 A.M. |
| | CTROOM:     10 |
| Defendants. | |

**ERRATA PLAINTIFF'S BRIEF IN  OPPOSITION TO DEFENDANTS'**

**MOTION FOR SUMMARY JUDGMENT OR SUMMARY ADJUDICATION**

**OF ISSUES** to include previously omitted "SDF" number references to Plaintiff's

Response to Defendant's Statement of Undisputed Facts.  The content and pagination

of the originally filed Opposition remain the same.  Plaintiff also includes herein a

Table of Content.  Plaintiff apologizes for any inconvenience.

# TABLE OF CONTENT

1. STATEMENT OF DISPUTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2. WHERE DISPUTED FACTS EXIST THE COURT MUST DENY A
MOTION FOR SUMMARY JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . 6

3. CONTROVERTING FACTS ESTABLISH DEP. BUGARIN
INTENTIONALLY DELAYED PLAINTIFF'S MEDICAL CARE. . . . . . . 7

    A. There Is No "Single Isolated Event" Requirement. . . . . . . . . . . . . . . 8

    B. There Is No Requirement That Delay in Providing
      Medical Treatment Is Not Actionable "Unless the Delay Causes
      Substantial Harm." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4. DEP. GARIBAY WAS DELIBERATELY INDIFFERENT TO
PLAINTIFF'S RIGHT TO REASONABLE SECURITY. . . . . . . . . . . . . . 9

5. DEP. BURGARIN USED EXCESSIVE FORCE WHICH WAS
UNREASONABLE AND DELIBERATELY INDIFFERENT TO
PLAINTIFF'S RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

6. CONTROVERTING EVIDENCE OF UNCONSTITUTIONAL
PATTERNS AND PRACTICES WHICH ARE DELIBERATELY
INDIFFERENT TO PLAINTIFF'S RIGHTS. . . . . . . . . . . . . . . . . . . . . . . 13

    A. There Are Two Methods of Proof to Establish the Liability
    of an Entity for Violation of 42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . 13

    B. Elements Required for The First Path to Liability . . . . . . . . . . . . . . 14

        (1) "Policy or Custom" in Proving  Liability Under Either Path to
            Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        (2) The Sheriff and Supervisor Defendants Are the
            Policymakers Whose Deficient Policies Lead to the
            Constitutional Violation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(3)     Whether the Policies Violated Plaintiff's Rights Does Not Require That the Policymakers Knew the Policies Would Harm Him in Particular. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

(4)     Under The First Path to Liability it Is Not a Requirement That an Individual Defendant Had Violated the Plaintiffs' Constitutional Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

C.     Under the Second Path to Liability, the County's Practices of Omission Were the Moving Force Behind the Violation of Plaintiff's Right to Reasonable Security.  . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

(1)     The Elements of the Second Path to Liability . . . . . . . . . . . . . 17

(2)      It Is Established That Dep. Garibay Violated Leon's Rights.  . 18

(3)      The County's Policies of Omission Are Deliberate Indifferent. 18

(4)     County's Policies Were the Moving Force Behind the Violation of Plaintiffs's Constitutional Rights . . . . . . . . . . . . . . . . . . . . . . 19

(5)     The Identified Deficiencies Are Closely Related to the Ultimate Injury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

(a)     Inaction in Correcting Staggering rates of Inmate on Inmate Murder, Attempted Murders and Assaults. . . . . . 19

(b)     The Injury To Starr Would Have Been Avoided.  . . . . . . 20

7.     CONTROVERTING EVIDENCE OF UNCONSTITUTIONAL CONDUCT OF LT. GONZALEZ, SGT. INGE, AND CAPT. CLARK. . . . . . . . . . . . . . 21

8.     DEP. BUGARIN IS NOT ENTITLED TO QUALIFIED IMMUNITY. . . . . 23

A.     Dep. Bugarin Is the Only Defendant Seeking Qualified Immunity. . . 23

B.     Defendant Bugarin Is Not Entitled Qualified Immunity.  . . . . . . . . . . 23

9.     DEFENDANTS HAVE LIABILITY FOR PUNITIVE DAMAGES. . . . . . . 25

# TABLE OF AUTHORITES

**CASES**

*Amos v. City of Page,*
    257 F.3d 1086, 1094 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 248 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Baker v. Monroe Twp.,*
    50 F.3d 1186 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Beck v. Pittsburgh,*
    89 F.3d 966 (3rd Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Bell v. Wolfish,*
    441 U.S. 520 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

*Board of County Comm'rs of Bryan County v. Brown,*
    520 U.S. 397 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 23

*City of Canton v. Harris,*
    489 U.S. 378 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*City of Los Angeles v Heller,*
    475 U.S. 796, 799 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*City of Oklahoma v. Tuttle,*
    471 U.S. 808, 823-824 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*City of St. Louis v. Praprotnik,*
    485 U.S. 112 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Collins, v. County of Kern,*
    390 F. Supp. 2d 964 (ED Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Cottrell v. Caldwell,*
    85 F.3d 1480 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Drummond v. City of Anaheim,*
    343 F.3d 1052, 1060 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Estelle v. Gamble,*
    429 U.S. 97 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

*Fairley v. Luman,*
    281 F.3d 913 (9th Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 14

*Farmer v . Brennan,*
    511 U.S. 825 845-846 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 14

*Gaut v. Sunn,*
    792 F.2d 874 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Gibson v. County of Washoe*,
    290 F.3d 1175 (9th Cir. 2002) .......... 12, 14, 16, 18

*Gomez v. Vernon*,
    255 F.3d 1118 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Graham v. Connor*,
    490 U.S. 386 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hall v. Lombardi*,
    996 F.2d 954 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hudson v McMillian*,
    503 U.S. 1 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hudson v. McMillian*,
    112 S. Ct. 995 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Hurd v. Garcia*,
    454 F. Supp. 2d 1032 (SD Cal 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*International Action Center v. United States*,
    365 F.3d 20 (DC Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Jett v Penner*,
    439 F.3d 1091 (9th 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Jones v. Chicago*,
    856 F.2d 985, 992 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Lipsett v. University of Puerto Rico*,
    864 F.2d 881, 902 (1st Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Liston v. County of Riverside*,
    120 F.3d 965 (9th Cir. 1997)(as amended) . . . . . . . . . . . . . . . . . . . . 24

*Lolli v. County of Orange*,
    351 F.3d 410 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 24

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*McGuckin v. Smith*,
    974 F.2d 1050 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*Monell v. Department of Soc. Servs.*,
    436 U.S. 658 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 15

