Richard S. Bryce
Criminal Justice Consulting

2 October 2009

**Rule 26 Report**
**Dion Starr v. County of Los Angeles, et al.**
**File No. 281-049-2, 3, 28**

The following report is respectfully submitted in compliance with Section (a)(2)(B) of
Rule 26. If called upon to testify as a witness in the above entitled matter, I would offer
the following opinions based upon the information that was available to me at the time
the report was prepared:

**OPINIONS:**

1. Jail personnel responded to the incident involving plaintiff in a timely,
   professional manner and in accordance with policies and procedures established
   by LASD.
2. The incident involving Plaintiff occurred during routine pill call.
3. It was common, reasonable practice to have trustees in the "freeway" of the
   housing unit during pill call.
4. Plaintiff was provided medical care in a reasonable time period following his
   injuries.
5. Evidence does not support the allegation that Deputy Maybet Bugarin kicked
   Plaintiff in the face and called him racial epithets.
6. Defendant Maybet Bugarin did not show deliberate indifference towards
   Plaintiff's medical needs.
7. Deputy Jose Garibay had no reason to believe that Plaintiff was as risk for being
   violently attacked prior to opening his cell gate for pill call.
8. Deputy Jose Garibay was following the established practice for pill call when he
   opened the cell gates for all cells in Module 2400 row B.
9. The supervision, training and security exercised by Defendants in this matter
   provided a reasonable level of safety for Plaintiff and the other inmates housed in
   the 2400 Module.

**DATA AND INFORMATION RELIED UPON:**

1.    Plaintiff's Second Amended Complaint.
2.    Plaintiff's Third Amended Complaint.

2

3.    Incident Report of 1/27/06.
4.    Medical records of Dion Starr from LAC USC Medical Center.
5.    Medical records of Dion Starr from Men's Central Jail.
6.    Deposition transcript of Dion Starr.
7.    Deposition transcript of Deputy Raul Magadan.
8.    Deposition transcript of Deputy Anthony Montes.
9.    Deposition transcript of Deputy Maybet Bugarin.
10.   Deposition transcript of Deputy Christine Martinez.
11.   Deposition transcript of Deputy Patricia Casas.
12.   Deposition transcript of Deputy Edgar Solano.
13.   Deposition transcript of Deputy Jose Garibay.
14.   Deposition transcript of Sgt. Michael Inge.
15.   Deposition transcript of Lt. Alfred Gonzales.
16.   Deposition transcript of Capt. John H. Clark vols. I & II.
17.   LACSD selected policies and procedures produced to date (10/17/08).
18.   Title 15 Documents produced to date (10/17/08).
19.   Color copies of photographs depicting plaintiff's injuries.
20.   Disciplinary records of Veloz and Sandoval.
21.   Plaintiff's response to LASD's interrogatories set 2.
22.   Plaintiff's response to LASD's request for production of documents set 2.
23.   Plaintiff's response to Maybet Bugarin's request for production of documents.
24.   Plaintiff's response to Maybet Bugarin's request for interrogatories.
25.   Plaintiff's supplemental response to LASD's interrogatories, set 2.
26.   Plaintiff's supplemental response to LASD's request for production of
      documents set 2.
27.   Plaintiff's response to Captain John Clark's request for admissions.
28.   Plaintiff's response to Captain John Clark's interrogatories.
29.   Plaintiff's response to Sgt. Michael Inge's request for admissions.
30.   Plaintiff's response to Sgt. Michael Inge's interrogatories.
31.   Plaintiff's response to Lt. Alfred Gonzales' interrogatories.
32.   Plaintiff's response to Lt. Alfred Gonzales' request for admissions.
33.   Plaintiff's response to Deputy Jose Garibay's request for admissions
34.   Plaintiff's response to Deputy Jose Garibay's interrogatories.
35.   OIR Report October 21, 2003 and April 20, 2004 Executive Summary.
36.   Personnel Orientation Manual for Men's Central Jail.
37.   LASD Custody Division Policies and Procedures (10/1/09).
38.   On site inspection of LA Men's Jail, Module 2400.