*Owen v. City of Independence*,
    445 U.S. 622, 652,(1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Oviatt v Pierce*,
    954 F.2d 1470 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . 15, 18, 19

*Pembaur v. City of Cincinnati*,
    475 U.S. 469 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Riley v. Dorton*, 12
      115 F.3d 1159 (4th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Rutherford v. City of Berkeley*,
      780 F.2d 1444 (9th Cir.1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Ruvalcaba v. City of Los Angeles*,
      167 F.3d 514, 525 (9th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Santos v. Gates*,
      287 F.3d 846 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Saucier v. Katz*,
      533 U.S. 194 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Smith v. City of Hemet*,
      394 F.3d 689 (9th Cir.), *cert. denied,* 125 S.Ct. 2938 (2005) . . . . . . . . . . . 24

*Smith v. Wade*,
      461 U.S. 30 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Thomas v. Warden Frank J. Pate*,
      493 F.2d 151, 158 (7th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Ward v. City of San Jose*,
      967 F.2d 280 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Whitley v. Albers*,
      475 U.S. 312 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*WMX Techs., Inc. v. Miller*,
      104 F.3d 1133 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Wood v. Housewright*,
      900 F.2d 1332 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Woodward* v. Worland,
      977 F.2d 1392 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*CONSTITUTIONAL AMENDMENTS*

U.S. Constitution, Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

U.S. Constitution, Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

U.S. Constitution, Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*FEDERAL STATUTES*

*Fed. R. Civ. P. 56(c)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## POINTS AND AUTHORITIES IN OPPOSITION

**1.    STATEMENT OF DISPUTED FACTS**

This case follows a string of assaults and killings that occurred at the Men's Central Jail (MCJ) at Los Angeles County Jail (LASD), which employees at MCJ were well informed about, and strikingly, half of the killings took place in the 2000 Floor of MCJ, where this incident also occurred.  To avoid repetition, please see the Declaration of George Sullivan, a nationally recognized correctional expert, who details a long history of notice to the County, LASD and its supervisors of failures to supervise, repetitive failures of deputies and supervisors to know basic policies and to follow them.  (SDF # 42 to 53, 66 to 78, Decl. Sullivan pp. 16-20.)

**Deputy Jose Garibay:** On January 27, 2006, Deputy Garibay was assigned to monitor module 2400 B Row control  booth, with duties to provide inmate security and safety, watching and listening to them, doing security checks and to document any occurrences of significant events in the module "Title 15" book.  He controlled access and egress to Row B gate and cells and was required to check inmate movement.  He knew of recent killing in this very Module 2400 day room in November 2005, due to inmate on inmate violence, Hispanics killed a Caucasian man, when deputies left inmates unattended.  (SDF # 3, 5, 6, 8, 19.)

This morning, Deputy Garibay saw numerous Hispanic inmates (he does not remember how many) seeking entry to Row B, whom he assumed to be inmate workers, and contrary to policy, without checking their wristbands, he just opened the row gate and let them in.  He did not monitor the activities of the inmates and he abandoned the observation booth and went elsewhere, again contrary to policy he opened three cell gates when the inmates were inside the row, and then abandoned the control booth contrary to policy that he monitor the "inmate workers" (which they clearly were not) at all times.  After he opened the cell gates he apparently left to go elsewhere, and when the incident occurred, he didn't know what happened "because when the incident occurred he was <u>not physically there.</u>" (SDF #5.)

Plaintiff, an African-American, was in Row B-cell 9.  He had never been involved in violence nor been disciplined.  He saw the Hispanics gather in front of his cell gate talking to the others in Spanish, when his cell gate opened (and cell 8 and 10 only) and the Hispanics rushed into his cell, joined by Hispanics and attacked him and his African-American cell mate with "shanks" (sharpened metal stabbing instruments).  He was stabbed 23 times, as was his African-American cell mate.  (SDF #1.)  Hearing screams for help Garibay returned and asked for help and within seconds personnel, and Sgt. Inge, the 2000 Floor sergeant, had everything under control, and all inmates were handcuffed without further incident.  (SDF #10.)

Garibay was responsible for preparing the incident report because he was the deputy in charge, but for unknown reasons Deputy Christina Martinez prepared the report.[1/] He was never questioned about the incident or trained on proper procedures regarding leaving his post, allowed 3 unauthorized inmates in a module; or the other policies he failed to follow.  (Exh. 7, 9, 18-21.)

**Deputy Maybet Bugarin**: arrived to when the incident was over and "Everything was okay," the inmates were already handcuffed and lying on the floor. She did not handcuff anybody, but remembers seeing Plaintiff lying on the floor injured with stab wounds.  While Plaintiff laid handcuffed on the floor, prone and face down, and tried to kick him, and as he tried to move to away, Dep. Bugarin kicked him in the nose saying, "Nigger" I told you to get down.  She wrongfully and maliciously kick him for no reason.  (SDF # 6, 9, 10.)  Sergeant Inge was present and observed Dep. Bugarin kick him in the face.  Bugarin had contact with Plaintiff, but she just doesn't remember, but on the day of this incident, she was wearing "Danner work boots" which are steel toe boots (steel tip toe boots, see Exh. 26).  (SDF #10.)

Starr was "bleeding from the nose and mouth,"  (Defs' Exh. J 1013.)  Bugarin was one of the movement deputies who would be responsible for moving Plaintiff

---

Martnez had been involved, and disciplined in a prior murder incidents (Tinajero Exhibit 38) and present also in the Cochran murder, Exhibit 39

and she interacted with him.  When Starr returned from the hospital to jail on January 27, 2006, he was put on isolation for no reason, and Bugarin denied him access to medical care for his nose.  During this time, she saw him in isolation, called "the hole because it jams up your stomach.  It is just four walls.  It is small . . .  and you get no privileges."  She knew that the only persons Mr. Starr could "talk to [was] whoever else might be down the way in the hole."  Bugarin put him in isolation because he complained about her kicking him, and he wanted to press charges against his attackers.  (SDF # 10.)  Defendants ignored him, and deprived him of a right to a hearing, he was in isolation 3 months (90 days) contrary to policies. (Exh 8, discipline maximum by penal code and policy is 30 days).  (SDF # 44, 45.)

Between January 27th to February 2, Bugarin and others denied him access to medical for his injuries to his body, and worse, to his noses.  On February 2, a nurse documented that he reported, "I have a broken nose, I was kicked in the face by custody."  (Def's Exh. K p. 1195.)  On February 7, Plaintiff obtained a Court Order to get access to further medical care for his nose, a nurse noted, "Starr has a broken nose and needs medical treatment," (Exh. 20) and on 2/9/06, a nurse noted that "Deputy Bugarin was notified again that inmate needs to be taken to the clinic to be evaluated by Dr. Vyden."  Starr received care for his nose on 2/10/06.  He complained, about Bugarin and "I told the nurse about it but nobody listens to me.  My nose is getting worse and I can't breathe"; he had "redness and swelling  . . . Patient breathes [sic] through the mouth."  (Defs' Exh. K, 1195.)