## BASES FOR OPINIONS AND DISCUSSION:

1.  **Jail personnel responded to the incident involving plaintiff in a timely, professional manner and in accordance with policies and procedures established by LASD.**

    When jail deputies discovered a disturbance in progress at approximately 8:30 a.m., on 1/27/06, during pill call, assistance was requested to put down the

5

Plaintiff was returned to the Men's Central Jail Clinic at 6:13 p.m., on 1/27/06.
He was treated by at least 4 medical practioners or doctors at the MCJ Clinic in
addition to the treatment he received at the LA County Medical Center on
1/27/06.

Plaintiff was treated 7 more times for his injuries between 1/27/06 and 2/22/06.
(LACSD Inmate Medical Documentation pages 5-9, COLA/LASD 01193-97.)

5. **Evidence does not support the allegation that Deputy Maybet Bugarin kicked
   Plaintiff in the face and called him racial epithets.**

   There was no information provided to me that would support Plaintiff's allegation
   that Deputy Maybet Bugarin kicked him in the face and called him racial epithets.

   The first record of Plaintiff making an allegation that he was kicked was on
   2/2/06, 6 days after the incident. (Inmate Medical Documentation, page 7,
   COLA/LASD 01195.) On 1/27/06, Plaintiff stated "I was coming out of my cell
   for pill call when the other inmates start hitting me and my cell mate," and "I was
   in a fight." Both of these statements were made to medical practioneers while he
   was being treated for his injuries. (Inmate Medical Documentation, pages 5, 6
   COLA/LASD 01193-94.)

6. **Defendant, Maybet Bugarin did not show deliberate indifference towards
   Plaintiff's medical needs.**

   The documents that were provided to me indicate that Deputy Bugarin was
   involved in Plaintiff's medical treatment on only two occasions. The first
   occurrence was when Plaintiff was involved in the altercation in his cell. Deputy
   Bugarin responded to a call for assistance and upon her arrival she found that the
   disturbance has been quelled. Plaintiff was handcuffed and she along with a male
   deputy escorted Plaintiff to the MCJ Clinic. (Inmate Injury Report LASD 01013,
   Bugarin Deposition pages 40-51.)

   The second time Deputy Bugarin was involved in Plaintiff's medical treatment
   was when she was requested by the MCJ Clinic on 2/9/06 at 10:49 a.m. to send
   Plaintiff to the clinic for follow up treatment. Deputy Bugarin advised Nurse Joji
   L. Hagler that the jail was in lockdown and she didn't know when he could be
   sent to the clinic. At 12:52 p.m., on 2/9/06 Nurse Hagler again notified Deputy
   Bugarin that Plaintiff was needed in the clinic for an evaluation. At 2:27 a.m., on
   2/10/06, Plaintiff was examined in the clinic. (Inmate Medical Documentation
   page 8 COLALASD 01196.)

   There was some delay in escorting Plaintiff to the clinic on 2/9/06, however, it
   was caused by a lockdown in the jail and was not an exercise of deliberate
   indifference on the part of Deputy Bugarin.

3

altercation. Deputies responded according to established procedures and subdued the offending inmates. (Incident Report dated 1/27/06, page 4.)

Deputy Jose Garibay testified in his deposition that when he heard a cry for help he put out a radio request for assistance. Within seconds of his request for assistance, responding deputies arrived at the housing module. (Garibay Deposition pages 62-63.)

Plaintiff alleges defendants knew, or should have known, that he was at risk for being violently attacked and "that he repeatedly yelled for help to prevent being attacked by violent Hispanic gang members." (Plaintiff's Third Amended Complaint for Damages page 6:7.) However, Plaintiff in his deposition testified that the 3 Hispanic trustees that attacked him were merely talking with his two Hispanic cellmates prior to the cell gates being opened. (Starr Deposition page 56.) He testified that he began yelling for help after he was attacked. ((Starr Deposition page 61, lines 22-25.)

Plaintiff has attempted to portray this as a major incident. The evidence does not support that allegation. (Custody Division Manual, section 4-01/010.15) Plaintiff has described his injuries as an attempted murder involving 23-25 stab wounds. Medical reports described his wounds as superficial lacerations. (Inmate Medical Documentation pages 5-6.)