**Floor Sergeant Inge:**  was the 2000 Floor sergeant and immediate supervisor who  responded to the incident in Row B.  It was his duty to approve the incident report, to ensure all evidence was preserved, however he failed to do so and the incomplete incident report was approved by the next shift sergeant, who was not present during this incident.  (SDF # 55.)

Sgt. Inge took no steps to determine who opened the module and cell gates, and he would not necessarily have wanted to know who opened them, or why the

unauthorized Hispanic inmates where inside the row.  He never discussed the incident with Deputy Garibay or Bugarin.  Sgt. Inge failed to supervise his subordinate Garibay for failing to follow LASD policy and procedure that inmate worker trustees should not be on a row at the time any cell gates are to be opened. Sgt. Inge failed to follow policy which required the sergeant on duty to approve in writing, in the Title 15 log, the selection of inmate workers trustees.  (SDF # 55, 56; Exh. Policy 5) He did not even know the basic policy that inmate workers had to be approved by him in writing in the Title 15 Log, and that an inmate accused of murder could not be a trustee.  All three Hispanic attackers were housed in module A and had no business being in Module B (See Exhs. 15 and 16; SDF # 55 -57, 63.)

Sgt. Inge was not aware of basic policies although he testified that it was his duty to know them (the policy indeed), (Exh 3) instead, contrary to policy he routinely deferred his duty to his module deputies to select the trustees, failed to take any corrective measures with Dep. Garibay for abandoning his post.  (SDF # 58; Exh 3.) Sgt. Inge failed to supervise Deputy Garibay to determine why he failed to check inmate wristbands of the persons he let into the Row B (all of whom were housed in Row A).  He acknowledge that LASD policies and procedures require that a deputy should not provide access to anyone who is not housed on that row. (SDF # 59- 63.)

Sgt. Inge had a duty to investigate his subordinate and prepare a use of force report mandated by policy, but he ignored this obligation. (SDF #4; Exh 4.)

**Lt. Gonzalez, Watch Commander on Duty**: was present when Plaintiff was attacked.  He reviewed the reports but he never followed-up to find out what had happened again in the 2000 Floor, where more than half the killings in the jail were occurring.  He reviewed and signed the incident report of the attack on Starr, and he further documented in the watch commander's log that the incident required hospitalization of inmates.  He knew this required reporting to Capt. Clark, but the record is void of any such reporting compliance.  (SDF #44.)  He did not inquire into why Garibay did not report the attempted murder in the Title 15 log; he did not

inquire into Sgt. Inge's failure to discuss the incident with Dep. Garibay; he did not inquire into Sgt. Ingle's failure to discuss the incident with Mr. Starr; he did not inquire into Sgt. Inge's failure to determine why the row gates were opened with three inmates in the row, of which only one was a designated trustee, a second lived in a different housing area, and a third went unidentified; or, Sgt. Inge's failure to monitor or supervise the security lapses of Dep. Garibay that allowed the armed attackers to enter the row and Plaintiff's cell.  He did nothing, although he knew of ongoing racial tension s and problems of ongoing security failures, and Sgts. and deputies not knowing basic policies.  (SDF # 50, 52, 53.)

**Captain John Clark, Facility Commander**: was the Facility Commander at the jail when Plaintiff was attacked.  His duties included to know of problems in the facility and to ensure that his subordinate lieutenants and sergeants were taking appropriate corrective action in situations caused by lapses in security.  His duties included talking to them about the policies and procedures and making sure that safety of deputies and the inmates was a paramount concern of subordinate lieutenants and sergeant when they were walking the floors and doing their supervisory duties.  The sergeant were to do shift training with their people on variety fo policies, including Title 15 deputies.  (SDF # 66-70.)

Capt. Clark does not recall what he did regarding the supervisory performance of Lt. Gonzalez and Sgt. Inge or the security lapses caused by Garibay, although he signed the incident report and the injury report prepared by Christina Martinez.  He testified that the Title 15 logs must identify significant incidents within a module, such as an attempted murder with significant injuries, or an inmate taken to the hospital.  He should be called/advised by Lt. Gonzalez and he would have to report the incident to his commander. He had previously counseled Lt. Gonzalez that his responsibilities were not being met, but that report was purged after a year.  (SDF # 71 -73.)

1   Capt. Clark and Lt. Gonzalez agree that the importance of being informed of

2   incidents of violence and inmate on inmate violence in their facility, provides the

3   supervisors with notice of ongoing facility problems requiring corrective

4   intervention, yet in this case both failed to take any action in this incident and to

5   comply with their supervisory responsibilities.  (SDF # 74 - 78.)

6   **2.      WHERE DISPUTED FACTS EXIST THE COURT MUST DENY A**

7   **MOTION FOR SUMMARY JUDGMENT.**

8   A court must grant summary judgment if the pleadings and supporting

9   documents, viewed in the light most favorable to the nonmoving party, "show that

10  there is no genuine issue as to any material fact and that the moving party is entitled

11  to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; see *Celotex Corp. v. Catrett*,

12  477 U.S. 317, 322-23 (1986).  The evidence must be "such that a reasonable jury

13  could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477

14  U.S. 242, 248 (1986).

15  "[A] party seeking summary judgment always bears the initial responsibility

16  of informing the district court of the basis for its motion, and identifying those

17  portions of the pleadings, depositions, answers to interrogatories, and admissions on

18  file, together with the affidavits, if any, which it believes demonstrate the absence of

19  a genuine issue of material fact." *Celotex*, at 323 (internal quotations and citations

20  omitted). The party opposing summary judgment "may not rest upon the mere

21  allegations or denials of [the party's] pleading, but . . . must set forth specific facts

22  showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*; see *Matsushita*

23  *Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). However,

24  "[c]redibility determinations, the weighing of the evidence, and the drawing of

25  legitimate inferences from the facts are jury functions, not those of a judge." *Id.*, 255.