Undoubtedly, some form of "jail manufactured weapon" was used in the altercation to inflict at least some of the injuries to Plaintiff and two other participants. However, none of the injuries to Plaintiff or the other participants were found to be life threatening. It is unfortunate that whatever weapon or weapons used were not recovered. That is not an uncommon occurrence in a jail disturbance as is also the reluctance of the parties involved to provide information that would assist in the investigation.

2. **The incident involving Plaintiff occurred during routine pill call.**

The evidence provided to me establishes a consistent record of the circumstances at the time Plaintiff was involved in the altercation with other inmates. The cell doors in his housing unit were opened to allow inmates in that particular housing row to exit their cells for pill call.

It is my opinion, based upon my professional experience in the operation of jails similar in configuration to Module 2400 row B, and observing pill call being conducted in facilities throughout the nation, that the procedures used during the pill call conducted in Module 2400 on 1/27/06, were consistent with industry standards and provided a reasonable level of safety for inmates and staff.

4

Deputy Martinez recorded in the Incident Report dated 1/27/06 (LASD 01004) "A fight began when cell gates were opened for pill call." And, "S/V #4 Starr told me when his cell gate (2400 B 9) opened for pill call, he was attacked."

Deputy Garibay testified in his deposition, "The first thing that I recall of this incident was having pill call and opening the gates from Baker row for pill call." (Garibay Deposition page 21:14-16.)

Staff nurse, Annaliza D Felix reported on 1/27/06 at 9:35 a.m., that Plaintiff, Starr " I/M alleged "I was coming out of my cell for pill call when the other inmates start hitting me and my cell mate." (COLA/LASD 01193).

Plaintiff testified in his deposition that he was a trustee for about eight months on the 2400 Baker row housing unit and that he was assigned to assist with pill call procedures. When asked how long it typically took to complete pill call, he responded "About an hour." (Starr Deposition page 21, line 13.) Plaintiff's Exhibit 16, 2400 Unit Housing Log, dated 1/27/06 shows that pill call began at 0740 am. (COLA/LASD 01369).

3. **It was a common, reasonable practice to have trustees in the "freeway" of the housing unit during pill call.**

   It is my opinion, based upon my professional experience in the operation of jails during pill call, and my personal observation of pill call being conducted in jail facilities throughout the nation, that absent knowledge of a pending security risk, it was reasonable to have trustees in the "freeway" of row B during pill call.

   Sergeant Inge was asked by Plaintiff's attorney during his deposition if he would allow trustees to stand in the "freeway" when pill call is made, and he responded that he would. (Inge Deposition page 163, lines 9-13.)

   Deputy Anthony Montes testified in his deposition that it was the custom and practice within the Sheriff's Department to allow trustees to be inside the module while the gates were open for pill call. (Anthony Montes Deposition page 63-64 lines 3-25, 1.)

4. **Plaintiff was provided medical care in a reasonable time period following his injuries.**

   Plaintiff, Starr was escorted to Men's Central Jail Clinic for treatment of his injuries and received treatment at 9:10 a.m., on 1/27/06, by A. Felix. (Inmate Injury Report LASD 01013).

   Plaintiff was transferred from the MCJ Clinic to LA. County Medical Center at 10:07 a.m., on 1/27/06. (Men's Central Jail Facility Log COLA/LASD 01353.)

6

7. **Deputy Jose Garibay had no reason to believe Plaintiff was at risk for being violently attacked prior to opening his cell gate for pill call.**

Nothing in the documents provided to me supports Plaintiff's allegation that Deputy Garibay should have known that Plaintiff was at risk for being violently attacked by Hispanic gang members prior to his cell gate being opened.

Deputy Garibay testified that he looked down the housing row and called out a warning that the gates were about to be opened prior to opening the cell gates. He did not hear any calls for help until after the cell gates were opened and the inmates were exiting their cells into the "freeway."(Garibay Deposition, pages 61-62.)

Plaintiff testified in his deposition that prior to the gate to his cell being opened the trustees in the "freeway" were talking to inmates in his cell and in cells on both sides of his cell. Plaintiff made no mention in his testimony that he was in any danger prior to his cell gate being opened. Plaintiff was asked, "So they were simply speaking with Hispanic prisoners or … inmates in the area?" Plaintiff answered "Yes." Additionally, Plaintiff testified that he had been housed with two of his alleged attackers for two weeks prior to 1/27/06, and again made no mention of any concern for his safety. (Starr Deposition, page 59:17.)