26  "The evidence of the non movant is to be believed, and all justifiable inferences are

27  to be drawn in his favor" at the summary judgment stage. *Id.*

28

3.     **CONTROVERTING FACTS ESTABLISH DEP. BUGARIN**
       **INTENTIONALLY DELAYED PLAINTIFF'S MEDICAL CARE.**

As set forth in the MSJ (at p 8:12-23) Defendant Bugarin admits it is her duty to seek medical care when indicated for an inmate.  Plaintiff Starr's Declaration (SDF #9,10) states: "My nose became very inflamed and **Deputy Bugarin refused to take me to medical for treatment of my nose**.   He had to get a court order to get treatment for my nose. This intentional delay violates Plaintiff's right to medical care. This violation is particularly flagrant because the Deputy knows of the inmate's serious injuries and inflicted some of them.  The standard established in *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), protects inmates against cruel and unusual punishment in a medical context. In *Bell v. Wolfish* 441 U.S. 520 (1979), this protection was extended to pre-trial detainees through the 14th Amendment and made the distinction between *Eighth* and *Fourteenth Amendment* protection for pre-trial detainees.

In the Ninth Circuit, the test for deliberate indifference consists of two parts. *McGuckin v. Smith*, 974 F.2d 1050 (9th Cir. 1991)*, overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc). First, the plaintiff must show a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.' " *Id.* at 1059. Second, the plaintiff must show the defendant's response to the need was deliberately indifferent. *Id.* at 1060. This second prong -- defendant's response to the need was deliberately indifferent -- is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. *Id.*

Plaintiff submit substantial facts that Bugarin acted with deliberate indifference.  Plaintiff presents evidence that he was stabbed 23 times  (SDF # 1) and that Bugarin kicked him in the face causing serious injury to his nose.   (SDF # 7). Bugarin was present at the incident and took Plaintiff to medical and knew the

seriousness of the injuries. After Plaintiff returned from the hospital, Bugarin also knew of his injuries and intentionally denied Plaintff access to medical treatment for many days notwithstanding his complaints of pain.

### A.   There Is No "Single Isolated Event" Requirement.

*Jett v Penner*, 439 F.3d 1091, 1096 (9th 2006) cited in the MSJ at p 9:2-4, for the proposition that "a single isolated event" is not actionable.  In *Jett*, a medical doctor was treating an inmate patient for a broken thumb.  The court rejected the Dr's argument that "because Dr. Penner ordered x-rays, prescribed pain medicine, continued to see Mr. Jett, and ultimately ordered an orthopedic consultation" that nonetheless he could be held liable for failing to follow up with required care.  The facts of *Jett* is inapplicable to Bugarin's conduct of intentionally, on several occasions, denying plaintiff access to medical care although she knew the initial treating doctor ordered Starr to return for medical care two days after Bugarin kicked him in the face.  See also *Thomas v. Warden Frank J. Pate,* 493 F.2d 151, 158 (7th Cir. 1974) (inmate in solitary confinement removal of sutures was delayed 15 days actionable.)

### B.   There Is No Requirement That Delay in Providing Medical Treatment Is Not Actionable "Unless the Delay Causes Substantial Harm."

*Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990) which the Defendant relies upon for the proposition that a plaintiff cannot establish a constitutional violation for delay in medical treatment "unless the delay causes substantial harm" was overruled in *Hudson v. McMillian*, 112 S. Ct. 995, 998-1000 (1992), rejecting "significant injury" requirement and noting that the Constitution is violated "whether or not significant injury is evident.")[2]

---

[2] The "substantial harm" requirement was never the law in the Ninth Circuit. See *McGluckin v. Smith*, 974 F.2d 1050, 1060, fn 12, (9th Cir.1992) (analyzing *Wood*.)

**4.    DEP. GARIBAY WAS DELIBERATELY INDIFFERENT TO PLAINTIFF'S RIGHT TO REASONABLE SECURITY.**

Plaintiff has a constitutional right under the *Fourteenth Amendment* to "reasonable safety" as required by *Farmer v . Brennan*, 511 U.S. 825 845-846 (1994).  "Prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners."  (*Id.*, 833 internal quotes and citations omitted.) "[H]aving stripped [inmates] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." (*Id.*, cites omitted.)  "A plaintiff may make the factual showing that a prison official had the requisite knowledge of a substantial risk 'in the usual ways, including inference from circumstantial evidence.'" Id., 842. "Thus a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*,  at 843 n.8.

The Court also made clear that a jail official such as Deputy Garibay could simply not turn a blind eye to the dangers of violating , let alone totally abandon his duty to provide reasonable security and then, as in this case, they ask a court to absolve him of his dereliction of duty and avoid liability because Plaintiff "in this instance" did not "did not inform anyone of safety concerns" of inmate-on-inmate violence and ignore what defendant did to cause it.  In rejecting this anticipated defense of self-created ignorance, *Farmer* held that jail officials will not "be free to ignore obvious dangers to inmates." Id., 842.

> Under the test we adopt today, an Eighth Amendment claimant **need not show that a prison official acted or failed to act believing that harm actually would befall an inmate**; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." (Id., citations omitted.)  "We doubt that a subjective approach will present prison officials with any serious motivation "to take refuge in the zone between 'ignorance of obvious risks' and 'actual knowledge of risks.'" Id., (cite omitted.) "Whether a prison official had the requisite knowledge of a substantial risk *is a question of fact* subject to demonstration in the usual ways, including *inference from circumstantial evidence*, and a factfinder may conclude that a prison

official knew of a substantial risk *from the very fact that the risk was obvious*. (Id., cite omitted, emphasis added.)

For example, if an Eighth Amendment plaintiff presents evidence showing that a **substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."** *Id*, 842-843 (Emphasis added.)

There is substantial evidence that at the time of the attempted murder, Dep. Garibay, was aware of a substantial risk of serious harm to inmates in the 2000 floor because of a series of previous murders in this area of the jail where Hispanic gang members inmates were allowed access into unauthorized areas with deputies not checking their wrist band identification (SDF #5), he had knowledge of the serious risk created by recent race riots involving Hispanic gangs attacking African Americans (SDF #1), he knew of the risk of failing to check the wrist band identification of the inmates he let into Row B, and, he was aware of the dangers of violating the security policy that cell gates are never opened when trustees are in the Row because broom and mops can be used as weapons (SDF # 4). Dep Garibay consciously disregarded to those risks by failing to demand wrist band inmate identification from the three Hispanic gang members who attacked Plaintiff (SDF # 4, 5). He knowingly opened the row security gate to the gang members, none were designated trustee (SDF #1; Exh # 11) and, intentionally opened Plaintiff's security cell gate **without looking** while the three Hispanic gang members were standing in front of Starr's cell; and, then, abandoning his post in the row's gate observation and control station after opening the cell gates letting the attackers into Plaintiff's cell. (SDF # 5.)