During my tour of the MCJ and specifically Module 2400 row B, I observed that the distance from the security cage to cell 9, where Plaintiff was housed, was approximately 90 feet. It is my opinion that if Plaintiff had "screamed for help and protection," prior to the gate to his cell being opened, as he alleged in his Third Amended Complaint, Deputy Garibay would have heard his cries for assistance. (Plaintiff's Third Amended Complaint, page 6:15.)

Based on the above listed facts and observations it is also my opinion that Plaintiff did not summon assistance until after the cell gates were opened for pill call.

8. **Deputy Jose Garibay was following the established practice for pill call when he opened the cell gates for all cells in Module 2400 row B.**

Deputy Garibay's actions during pill call on 1/27/06 were consistent with the pill call protocol described by Sergeant Michael Inge in his deposition. (Inge Deposition, pages 32-44.)

Deputy Patricia Casas's description of the pill call protocol in effect on 1/27/06, was consistent with the description of the procedure Deputy Garibay testified he used on 1/27/06. (Casas Deposition, pages 53-57.)

7

Captain Clark testified in his deposition that it was the appropriate procedure to
open all the cell gates in a single row, in a general population module, during pill
call. (Clark Deposition Volume I, page 163:8-18.)

9. **The supervision, training and security exercised by Defendants in this matter
provided a reasonable level of safety for Plaintiff and the other inmates
housed in the 2400 Module.**

Improper classification and housing of inmates.

There was no evidence provided to me that supported Plaintiff's allegation
that any of the inmates involved in this incident or any of the inmates
housed in Module 2400 row B, were improperly classified. There also
was no evidence provided that supported the allegation that Plaintiff was
in danger for risk of harm because of the LASD classification system.

The LASD Classification Program is a very comprehensive system
designed to provide security and safety for inmates and employees
working in the various custodial facilities controlled by LASD.

The LASD Classification Program has a very rigid system of
accountability for the proper classification of inmates. Unit Commanders
are required to ensure that their facilities are in compliance with
classification review procedures. The Inmate Reception Center Unit
Commander or his designee is responsible for reviewing the status of each
facility on a weekly basis and is required to report, in writing, any
violations to the concerned Division Chief, Area Commander and Unit
Commander. ( COLA/LASD 01309)

Inadequate supervision and training of custody assistants and deputies to provide
reasonable security to inmates.

There was no evidence provided to me that supported Plaintiff's allegation
that Captain Clark, Lieutenant Gonzales and Sergeant Inge failed to
provide adequate supervision and training to the deputies and custodial
assistants involved in this incident.

In Defendant's requests to Plaintiff for admissions and production of
documents, Plaintiff failed to provide any information or documentation
that would support the above allegations against Captain Clark, Lieutenant
Gonzalez and Sergeant Inge,. (Plaintiff's Response to Defendant, Capt.
John Clark's Request for Admissions, Plaintiff's Response to Defendant,
Sgt. Michael Inge's Request for Admissions, Plaintiff's Response to
Defendant, Lt. Alfred Gonzales's Request for Admissions.)

When asked in his deposition, "How did you ensure the welfare and safety of inmates when you were on duty," Lieutenant Gonzales said he would have daily briefings with his deputies and sergeants and update them. He would also walk the floors and interact with the deputies. (Gonzalez Deposition, page 30.)

Lieutenant Gonzales testified in his deposition that he had daily briefings with deputies and custody assistants to discuss officer safety issues and incidents that had occurred previously. (Gonzales Deposition, page 33.)

Sergeant Inge was asked in his deposition "what did you do to ensure that your deputies were performing their duties and responsibilities appropriately so that incidences of inmate-on-inmate - - major incidents of violence would not have occurred?" He responded. "I taught my deputies. I mentored them and supervised them. I maintained a high profile visibility on the floor and ensured that my deputies were performing their duties properly." He further explained that he reviewed policy and explained what was expected of them. (Inge Deposition, pages 83-84.)

Failure to provide reasonable security and/or prevent abuse of inmates by other inmates.