*Farmer* specifically rejected the arguments advanced by Deputy Garibay that to establish deliberate indifference to the right to reasonable security a

plaintiff must prove "the defendants were aware of a threat to the plaintiff" or that a plaintiff "must complain about his cell assignment" or that a particular inmate must have "threatened or caused a plaintiff harm prior to the subject incident" *Farmer*, at 843.

The cases cited in the MSJ are inapplicable to Plaintiff's claims. *Ruvalcaba v. City of Los Angeles*, 167 F.3d 514, 525 (9th Cir.1999) does not discuss a reasonable security issue, but is an issue of whether a "Dr. Sakamoto showed "deliberate indifference to [Ruvalcaba's] serious medical needs." *Id. Collins, v. County of Kern*, 390 F. Supp. 2d 964 (ED Cal. 2005) is inapplicable as the statements cited are misleading and taken out of context as the court's discussion was subtitled "***Transfer***" (*id.*, at 973, emphasis in the original) and it was in the context of whether the individual named defendants were responsible for a State prison inmate transfer. "[T]he court will presume that placing Plaintiff in D-Pod, Unit 5, created a serious threat to Plaintiff's safety." *Id.*, 973-974.  However, none of named defendant were involved in the decision to transfer plaintiff" (*id.*) And summary judgment in was based solely because the inmate plaintiff named the wrong persons to sue.  Similarly, in *Hurd v. Garcia*, 454 F. Supp. 2d 1032 (SD Cal 2006), again, the statements cited are misleading and taken out of context as the inmate plaintiff was alleging the defendants should have known a transfer to "Facility C" would place him at risk. *Id.*, 1046.  However, the plaintiffs own transfer records containing his interview and exhibits impeached him. *Id.*, 1046 -1047.

As stated above, defendants are attempting to use the language of *Collins* and *Hurd* to create requirements that Garibay cannot be liable solely because Plaintiff did not tell them he had been threatened.  This is not the law.

**5.    DEP. BURGARIN USED EXCESSIVE FORCE WHICH WAS UNREASONABLE AND DELIBERATELY INDIFFERENT TO PLAINTIFF'S RIGHTS.**

A reasonable jury could find that Dep. Burarin used excessive force against Plaintiff in violation of the *Fourth Amendment*. *See Lolli v. County of Orange*, 351 F.3d 410, 415 (9th Cir. 2003) ("'The *Fourth Amendment* sets the applicable constitutional limitations for considering claims of excessive force during pretrial detention'" (quoting *Gibson v. County of Washoe*, 290 F.3d 1175, 1197 (9th Cir. 2002)). Viewing the evidence in the light most favorable to Plaintiff, he was intentionally kicked in the face by Dep. Bugarin with steel tipped boots while he was the victim of a crime which had left him physically disabled from being stabbed 23 times.  He was lying face down on the floor of the row, completely handcuffed, offered no resistance and made no attempt to harm anyone.  (SDF #6)  He had committed no crime and had only lifted his head when he was kicked. (SDF #6.)

Under the circumstances, balancing the amount of force used against the lack of provocation, a reasonable jury could find that Dep. Bugarin's use of force was excessive.  "In considering an excessive force claim, we balance the nature and quality of the intrusion on the individual's *Fourth Amendment* interests against the countervailing governmental interests at stake." *Lolli*, at 415, internal quotation marks omitted).[3/]

Some older cases and other circuits hold that a pre-trial detainee's claim of excessive force is governed by the  Fourteenth Amendment's Due Process Clause instead of the Fourth Amendment. See e.g., *Rutherford v. City of Berkeley*, 780 F.2d 1444, 1446 (9th Cir.1986);  *Riley v. Dorton,* 115 F.3d 1159, 1161-1162 (4th Cir. 1998) and *Cottrell v. Caldwell,* 85 F.3d 1480, 1490 (11th Cir. 1996).  Here,

---

[3] See also *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir. 2003) (cert. denied *Anaheim v. Drummond*, 2004 U.S. LEXIS 4396 (U.S. 2004) (pre-trial detainee subjected to force is analyzed under the *Fourth Amendment* "[T]he degree of force used by the police is permissible only when a strong government interest *compels* the employment of such force." *Id.*, internal alteration and quotation marks omitted, emphasis in original.

because of the egregious nature of Bugarin's acts, under either standard, she intentionally used force where only a word command or a hand to control was necessary.

Defendant's argument that the "maliciously or sadistically or "intent to harm" standard for liability for use of force as is set forth in *Hudson v McMillian*, 503 U.S. 1 (1992) and other post conviction prison is not well taken.  In *Whitley v. Albers*, 475 U.S. 312 (1986), where an inmate shot by a guard during a prison riot, the Court established that in such circumstances "the unnecessary and wanton infliction of pain" violated the *Eighth Amendment*.'" *Id.*, at 319.  The above cited cases, *Lolli, Gibson* and *Drummond* hold this standard is inapplicable to a pre-trial detainee in a county jail in this circuit.  More importantly, the MSJ presents no admissible evidence that any defendant believed at any time of Bugarin's assault on Plaintiff was in the context of a prison-wide riot or other institutional explosive situation. When Bugarin arrived at the scene, all of the inmates were quietly lying on the floor (SDF #6).

**6.    CONTROVERTING EVIDENCE OF UNCONSTITUTIONAL PATTERNS AND PRACTICES WHICH ARE DELIBERATELY INDIFFERENT TO PLAINTIFF'S RIGHTS.**

   **A.    There Are Two Methods of Proof to Establish the Liability of an Entity for Violation of 42 U.S.C. § 1983**

*Oviatt v Pierce*, 954 F.2d 1470 (9th Cir. 1992) sets forth the two paths in which a plaintiff can prove entity and supervisor liability.  There, the court held that a local governmental entity is liable under § 1983 when (1) "**action** pursuant to official municipal policy of some nature causes a constitutional tort." *Monell v. Department of Social Servs.*[cites omitted] . . ." (2) "Moreover, a local governmental body may be liable if it has a **policy of inaction** and such inaction amounts to a failure to protect constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 388." *Id.*, 1474.

These "two alternative paths to liability" set forth in *Oviatt* were again carefully delineated in *Gibson v. County of Washoe*, 290 F.3d 1175, 1184 (9th Cir. 2002), (deputies' actions resulted from policies, practices of the Sheriff's Department, that caused and/or contributed to Gibson's death) as follows:

> First, a plaintiff can show that a municipality itself violated someone's rights or that it directed its employee to do so. [cite omitted].  Alternatively . . . a plaintiff can demonstrate that a municipality is responsible for a constitutional tort committed by its employee, even though it did not direct the employee to commit the tort.[cites omitted]." *Gibson,* 1185.