It is my opinion that the policies and procedures of the MCJ were adequate to provide reasonable security for the staff and inmates of that facility. I saw no evidence that supervisors, deputies, or custody assistants failed to follow the established policies of this facility and their actions or lack of action jeopardized the safety of Plaintiff.

Failure to supervise, investigate and take corrective actions in incidents of failure to provide reasonable security resulting in inmate-on-inmate violence.

Captain Clark in his deposition was asked what action he had taken in response to the jail homicides that occurred in 2004. He testified that the corrective measures that had been outlined in the Office of Independent Review Report had taken place. He also testified that he met with Lieutenants and Sergeants and reviewed policies to make sure that those corrective actions were in place and the policies were being followed. He personally walked around the jail and monitored the activities within the jail to insure that the corrective activities that had been identified had actually taken place. (Clark Deposition Volume II, page 300.)

Condoning lax supervision of deputy misconduct, unconstitutional conduct, and or dereliction of duty.

9

No evidence or documentation was provided to me that would support an allegation of misconduct by a deputy in this incident, or that the supervisors involved in this issue condoned misconduct by any employee.

Lieutenant Gonzales testified that he held daily briefings with his sergeants and talked about personnel issues; i.e., how they were going to handle problem deputies. (Gonzales Deposition, page 33.)

Condoning lax supervision by supervisors who fail to report or investigate deputies and other supervisors wrongful, unconstitutional, or dereliction of duty and failure to provide reasonable security to inmates.

Plaintiff provided no evidence relating to this incident involving Djon Starr that would support this allegation. However, Plaintiff has attempted to draw some correlation between the jail murder investigations that occurred prior to April 20, 2003, and this incident. It is my opinion that Plaintiff's safety was in no danger because of circumstances that occurred relating to these homicides.

In the executive summary of the, OIR Evaluation and Recommendations Concerning Sheriff's Department Investigations of Five Custody Homicides Occurring Between Oct. 21, 2003 and April 20, 2004, page 2, it was noted that: "With regard to accountability, the discipline handed down in the jail murders has been unprecedented in its breadth, size and scope. Over 25 LASD employees have been disciplined as a result of actions or failure to fulfill their work responsibilities. The include deputies, sergeants, lieutenants, and custody assistants."

Condoning lax supervision by line supervisors who fail to report or investigate deputies who use excessive force on inmates.

I saw no documentation that Plaintiff complained of excessive force being used against him by any of the custodial staff. The only record of this allegation, other than in the moving papers of this court action, was recorded 6 days after his altercation with the Hispanic inmates. He apparently told Dr. Policarpio Enriquez that "I have a broken nose, I was kicked on the face 1/27/06 by custody. My nose bleed every am.," while he was at the MCJ Clinic for a follow up visit.
(Inmate Medical Documentation, page 7 COLA/LASD 01195.)

Custodial staff did not have access to the Inmate Medical Documentation report and would therefore not have seen the record of Plaintiff's allegation.

Ratifying wrongful conduct by deputies and/or supervisors that results in serious injuries to inmates or deaths of inmates, civil litigation, judgments and settlements

by failing to implement corrective action to prevent repetition of wrongful conduct.

There was no evidence or documentation provided to me that would support this allegation relating to the incident that occurred on 1/27/06.

In the first page of the, OIR Evaluation and Recommendations Concerning Sheriff's Department Investigations of Five Custody Homicides Occurring Between Oct. 21, 2003 and April 20, 2004, the report points out:

"Shortly after Tinajero was killed, Sheriff Baca held a news conference to report not only about the murder of Tinajero, but to provide preliminary facts regarding four additional inmate homicides that had occurred in the Los Angeles County jails since October 2003. In addition, Sheriff Baca opened his jails to the media so that it could be viewed first-hand the current jail environment. During that conference and in subsequent confidential reports to the Board of Supervisors, OIR had been impressed with the candor of LASD. Moreover, the Sheriff was personally engaged in steering the investigation of these murders to insure accountability of his employees. After chairing a several hour debriefing of the incidents, the Sheriff ordered a full investigation into each of the murders with very short completion dates. By his order, the Sheriff made clear to LASD member the priority of these investigations."

Failure to implement competent and appropriate policies and procedures regarding supervision of gates and control of gates.