**B.     Elements Required for The First Path to Liability**

To find the County liable under the first path, "the County must have **(1)** had a policy that posed a substantial risk of serious harm to [someone in plaintiffs' situation]; and **(2)** known that its policy posed this risk." *Farmer v. Brennan,* 511 U.S. 825, 837, fn.10 (1994), *Gibson,* 1188.  Direct or circumstantial evidence may show that a reasonable jury could infer that County policymakers knew that this risk existed and chose to ignore it.  *Gibson,* 1190, 1193.  Because direct evidence of a person's mental state rarely exists, it is not necessary to prove a person's subjective awareness.  This inquiry is "subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer,* 842, *Gibson,* 1190.

In considering whether a municipality or its supervisors violated a person's rights, the focus is on the municipality's "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 121,(1988) (quoting *Monell,* 436 U.S. at 690).

A *single incident* of unconstitutional activity is insufficient to impose liability under the first path, where, as here, the incident "includes proof that it was caused by an existing, unconstitutional municipal policy, which . . . can be attributed to a

municipal policymaker." *City of Oklahoma v. Tuttle,* 471 U.S. 808, 823-824 (1985).

**(1)    "Policy or Custom" in Proving  Liability Under Either Path to Liability.**

Under *either* "path to liability" a "policy" is defined as "'a deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.'" *Oviatt,* 954 F.2d at 1477, quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483 (1986).  The Ninth Circuit reiterated this definition of "policy" in the context of either path to municipal liability in *Fairley v. Luman,* 281 F.3d 913 (9th Cir.2002).  "A "policy" can be **one of action**, see *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 661 (1978) (forcing women to take early maternity leave), **or inaction**, see *City of Canton*, 387 (failure to train); *Oviatt,* 954 F.2d at 1477 (failure to implement adequate procedural safeguards)." Id., 918, emphasis added.

**(2)    The Sheriff and Supervisor Defendants Are the Policymakers Whose Deficient Policies Lead to the Constitutional Violation.**

The MSJ does not argue nor set forth any *evidentiary facts* that Sheriff Baca (in his official capacity) and MCJ Facilites Capt. Clark are not the "officials responsible for establishing final policy with respect to the subject matter in question," i.e., the affirmative policies of Defendants County, LASD and Baca. These Defendants were on actual and constructive notice by a series of reports, injuries and deaths of inmates from incidents of inmate on inmate violence that (1) its custom of failing to train in the policy requiring the selection of inmate trustees with the approval of a supervisor would result in violent prison gang members being selected as trustees within the jail (SDF# 30, 66,71); (2) its failure to train deputies that the failure to affirmatively require identification checks of inmates entering a housing area (SDF#30, 72-78 Decl. Sullivan pp. 25-27); and, (3) its custom of

tolerating inmate on inmate violence, caused by lax supervision, a failure to train line personnel in reasonable security procedures and a practice of not investigating, not disciplining deputies and supervisors, not ensuring training regarding corrective measures are enforced would likely result in constitutional violations. The entity defendant's deliberate indifference led to the violation of Plaintiff's constitutional right. (See SDF# 72-78; Decl. Sullivan pp. 7-8, setting forth the Sheriff's statutory duties and his inaction.)

>    **(3)    Whether the Policies Violated Plaintiff's Rights Does Not Require That the Policymakers Knew the Policies Would Harm Him in Particular.**

The moving papers ( at MSJ p. 17:21-23) wrongly state the law on the requirements under the "first path," where they argue "he cannot show that such customs and practices were the moving force behind his claimed damages." This argument has been directly refuted by the Supreme Court and the Ninth Circuit:

> . . . whether the County policies violated Gibson's rights does not hinge on whether County policymakers knew that the County's policies would pose a substantial risk of serious harm *to Gibson*, in particular. As long as a jury can infer that the policymakers knew that their policy . . . *would pose a risk to someone in Gibson's situation*, we must reverse the summary judgment in favor of the County. [cite omitted] (*Gibson,* 1191, emphasis added.)

>    **(4)    Under The First Path to Liability it Is Not a Requirement That an Individual Defendant Had Violated the Plaintiffs' Constitutional Rights**

Defendants do not address the elements required of the first path ("policy of action,") and instead argue (at MSJ p. 14:20-24) the following contention: "*Monell* does not authorize an award of damages against a public entity based on the actions of one of its officers when the *officer inflicted no constitutional harm*"

citing *City of Los Angeles v Heller,* 475 U.S. 796, 799 (1986).  In *Gibson,* the Ninth Circuit stated:

> The municipal defendants (the County and its policy-makers, Sheriff Kirkland and Chief Deputy Sheriff Wright) assert that if we conclude, as we do, see infra, that the individual deputy defendants are not liable for violating Gibson's constitutional rights, then they are correspondingly absolved of liability. Although there are certainly circumstances in which this proposition is correct, see *City of Los Angeles v. Heller,* [cites omitted] *it has been rejected as an inflexible requirement by both this court and the Supreme Court.*  (*Id.*, fn.7, 1186, emphasis added.)

The *Gibson* court cited many cases in support of this position [4/] and explained the distinction between *Heller* and the case at bar: " . . . in this case, the constitutional violations for which we hold the County may be liable *occurred before the actions of the individual defendants at the jail*, so the County is not being held liable for what those deputies did." *Id.*, emphasis added.  Here, as in *Gibson,* the County's violations involved past policy decisions by the policymakers.  These will be discussed below.

**C.**   **Under the Second Path to Liability, the County's Practices of Omission Were the Moving Force Behind the Violation of Plaintiff's Right to Reasonable Security.**

**(1)**   **The Elements of the Second Path to Liability**

To impose liability against the County under the second path, a plaintiff must show: (1) that a County employee violated Leon's rights; (2) that the County has customs or policies that amount to deliberate indifference (as that phrase is defined by Canton); and (3) that these policies were the moving force behind the employee's

---

[4] *Gibson,* fn.7, 1186, citing e.g., *Owen v. City of Independence,* 445 U.S. 622, 652,(1980) (a "'systemic' injury" may "result not so much from the conduct of any single individual, but from the interactive behavior of several government officials, each of whom may be acting in good faith.")

violation of Gibson's constitutional rights, in the sense that the County could have prevented the violation with an appropriate policy.  *Gibson,* 1193-1194, *Amos v. City of Page,* 257 F.3d 1086, 1094 (9th Cir. 2001).

>        **(2)      It Is Established That Dep. Garibay Violated Leon's Rights**.