I saw no evidence that Deputy Jose Garibay, or any of the other defendants in this case, failed to implement competent and appropriate policies and procedures regarding supervision of gates and the control of gates.

Captain Clark testified that it was appropriate to open all cell gates on a specific housing row during pill call, which was consistent with what Deputy Garibay did prior to the altercation involving Plaintiff. (Clark Deposition Volume I, page 163:8:-18.)

Failure to enforce policies and procedures regarding the use and designation of inmates as trustees.

I saw no evidence that would support this allegation regarding the incident that occurred on 1/27/06.

Captain Clark testified that he insured that the policies relating to the selection of trustees were being followed, by making sure that his staff were aware of the policies and that his sergeants and lieutenants were

11

enforcing those policies. He would also personally check the jail records to insure that those policies were being followed. (Clark Deposition Volume I, pages 188-189.)

### Failure to implement indicated policies and procedures for designation of inmate workers as trustees.

I saw no evidence that Defendants failed to implement indicated policies and procedures for designation of inmate workers as trustees relating to the incident that occurred on 1/27/06.

### Failure to comply with policies and procedures regarding checking inmate identification.

I saw no evidence that custodial staff failed to comply with policies and procedures regarding checking inmate identification in this matter.

Lieutenant Gonzales testified in his deposition that security measures were implemented to monitor an inmate's movement throughout the jail. "I know for a fact that before an inmate could exit a floor, he had to be checked, he had to be scanned. Inmates had wrist bands like the grocery scanners. We had hand scanners that were given to deputies on the floors. They were scanned off of floors. And as they entered in another floor, they were scanned again so you could follow the inmate's progress through the jail. And when they came back, the same in reverse happened." (Gonzales Deposition, page 189:9-17.)

## QUALIFICATIONS:

I am qualified and competent to render my opinions in the case before this Court due to my experience, training and professional activities in criminal justice and corrections.

I am currently self-employed as a criminal justice consultant and enter private engagements with criminal justice agencies to perform a wide range of services, including audits and inspections, review of policy and procedure, administrative investigations, audits of practices and processes, development and delivery of training courses, original research, surveys, draft policies and procedures, staff development, meeting and conference facilitation, and expert testimony in court and before governing bodies.

My initial experience in a custodial workspace was as a roving floor deputy in the Poli Street Jail, in Ventura California during late 60's early 70's.

From December of 1976 until May of 1977, I served as a Watch Commander at the Sheriff's Honor Farm in Ventura County. My responsibilities included supervision of all deputies and correctional staff assigned to a particular shift at the Honor Farm, conduct

12

inspections of inmate housing facilities, and assure that department rules and regulations were followed by staff and inmates.

From May of 1977 to May of 1978, I served as the Administrative Sergeant at the Sheriff's Honor Farm in Ventura County. I was responsible for the scheduling of all Honor Farm personnel, training, budget construction, and development of operational policies.

From May of 1978 to January of 1979, I was assigned to the Court Services Division, and was responsible for the security of all Superior Courts in Ventura County, which included the supervision of in-custody defendants.

From January of 1979 to November of 1979, I served as a Lieutenant in the Custody Division, assigned as the Facility Commander of the Oxnard Branch Jail. My responsibilities included the overall operation of the branch jail, which was the high security facility of the Ventura County Custodial System, oversee the management of the inmate transportation unit, and maintain compliance with a Federal Court Order regarding conditions of confinement.

From February 1983 to March 1986, I was assigned as the Commander of the Custody Division. My responsibilities included the overall operation and administration of the Sheriff's 5 facilities, 339 custody employees, and the supervision of over 1500 inmates, development of an annual budget totaling over 20 million dollars, created and implemented division policy, trained subordinates in jail operations and management.

From March 1986 to June 1993, I served as Assistant Sheriff. My responsibilities included the administration and direction of 4 of the Department's 8 Divisions. The Custody Division and its 5 custodial facilities were a major part of my responsibilities. I gave administrative oversight to the Custody Division Commander and his staff, as well as the Project Development Division with the design, development, and construction of a new 2000 bed jail.