Plaintiff has previously established that disputed facts exist that the Deputy Garibay denied Plaintiff's right to reasonable security and this conduct violated his rights.  (SDF # 11.)

>        **(3)      The County's Policies of Omission Are Deliberate Indifferent.**

In *City of Canton* the Supreme Court held that policies of omission regarding the failure to train or the inadequacies of supervision of employees, can be "policies" or "customs" that create municipal liability, but only if the omission "reflects a 'deliberate' or 'conscious' choice" to countenance the possibility of a constitutional violation. *Id.*, 389-390. "Unlike the deliberate indifference standard used to determine if a violation of a detainee's right to receive medical care took place, **this standard does not contain a subjective component**." *Farmer,* 841 emphasis added. As a result, there is no need for plaintiffs "to prove that the County policymakers actually knew that their omissions would likely result in a constitutional violation." *Gibson,* 1195.  A jury may infer that a municipality made such a deliberate choice "when a municipal actor disregarded a known or obvious consequence of his action." *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1994). Whether a local government has displayed a policy of deliberate indifference to constitutional rights is generally a jury question.  *Oviatt,* 1478; *Gibson,* 1194-1195.)

"When the need to remedy the omission "is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, ... the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton,* 390. The need to act "may be obvious because *any reasonable person* would recognize the need; for example, because armed officers will often arrest fleeing

felons, it is obvious that a municipality must train its officers in the constitutional limitations on the use of deadly force." Id. at 390, fn.10.  Here, the evidence is overwhelming that the County's policymakers and individual supervisors have policies that amount to deliberate indifference to the right to reasonable security.

### (4)     County's Policies Were the Moving Force Behind the Violation of Plaintiffs's Constitutional Rights

In order to be a "moving force" behind Plaintiff's right to reasonable security the "identified deficiency" in the County's policies must be "closely related to the ultimate injury." *Canton,* In order to be a "moving force" behind Gibson's injury, we must find that the "identified deficiency" in the County's policies is "closely related to the ultimate injury." *Canton,* 391; see also *Oviatt,* 1478.  The plaintiff's burden is to establish "that the injury would have been avoided" (Id.)  The undisputed evidence before the Court is that these policies were the moving force leading to Mr. Leon's death.

### (5)     The Identified Deficiencies Are Closely Related to the Ultimate Injury.

#### (a)     Inaction in Correcting Staggering rates of Inmate on Inmate Murder, Attempted Murders and Assaults.

The practice of inaction of the policymakers that ignored repeated written warnings of findings of the continuing failures of the supervisors at the MCJ in Los Angeles County to enforce the policies, procedures, orders, and findings of government agencies including their own investigative bodies, is shocking, and clearly shows deliberate indifference to the safety and welfare of the jail detainees. (SDF # 30, 69-77; p. 26 Sullivan, ¶s 1.)  The inaction in policymakers correcting continuing lapses of security and failures to investigate and take appropriate action to train, supervise, reprimand or discipline not only line staff, but more importantly, the

sergeants, lieutenants and captains working in the jails is closely related to Plaintiff not having reasonable security.  (SDF # 30, 71-78; p. 26 Sullivan, ¶s 2.)  Defendants chose to ignore The reports by Special Counsel Merrick Bobb, of his attorneys at OIR, and PARC, which gave the County, LASD and Sheriff Baca clear notice of reported endemic ongoing violations and of the existence of conditions which created potential violations by his staff, and which led to inmate-on-inmate violence, resulting in many murders and brutal beatings.  The reports gave him notice that the incidents resulting in deaths and brutal beatings, which included gang related killings and beatings, many times occurred due to deputies abandonment of their assigned positions, failure of deputies to timely monitor, and the failure of supervisors to supervise their deputies and to take corrective measures. (SDF # 30,66 p.26 Sullivan, ¶s 3.) These policies of inaction--failing to institute basic, fundamental, systems of supervision and training-These ongoing and unabated problems, reveal that the County, LASD and Sheriff  has a custom of tolerating inmate on inmate violence, caused by lax supervision, a failure to train line personnel in reasonable security procedures and a practice of not investigating, not disciplining deputies and supervisors, not ensuring training regarding corrective measures are enforced.  Most troubling, despite these explicit warnings and notices, Sgt. Inge, Lt. Gonzalez and Capt. Clark all testified in deposition that the Sheriff did not undertake any actions before this case to direct his facility supervisors or lieutenants to target the ongoing patterns and practices stated above. (SDF # 66-69 p. 26 Sullivan, ¶ 4.)

> **(b)    The Injury To Starr Would Have Been Avoided.**

A jury could conclude that had the County, LASD, and Sheriff Baca and supervisor defendants had a policy to fully investigate, train and discipline each lapse of security, the injury to Plaintiff could have been avoided by simply enforcing the common sense requirements of reasonable security.

**7.    CONTROVERTING EVIDENCE OF UNCONSTITUTIONAL CONDUCT OF LT. GONZALEZ, SGT. INGE, AND CAPT. CLARK.**

Supervisory liability can be established as follows:

- a supervisor has actual knowledge of a subordinate's constitutional violation and acquiesces (see, *e.g.*, *Baker v. Monroe Twp.*, 50 F.3d 1186, 1194 (3d Cir. 1995) and *Woodward v. Worland*, 977 F.2d 1392, 1400 (10th Cir. 1992)); or,

-  where supervisors "'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see,'" (see e.g., *International Action Center v. United States*, 365 F.3d 20, 28 (DC Cir. 2004)(quoting *Jones v. Chicago*, 856 F.2d 985, 992 (7th Cir. 1988)); or,

- where the supervisor has no actual knowledge of the violation but was reckless in his supervision of the subordinates (see, *e.g.*, *Hall v. Lombardi*, 996 F.2d 954, 961 (8th Cir. 1993)); or,

- where the supervisor was grossly negligent (see, *e.g.*, *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 902 (1st Cir. 1988).

Here, Lt. Gonzalez the Watch Commander present at the jail when Plaintiff was attacked, as part of the long standing custom or practice, failed to supervise, investigate or report the attempted murder.  Lt. Gonzalez abandoned his post and failed to approve the reports of the incident  (SDF # 42-53) he failed to report or investigate Sgt, Inge's failure to investigate the security lapses of Dep. Garibay that allowed the attackers to enter the row and Plaintiff's cell; Sgt. Inge's failure to approve the selection of trustees (Dep. Bugarin's use of force; Sgt, Inge's failure to train Dep. Garibay in the policies regarding reasonable security in opening gates; Sgt, Inge's failure monitor or supervise the opening of security gates; or investigate Garibay's conduct.