From June 1993 until August 1999, I served as Undersheriff. I was responsible for the administration of the entire Sheriff's Department under the direction of the Sheriff. At the time of my appointment as Undersheriff, the Sheriff's Department was reorganized into 4 major divisions headed by a chief deputy. Each chief deputy reported directly to me. The 4 divisions of the Sheriff's Department are comprised of the Detention Services Division, East Valley Police Services Division, West County Police Services Division and Support Services Division. At the time of my retirement the Sheriff's Department employed 1355 individuals with an operational budget of $140,000,000.00

Some of the other custodial experiences I have acquired over my career have included:

Serving from 1984 to 1986 and again from 1988 to 1990, as a member of the California State Standards and Training for Corrections Program Advisory Committee. In 1986 I was appointed chairman of that committee.

13

I have served as a consultant to the State of California on the last three major revisions of the California State Minimum Jail Standard Act.

I have lectured on jail management, construction, and operation for the American Corrections Association Conference, the American Jail Association Conference, the California Jail Managers Association Conferences, The Washington State Jail Managers Association Conference, and meetings of the National Large Jail Network at Denver Colorado, sponsored by the National Institute of Corrections.

I have served as a Technical Assistance Consultant for the National Institute of Corrections since 1985. As a consultant for that agency I have completed the following assignments:

March 1985, Assisted in the development of curriculum for the Academy of Corrections on Large Jail Management.

February 1986, trained and assisted the staff of the Shasta County Sheriff's Department, Redding, California in the development and publication of a Jail Policy and Procedures Manual.

July 1986 conducted a staffing analysis of the custodial operations of the Humboldt County Sheriff's Department, Eureka, and California.

September 1987 conducted a staffing analysis of the custodial staff of the Washington County Department of Public Safety, Hillsboro, Oregon.

September 1991 conducted a systems assessment for the Santa Ana Police Department, Santa Ana, California, to aid in the design and development of a new city jail.


During the course of my employment in the custodial field, I have toured and/or inspected the following facilities:

**California**

| | |
|---|---|
| Contra Costa County Detention Center | Direct Supervision |
| Shasta County Main Jail | Indirect Supervision |
| Humboldt County Jail | Linear Construction |
| Sacramento County Main Jail | Indirect Supervision |
| Yolo County Monroe Center | Direct Supervision |
| Yolo County Jail | Linear Construction |
| Delancy Street Foundation Harbor | Apartment Housing |
| Delancy Street Foundation Hill | Multi-occupancy rooms |
| Santa Cruz County Main Jail | Indirect Supervision |

14

| | |
|---|---|
| Santa Cruz Women's Facility | Remote Supervision |
| Sonoma County Main Jail | Indirect Supervision |
| Sonoma County Honor Farm, Men's | Dormitory |
| Sonoma County Women's Facility | Dormitory |
| San Luis Obispo County Downtown | Linear Construction |
| San Luis Obispo Main Jail | Indirect Supervision |
| San Luis Obispo Honor Farm | Dormitory |
| Santa Barbara County Main Jail | Indirect Supervision |
| Kern County Main Jail | Linear Construction |
| Kern County Lerdo Facility | Indirect Supervision |
| Los Angeles County Central | Linear Construction |
| Los Angeles County HOJ | Linear Construction |
| Los Angeles County HF Max | Linear Construction |
| Los Angeles County HF Minimum | Barracks |
| Los Angeles County Cybil Brand | Indirect/Dormitory |
| LA County Correctional Facility | Indirect/Direct |
| San Bernardino Glen Helen | Dormitory |
| San Bernardino West Valley | Indirect Supervision |
| Detention Center | |
| Orange County Intake/Release | Indirect Supervision |
| Orange County Theo Lacy | Remote Supervision |
| Orange County James Musick | Dormitories/Tents |
| Orange County Women's Jail | Indirect/Dormitories |
| Riverside Jail | Indirect Supervision |
| Ventura County Main Jail | Indirect Supervision |
| Ventura County Poli St. | Linear |
| Ventura County Loma Hall | Single/Linear |
| Oxnard Branch Jail | Linear/Dormitories |
| Ventura Honor Farm Men's | Dormitories/Wheel |
| Ventura Honor Farm Women's | Indirect Supervision |
| East Valley Old | Linear/Single |
| East Valley New | Indirect Supervision |
| Rose Valley Work Camp | Barracks |
| Alameda County Santa Rita | Indirect Supervision |
| San Mateo County | Indirect/Dorms |
| Napa County Main Jail | Direct Supervision |
| Santa Ana City Jail | Linear |
| Santa Clara County Main Jail | Direct Supervision |
| Santa Clara County Elmwood Facility | Direct |
| Supervision/Barracks/Indirect | |