Sgt, Inge's who was present at the attempted murder of Plaintiff failed to train Dep. Garibay in the policies regarding reasonable security in opening gates; failed to

monitor or supervise the opening of security gates; failed to investigate the security lapses of Dep. Garibay that allowed the attackers to enter the row and Plaintiff's cell; failed approve the selection of trustees as required by policy, apparently allowing a accused murder to enter Row B; failed to report or investigate Dep. Bugarin's use of force; failed to report the crime of attempted murder and failed to supervise, investigate or report the security lapses caused by Dep. Garibay.

Capt. Clark, the Facility Commander at the jail when Plaintiff was attacked, as part of the long standing custom or practice, failed to supervise, investigate or report Lt. Gonzalez's and Sgt, Inge's failure to investigate the security lapses of Dep. Garibay that allowed the attackers to enter the row and Plaintiff's cell; Sgt. Inge's failure to approve the selection of trustees; Dep. Bugarin's use of force; the the crime of attempted murder; Sgt, Inge's failure to train Dep. Garibay in the policies regarding reasonable security in opening gates; Sgt, Inge's failure monitor or supervise the opening of security gates; and Lt. Gonzalez's abandonment his post and failure to approve the reports of the incident.

In *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) The Circuit found as follows:

The findings of fact detail the top administrators' failure to investigate the retaliation complaints, the lack of reprimand or discipline for the officers involved even when their supervisors were aware of the complaints, and the delegation of investigation to officers involved in the grievances. This turn a-blind-eye approach does not insulate the Department. On the contrary, the findings are more than sufficient to support the conclusion that the retaliatory acts were condoned by the officials, sufficient to "make clear to officers that ... they could get away with anything." *Id*. The Department's failure to investigate or correct

constitutional violations supports the district court's finding that there

was a policy or custom that led to violation of the inmates' rights. *Id.*

See also *Beck v. Pittsburgh*, 89 F.3d 966 (3rd Cir. 1996) (acts of ineffectual

investigators who rarely disciplined police officers for excessive force

constituted "sufficient evidence from which a reasonable jury could have

inferred that the City knew about and acquiesced in a custom tolerating the tacit use

of excessive force by its police officers").

## 8.   DEP. BUGARIN IS NOT ENTITLED TO QUALIFIED IMMUNITY.

### A.   Dep. Bugarin Is the Only Defendant Seeking Qualified Immunity.

While the caption presents that the "Individual Defendants are Entitled to

Qualified Immunity," the only person the MSJ presents any evidence or argument is

Dep. Bugarin.  Based on the principle that "[A] party seeking summary judgment

always bears the initial responsibility  of informing the district court of the basis for

its motion, and identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, which it

believes demonstrate the absence of a genuine issue of material fact (*Celotex*, 477

U.S. at 323 (internal quotations and citations omitted) Plaintiff will not address any

other named individual defendant as the MSJ fails to meet its burden.[5/]

### B.   Defendant Bugarin Is Not Entitled Qualified Immunity.

Resolving claims of qualified immunity allows for a two-issue analysis of

*Saucier v. Katz*, 533 U.S. 194 (2001). First, a "court required to rule upon the

qualified immunity issue must consider . . . this threshold question: Taken in the light

most favorable to the party asserting the injury, do the facts alleged show the

---

[5]   (See MSJ at p. 23:3-5 arguing qualified immunity for "Dep. Bugarin," for a "housing choice" not alleged in this case; MSJ at p. 24:7-10 ep. Bugarin used force "to quell an altercation;" MSJ at p. 24:19-21 "Dep. Bugarin used force . . .;" MSJ at p. 24:7-10 "Dep. Bugarin did not violate . . . " and, MSJ at p. 25:19-21 "Dep. Bugarin entitlement to qualified immunity . . . ."

officer's conduct violated a constitutional right?" *Id*. at 201. This hurdle is generally a low one for plaintiffs opposing summary judgment in excessive force cases.

The Ninth Circuit has held that claims that law enforcement officers have used excessive force of an arrestee or pretrial detainee must be analyzed under the Fourth Amendment and its 'reasonableness' standard. *Lolli v. County of Orange*, supra, *Smith v. City of Hemet*, 394 F.3d 689, 700-01 (9th Cir.), *cert. denied*, 125 S.Ct. 2938 (2005) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989), and *Ward v. City of San Jose*, 967 F.2d 280, 284 (9th Cir. 1992) (as amended).

> "Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); *see also Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (as amended) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury."). This is because such cases almost always turn on a jury's credibility determinations. *Id.* (brackets in original).

The record, viewed in plaintiffs' favor, establishes that Dep. Bugarin  kicked Plaintiff in the face when he was physically disabled from being stabbed 23 times, lying face down on the floor of Row B, completely handcuffed, offered no resistance and made no attempt to harm anyone, and only raised his head. The MSJ offers no evidence that Dep. Bugarin "was quelling an altercation."  The evidence is that it was clam and every inmate was compliant.

The second issue on the qualified immunity analysis is whether the right to be free of force The use of force on a handcuffed person when they are have not committed a crime, not attempting to flee and pose no danger to the officer is well established.  See *Gaut v. Sunn*, 792 F.2d 874, 875 (9th Cir. 1986) (inmate beaten and

-24-

1  kicked and thrown against a wall when he shuffled his feet during a prison

2  "shakedown," and  beaten again while handcuffed, and listing other similar cases).

3  **9.    DEFENDANTS HAVE LIABILITY FOR PUNITIVE DAMAGES.**

4       *Smith v. Wade*, 461 U.S. 30, 34 (1983) held that punitive damage awards "did

5  not require a showing of actual malicious intent; they permitted punitive awards on

6  variously stated standards of recklessness, or other culpable conduct short of actual

7  malicious intent." *Id*, at 45.

8       Allegations of punitive damages are not normally subject to summary

9  judgment.  However, if the court reaches the issue, there are issues of disputed fact to

10  support a finding of Bugarin intentionally using excessive force, Garibay's reckless

11  violation of plaintiff's right to reasonable security, intentional denial of access to

12  medical care, intentional deprivation of due process in retaliation of Plaintiff's

13  complaint against Dep Bugarin for being kicked in the face which are triable issues

14  of fact to be determined by the jury.

15  Dated: October 15, 2009

16  **LAW OFFICE OF R. SAMUEL PAZ    SONIA MERCADO & ASSOCIATES**

17

18       /S/ R. Samuel Paz                        /S/ Sonia Mercado
    By: _____        By: _____
19  R. Samuel Paz, Co-Counsel for Plaintiff   Sonia Mercado, Co-Counsel for Plaintiffs

20

21

22

23

24

25

26

27

28