## Texas

| | |
|---|---|
| Texas DoC Michael Unit | Indirect Supervision |
| Harris County 701 | Indirect Supervision |

Harris County 1301                           Remote Supervision
Harris County 301                            Indirect/Dorm
Harris County Detention Center               Linear
Harris County Boot Camp                      Barracks
Harris County Inmate Reception Center        Booking Facility
Pasadena City Jail                           Linear
Bexar County Jail                            Barracks/Linear
Liberty County Jail                          Linear

## Georgia

Spalding County                              Indirect Supervision
Cobb County                                  Indirect Supervision
Fulton County                                Indirect Supervision

## Nevada

Washoe County                                Direct Supervision
Clark County Detention Facility              Indirect

## New York

Erie County Correctional Facility            Indirect Supervision

## North Carolina

North Carolina Central Prison                Indirect Supervision
Eastern Correctional Center                  Indirect/Direct

## Florida

Pinellas County Medium Security              Indirect Supervision
Pinellas County Minimum Security             Dormitories
Marion County Detention Facility             Indirect Supervision

## Wyoming

Evanston Jail                                Remote Supervision

## Oregon

Washington County Jail                       Linear

## New Mexico

Albuquerque                                  Linear

16

**Colorado**

| | |
|---|---|
| Bolder County Jail | Direct Supervision |
| Denver County Jail | Indirect/Linear |

**Minnesota**

| | |
|---|---|
| Hennepin County Jail | Linear |

**Louisiana**

| | |
|---|---|
| Orleans Parish Jail | Indirect/Linear |
| Emergency Detention Center | Tents |
| Central Lockup | Indirect/Podular |
| House of Detention | Linear |
| Orleans Parish Prison | Linear |
| Community Corrections Center | Mezzanine/Indirect |
| Templeman Phase I | Podular/Dormitory |
| Templeman Phase II | Podular/Direct |
| Templeman Phase III | Podular/Direct |
| Fisk School | Indirect/Dormitory |
| Rendon Street | Indirect/Steel Containers |
| Broad Street | Dormitory |
| White Street | Dormitory |

FORMAL EDUCATION:

| 1985 | **Master of Public Administration**<br>University of La Verne |
|---|---|
| 1982 | **Bachelor of Science: Criminal Justice**<br>University of La Verne |

PROFESSIONAL CERTIFICATES:

**P.O.S.T.** Management Certificate

**P.O.S.T.** Supervisory Certificate

**P.O.S.T.** Advanced Certificate

**P.O.S.T.** Intermediate Certificate

17

**P.O.S.T.**  Basic Certificate

**California Community College**  Teaching Credential

PROFESSIONAL MEMBERSHIPS Past and Present:

American Correctional Association

American Jail Association

California State Sheriff's Association

California Peace Officer's Association

California Narcotic Officer's Association

National Sheriff's Association

Southern California Jail Managers Association

**PREVIOUS CASES:**

Santa Clara County, California
Leal v. Officer Siegal et al. – Sep 06 D
Gracia et al. v. County of Santa Clara – Dec 06 D
Richard Carrasco v. County of Santa Clara – Jan 07D
Marino v. County of Santa Clara – Mar 07D

Fresno, California
Eliseo Renteria v. Tulare Co. Sept. 03 P
Cindy Staunton v. City of Clovis – Jun 01 P

City of Houston, Texas
Claudia Navarro Pineda, et al. vs. City of Houston, Dec 00 D

Pasadena, Texas
Moises Delao v. The City of Pasadena, Texas-Dec 96 D

Palm Springs, California
Sandra Lee Denham v. City of Palm Springs - Nov 99 P

Harris County, Texas
Alberti v. Harris County-Apr 92 D
Laura Sherrard v. Harris County-Nov 93 D