R. Samuel Paz (SBN: 62373)
**LAW OFFICES OF R. SAMUEL PAZ**
Sonia M. Mercado (SBN: 117069)
**SONIA MERCADO & ASSOCIATES**
5701 West Slauson Ave., Suite 202
Culver City, CA 90230
Telephone: (310) 410-2981
Facsimile: (310) 410-2957

Attorneys for Plaintiff Dion Starr

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DION STARR,<br>　　　Plaintiff,<br><br>　　　v.<br><br>COUNTY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, SHERIFF LEE BACA IN HIS INDIVIDUAL AND PERSONAL CAPACITY, ET., AL,<br>　　　Defendants. | CASE NO. CV O8-00508 GW (SHx)<br><br>[Hon. George H. Wu]<br><br>**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF LAW AND FACT**<br><br>Date:　　November 30, 2009<br>Time:　　8:30 a.m.<br>Courtroom:　10 |

　　　Plaintiffs hereby submits his Memorandum of Contentions of Law and Fact pursuant to Central District Local Rules, Rule 16-4.

**16-4.1.　　PLAINTIFFS' CLAIMS AGAINST DEP. GARIBAY, DEP. BUGARIN, SGT. INGE, LT. GONZALEZ, CAPT. CLARK, COUNTY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF'S DEPARTMENT.**

**CLAIM 1: Failure to provide Reasonable Security as against Deputy Garibay, 42 U.S.C. § 1983.**

　　　**16-4.1 (a)　　Summary Statement of the Claim Against Dep. Garibay.**

1  On January 27, 2006, Deputy Garibay was assigned to monitor module 2400 B Row control booth, with duties to provide inmate security and safety and to document any occurrences of significant events in the module. He controlled access and egress to Row B gate and the cells therein. He saw numerous Hispanic inmates seeking entry to Row B, and contrary to policy, without checking their wristbands, he opened the row gate and let them in. He did not monitor the activities of these inmates and abandoned the observation booth and Row B contrary to policy, he further opened three cell gates, including Plaintiff's cell, allowing the Hispanic inmates inside the row access inside the cell where Plaintiff, an African-American, was housed. The three unattended Hispanic inmates entered Plaintiff's cell #9, and attempted to kill Plaintiff, seriously injuring him with a jail made knife. Garibay responded after he heard screams for help, but did not remember what happened because he testified he was elsewhere.

Garibay was responsible for preparing the incident report because he was the deputy in charge, but did not do so. He was never questioned about the incident or trained on proper procedures regarding leaving his post, allowing 3 unauthorized inmates into a Row; leaving them unattended; and failing to follow policies and procedures.

**16-4.1 (b)   Elements Required to Establish the Claim.**

1. Plaintiff has a constitutional right under the *Fourteenth Amendment* to "reasonable safety." (*Farmer v. Brennan*, 511 U.S. 825 845-846 (1994));
2. "Prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." (*Id.*, 833) "[H]aving stripped [inmates] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." (*Id.*, cites omitted.)

3. "A plaintiff may make the factual showing that a prison official had the requisite knowledge of a substantial risk 'in the usual ways, including inference from circumstantial evidence.'" Id., 842.

**16-4.1 (c)   Key Evidence Re Right to Reasonable Security.**

Plaintiff will present defendants and defense witnesses testimony, expert testimony, and Plaintiff that an inmate is entitled to reasonable security, that this is the responsibility of the deputies and their supervisors; and that in this incident, Dep. Garibay failed to comply with this constitutional requirement.

Plaintiff will present documentary evidence produced by defendants during discovery, including but not limited to training material, policies and procedures, photographs and graphic renderings, reports, the incident report, and other discovery material.

**CLAIM 2:  Use of Excessive Force Against Deputy Bugarin, 42 U.S.C. § 1983.**

**16-4.1 (a)   Summary of the Claim for Excessive Force Against Bugarin.**

Deputy Maybet Bugarin responded to the incident, but by the time she arrived "Everything was okay," the inmates were already handcuffed and lying on the floor. However, while Plaintiff laid handcuffed on the floor, Dep. Bugarin kicked him in the nose saying, "Nigger" I told you to get down.  She wrongfully and maliciously kick him for no reason.

**16-4.1 (b)   Elements Required to Be Free from Unnecessary Force.**

In general, under the Fourth Amendment, a police officer may only use such force as is "objectively reasonable" under all of the circumstances.  In other words, you must judge the reasonableness of a particular use of force from the perspective of a reasonable officer on the scene and not with the 20/20 vision of hindsight.  In determining whether the officers used excessive force in this case, consider all of the circumstances known to the officers on the scene, including:

1. The severity of the crime or other circumstances to which the officers were responding;

2.  Whether the plaintiff posed an immediate threat to the safety of the officers or to others;
3.  Whether the plaintiff was actively resisting arrest or attempting to evade arrest by flight;
4.  The amount of time and any changing circumstances during which the officer had to determine the type and amount of force that appeared to be necessary;
5.  The type and amount of force used;
6.  The availability of alternative methods to take the plaintiff into custody or to subdue the plaintiff;
7.  The officers' obligations under federal law and LASD policy and procedure regarding "use of force".

Ninth Circuit Jury Instruction 9.22  Particular Rights—Fourth Amendment—Unreasonable Seizure of Person—Excessive (Deadly and Nondeadly) Force, *Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1366 (9th Cir. 1994), *Duran v. City of Maywood*, 221 F.3d 1127, 1130-31 (9th Cir. 2000), *Blankenhorn v, Smith*, 485 F.3d 463, 479 (9th Cir. 2007), *Feemster v. Dehntjer*, 661 F.2d 87, 89 (8th Cir 1981) and *Baldwin v. Placer* County, 418 F.3d 966 (9th Cir. 2005).

**16-4.1 (c)   Key Evidence Re Right to Be Free from Unnecessary Force, 42 U.S.C. § 1983.**

The key evidence that Dep. Bugarin used unnecessary and excessive force is that:

- LASD policy requires that all use of force "must be necessary and reasonable," and mandates that "Members shall use force only when the necessity exists, and when fully justified by the circumstances;"
- LASD Training Bulletin re "use of force" authorizes members "to use only that amount of force that is "objectively Reasonable" (*Graham vs. Connor*

1989) to perform their duties." This policy requires that all use of force "must be necessary and reasonable;"

- Plaintiff testified that Deputy Bugarin kicked him in the face and nose while he was handcuffed, on the ground and for no justified reason; and,
- Dep. Bugarin admits that kicking a handcuffed inmate is "unconstitutional" if not "criminal conduct"; she failed to follow indicated protocols, policies and procedures for responding to a person who is already handcuffed on the ground, in an environment already controlled by her and other officers; and she failed to report the use of force.

**CLAIM 3: Failure to Provide Access to Medical Care Against Deputy Bugarin.**

**16-4.1 (a)   Summary of the Claim.**

Plaintiff states: "My nose became very inflamed and **Deputy Bugarin refused to take me to medical for treatment of my nose**. He had to get a court order to get treatment for his nose. This intentional delay violates Plaintiff's right to medical care. This violation is particularly flagrant because the Deputy knows of the inmate's serious injuries and inflicted some of them.

When Starr returned from the hospital to jail on January 27, 2006, he was put on isolation for no reason, and Bugarin denied him access to medical care for his nose. Bugarin was one of the movement deputies who would be responsible for moving Plaintiff and she admits seeing him in isolation. She called isolation "the hole because it jams up your stomach. It is just four walls. It is small . . . and you get no privileges." She knew that the only persons Mr. Starr could "talk to [was] whoever else might be down the way in the hole." Plaintiff requested medical access for the pain to his nose, but Bugarin denied and/or delayed his right to access to medical care and treatment for the injury she caused his nose. On February 7, Plaintiff obtained a Court Order to get access to further medical care for his nose, Medical records note that "Deputy Bugarin was notified again that inmate needs to be taken to the clinic to be evaluated by Dr. Vyden." Deputy Bugarin did not take

1  him to medical.  Starr finally received care for his nose on 2/10/06.  Bugarin caused
2  days of delay to treatment and ongoing pain.

**16-4.1 (b)   Elements Required to Establish the Claim.**

The standard established in *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), protects inmates against cruel and unusual punishment in a medical context. In *Bell v. Wolfish* 441 U.S. 520 (1979), this protection was extended to pre-trial detainees through the 14th Amendment and made the distinction between *Eighth* and *Fourteenth Amendment* protection for pre-trial detainees.

In the Ninth Circuit, the test for deliberate indifference consists of two parts. *McGuckin v. Smith*, 974 F.2d 1050 (9th Cir. 1991), overruled on other grounds by *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).  First, the plaintiff must show a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.' " *Id.* at 1059. Second, the plaintiff must show the defendant's response to the need was deliberately indifferent. *Id.* at 1060. This second prong -- defendant's response to the need was deliberately indifferent -- is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. *Id.*

**16-4.1 (c)   Key Evidence Re Right to Access to Medical Care.**

Plaintiff will present defendants' and defense witnesses' testimony, expert testimony, and his testimony that an inmate is entitled to access to medical care and treatment for his physical injury caused by Bugarin kicking him in the face; and that he was denied or delayed in receiving access to medical.

Plaintiff will present documentary evidence produced by defendants during discovery, including but not limited to training material, policies and procedures, photographs, medical records, reports, the incident report, Court Order, and other discovery material.

**CLAIM 4: Policy, Custom or Practice Causing Constitutional Violation**

**16-4.1 (a)    Summary of the Claims.**

These Defendants were on actual and constructive notice by a epidemic of injuries leading to a series of deaths of inmates, followed by a series of public reports from their lawyers and lawsuits arising from incidents of inmate on inmate violence of the following claims:

(1) its failure to train in the policy requiring the selection of inmate trustees with the approval of a supervisor would result in violent prison gang members being selected as trustees within the jail having access to housing areas to attack other inmates, including those of other races;

(2) its failure to train deputies that the failure to affirmatively require identification checks of inmates entering a housing area would result in violent prison gang members having access to housing areas to attack other inmates, including those of other races; and,

(3) its custom of tolerating inmate on inmate violence, caused by lax supervision, a failure to train line personnel in reasonable security procedures and a practice of not investigating, not disciplining deputies and supervisors, not ensuring training regarding corrective measures are enforced would likely result in  constitutional violations of inmates attacking other inmates.

The County and LASD's deliberate indifference led to the violation of Plaintiff's constitutional right to be free from physical attack.

**16-4.1 (b)    Elements Required to Establish the Claims.**

**Elements Required: Claims of Failure to Train**

1. The acts of Deputy Garibay deprived the plaintiff of his particular right to reasonable security under the United States Constitution;
2. Deputy Garibay acted under color of law;

3.  the training policies of the defendants County and LASD were not adequate to train its employees to handle the usual and recurring situations with which they must deal;
4.  the defendants County and LASD were deliberately indifferent to the obvious consequences of its failure to train its employees adequately; and
5.  the failure of the defendants County and LASD to provide adequate training caused the deprivation of the plaintiff's rights by Deputy Garibay; that is, the defendant's failure to train is so closely related to the deprivation of the plaintiff's rights as to be the moving force that caused the ultimate injury.

9.7 SECTION 1983 CLAIM AGAINST LOCAL GOVERNING BODY DEFENDANTS BASED ON POLICY OF FAILURE TO TRAIN—ELEMENTS AND BURDEN OF PROOF. "[A] local governmental body may be liable if it has a policy of inaction and such inaction amounts to a failure to protect constitutional rights." *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir.1992), citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). The policy of inaction must be a conscious or deliberate choice among various alternatives. *Berry v. Baca*, 379 F.3d 764, 767 (9th Cir.2004). *Redman v. County of San Diego*, 942 F.2d 1435, 1442 (9th Cir.1991), *cert. denied,* 502 U.S. 1074 (1992) (deliberate indifference does not require express intent to harm).

**Elements Required: Claim of Custom of Tolerating Inmate on Inmate Violence**
1.  Sheriff Leroy Baca was a final policymaker and had final policymaking authority from defendants County and LASD and acted under color of law;
2.  the acts and inaction of Sheriff Leroy Baca deprived the plaintiff of his particular right under the United States Constitution to reasonable security;
3.  Sheriff Leroy Baca acted pursuant to a longstanding practice or custom of the County and LASD

Ninth Circuit Jury Instruction 9.4 and 9.5 SECTION 1983 CLAIM AGAINST LOCAL GOVERNING BODY DEFENDANTS BASED ON OFFICIAL POLICY,

PRACTICE, OR CUSTOM—ELEMENTS AND BURDEN OF PROOF, *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 691 (1978). *See also Gibson v. County of Washoe, Nev.*, 290 F.3d 1175, 1185 (9th Cir.2002), *cert. denied*, 537 U.S. 1106 (2003).  Liability of a local governing body may attach under § 1983 when an employee committed a constitutional violation pursuant to a "longstanding practice or custom." *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir.2003), *cert. denied*, 540 U.S. 1141 (2004).

**16-4.1 (c)   Key Evidence Re Custom and Failure to Train Right to Reasonable Security, 42 U.S.C. § 1983.**

**1.   Testimony of Captain John Clark, Facility Commander**

Captain John Clark was the Facility Commander at the jail when Plaintiff was attacked.  His duties included to know of problems in the facility and to ensure that his subordinate lieutenants and sergeants are taking appropriate corrective action in situations caused by lapses in security that lead to inmate on inmate attacks.

In the attempted murder of Starr, Capt Clark not recall what he did regarding the supervisory performance of Lt. Gonzalez and Sgt. Inge or the security lapses caused by Garibay, although he signed the incident report and the injury report prepared by Christina Martinez.  He testified that the Title 15 logs must identify significant incidents within module such as an attempted murder with significant injuries or an inmate taken to the hospital.  He should be called/advised by Lt. Gonzalez and he would have to report the incident to his commander. He had previously counseled Lt. Gonzalez that his responsibilities not being met, but that report was purged after a year.

**Failure to Train: Selection of Trustee**

Capt. Clark (and Lt. Gonzalez) testified that a inmate selected to be a trustee had to be screened for security classification level and approved in writing by the sergeant.  An inmate accused of murder could not be a trustee.  This policy change

1  went into effect in 2005 (Minutes of the County criminal Justice Committee of
2  February 15, 2006), and Sgt. Inge and Deputy Garibay were not aware of the policy.
3  In the attack on Starr, one of the trustees noted in the Title 15 logs as a trustee was
4  inmate Gascon, who was charged with murder.  Sgt. Inge was required to sign Title
5  15 log approving inmate trustee worker, but did not do so.

6  **Custom of Lax Supervision and Failure to train on Checking Wristbands**

7  Part of Capt. Clark's duties was to attend death reviews for incidents, such as
8  an inmate being murder at his facility.  The death reviews were attended by upper
9  command staff and many other LASD and OIR representatives to determined what
10 had happened, whether any policies or procedures were violated and what, if any,
11 corrective measures were to be taken to avoid future repeats of incidents.  He would
12 also review the homicide investigations of the murders, reviewed Government Code
13 claims of injuries or deaths occurring at the jail, and any lawsuit complaints, and to
14 investigate and take corrective measures for meritorious claims. The following is a
15 brief summary of the cases Capt. Clark testified he reviewed and his comments:
16
17 Ramon Gavira: Mr. Gavira, was arrested for DUI.  At intake screening he was
18 evaluated to be mentally ill and suicidal and ordered to be placed in a pill module to
19 receive medication, treatment and psychotherapy.  He was no and was in 2000 floor
20 where he was severely beaten over approximately two days before his death
21 (according to forensic evidence), and died on July 6, 2002.  Although the homicide
22 investigation interviewed many  inmate witness who identified a deputy who had
23 beaten Gavira, no investigation of the deputy was conducted by LASD
24 Ki Hong killing: due to several lapses in security, failure to supervise three trustees,
25 failure to safety checks, failure to do wristband checks and selecting a trustee who
26 was considered dangerous, inmate Ki Hong ("Hong") on October 21, 2003, was
27 killed by three inmates who entered the dayroom where Hong was housed.  Inmate
28

Hong was stabbed, beaten and strangled to death approximately 1½ hours after he arrived at his housing in Men's Central Jail.

Steven Prendergast murder: On December 6, 2003, Prendergast was beaten periodically over several hours as a result of lapses in security - not checking wristband, deputy not doing row checks, failing to do counts, inmates made jail alcohol in their cells, got drunk and killed Prendergast. No crime scene was established. There were issues of accountability and LASD could not identify who was responsible and thus no discipline of anyone.

Mario Alvarado killing: On December 9, 2003, inmate Mario Alvarado, aka Victor Cortez, was killed in a holding cell at Custody Line Inmate Reception Center ("IRC"). He had previously been housed at MCJ a short time after he arrived at the IRC Custody Line holding cell, which contained 40 inmates, he was attacked by one or more other inmates, who punched and kicked him until he lost consciousness and continued to beat him afterward. Approximately seven hours after his assault, a worker inmate cleaning the cell discovered his body and notified IRC deputies. Again, a lapse of security in the supervision of the safety rows and the "inaccurate reporting" of a deputy was the cause of the incident.

Faye murder: On January 12, 2004, inmate Kristopher Faye was stabbed to death by several inmates with jail-made knives on the lower tier of his module (at MCJ?) after he lowered himself down from the upper tier balcony and attempted to use the phones. Fay was black; the alleged attackers were Hispanic. Fighting ensued between the two racial groups which resulted in racial disturbance. Accountability issues, cell gates left open, gates not closed per policy a lieutenant was disciplined for failing to insure that use of force report had been done. Capt. Clark again recognized that a lapse of reasonable security was the cause.

Tinajero murder: On April 20, 2004, inmate Raul Tinajero was beaten to death in his cell in MCJ by an inmate trustee Santiago Pineda. Based on the investigative report, fourteen LASD employees were found to have violated various LASD policies.

(Office of Independent Review Report on the Los Angeles County Jail Homicides ("OIR Homicide Report"), Fall 2004, p. 29).  Some of the violations were:

- Due to monitoring failures, Pineda was able to improperly leave his cell without being detected.
- Due to monitoring failures and inadequate procedures with regard to the escorting of inmates, Pineda was able to enter Tinajero's cell unchallenged.
- There was insufficient monitoring of Tinajero's cell during the five hours that Pineda was in the cell.
- On two prior occasions, allegations of inmate misconduct against Pineda were inadequately addressed.
- The Training Sergeant was unfamiliar with the most basic of LASD policies.
- Pineda had previously escaped from MCJ, but on at least two occasions, Pineda was designated as an inmate worker.

Capt. Clark agrees that in "Tinajero case there were similar lapses of security which were the moving force of inmates reaching Mr. Tinajero and killing him."

Capt. Clark agrees all these lapses in security resulted in lapse of reasonable security to inmates which caused the killing of Tinajero.  He also agrees that it is the duty of lieutenants and sergeants to make sure that staff is complying with OIR recommendations and policies.  He agreed that he needs to know the recommendations and policies to stop continued lapses of failure of deputies to provide reasonable security to inmates.  He agrees that these cases indicate insufficient monitoring and of deputies failing to keep their eyes and supervise what's going on their particular watch. Another problem Capt. Clark identified was that inmates were not being properly disciplined for wrongful conduct so that they don't continue committing wrongful conduct.

As in Tinajero, the training Sergeant was not familiar with basic training policies.  This was the same problem identified with Sgt. Inge.  Capt. Clark testified that it is a custody captain's job to know of problems to make sure sergeants and

1  lieutenants are taking appropriate corrective action in lapses security.
2  <u>McNamera Beating</u>: On June 7, 2005, a deputy was assigned to a staff station to
3  monitor and supervise four housing units, each of which containing 70 inmates. He
4  admitted in deposition to abandoning his assigned post. Once he left his post, a
5  number of members of a violent jail gang took advantage of the fact that no deputy
6  was present and repeatedly attack Sean McNamera over an extended period of time
7  directly in front of Schultz's empty observation station, in full view of approximately
8  65 other pre-trial detainees. Deputy Schultz admitted abandoning his housing area
9  post to go to another housing area, because that deputy had also abandoned his post.
10 Neither called for a back-up or a replacement or asked for assistance. McNamera
11 suffer permanent brain damage and multiple other injuries, is totally disabled. As in
12 this case there was no administrative investigation into why the deputy caused the
13 lapse in security, and his sergeant and lieutenant never questioned Schultz or
14 reported how or why the deputies had abandoned their posts.

15 <u>Cochran killing</u>: It occurred on November 16, 2005, in day room of 2400, the
16 same module where Mr. Starr was the victim of an attempted murder on February 27,
17 2006, three months and two weeks later. Cochran was transferred to 2400 after he
18 was transferred the section for the mentally ill to protect them from violent offenders
19 to prevent their victimization. When Cochran arrived at 2400, the deputies
20 responsible the safety and security of inmates failed to check his red identification
21 card which should have been removed when he was reclassified.

22 When deputies took the 2400 inmates down from the roof and put all of them
23 in the "T.V. day room" the deputies abandoned their supervision of the "T.V. day
24 room" where the windowless door was closed and locked. Inside, with
25 approximately 40 other inmates, some of whom were classified as violent "high risk"
26 inmates including accused murderers, gang members, and known violent offenders,
27 over the next 20 minutes Cochran was beaten with feet and fists. Cochran and many
28 other inmates were screaming and yelling for help, but no deputy heard the noise,

1  although Cochran was in a room 10 feet from control cage of 2400.  Capt. Clark
2  agreed it was LASD policy that a module officer has to be in cage.  He stated that the
3  practice and requirement is "there is always somebody in the cage"
4      Capt. Clark stated that he had the information as to where killings had
5  occurred and that he knew that half of the killings were happening in 2000 floor.
6  However, he requested no external investigator on lapses of security in 2000 floor.
7      Capt. Clark testified that the general issue for all these killings was a lapse of
8  security - a personal lapse of somebody not doing what they were supposed to do -
9  they were derelict in performing their duties.  In 2005 he aware of racial tension at
10 Men's Central Jail (MCJ).
11     Capt. Clark Lt. Gonzalez and Sgt. Inge all testified that County and LASD
12 policymaker Sheriff Baca had no communication with them on the epidemic of
13 inmate on inmate attacks.
14     The Rule 26 Report and Declaration of George Sullivan (filed in Opposition to
15 Defendant's Motion for Summary Judgment) also summarizes the key evidence.
16 **CLAIM 5:  Failure to Train, Supervise, Causing Constitutional Violations**
17         **Against Individual Defendants Inge, Gonzalez and Clark.**
18     **16-4.1 (a)    Summary of the Claim.**
19     These individual Defendants were on duty the day of the attempted murder
20 incident and had worked in the 2000 floor of MCJ where more that 50% of the
21 killings mentioned above had occurred and where an were on actual and constructive
22 notice by a epidemic of injuries from inmate on inmate attacks leading to a series of
23 deaths of inmates arising from incidents of inmate on inmate violence.
24                 **Claim Against Sgt Inge**
25     Sgt, Inge failed to train Dep. Garivay in the policies regarding reasonable
26 security in opening gates; failed to monitor or supervise the opening of security
27 gates; failed to investigate the security lapses of Dep. Garivay that allowed the
28 attackers to enter the row and Plaintiff's cell; failed approve the selection of trustees

as required by policy, apparently allowing a accused murder to enter Row B at the time of the attack on Plaintiff; failed to report or investigate Dep. Bugarin's use of force; failed to report the crime of attempted murder.

### Claim Against Lt. Gonzalez

Lt. Gonzalez was the Watch Commander present at the jail when Plaintiff was attacked. He failed to supervise, investigate or report the attempted murder. Lt. Gonzalez abandoned his post and failed to approve the reports of the incident; he failed to report or investigate Sgt, Inge's failure to investigate the security lapses of Dep. Garivay that allowed the attackers to enter the row and Plaintiff's cell; he failed to report or investigate Sgt. Inge's failure to approve the selection of trustees; he failed to report or investigate Dep. Bugarin's use of force; he failed to report or investigate Sgt, Inge's failure to train Dep. Garivay in the policies regarding reasonable security in opening gates; he failed to report or investigate Sgt, Inge's failure monitor or supervise the opening of security gates; and he failed to report or investigate Garivay's conduct.

### Claim Against Capt. Clark

Capt. Clark, the Facility Commander at the jail when Plaintiff was attacked, failed to supervise, investigate or report Lt. Gonzalez's and Sgt, Inge's failure to investigate the security lapses of Dep. Garivay that allowed the attackers to enter the row and Plaintiff's cell; Sgt. Inge's failure to approve the selection of trustees; Dep. Bugarin's use of force; the crime of attempted murder; Sgt, Inge's failure to train Dep. Garivay in the policies regarding reasonable security in opening gates; Sgt, Inge's failure monitor or supervise the opening of security gates; and Lt. Gonzalez's abandonment his post and failure to approve the reports of the incident.

**16-4.1 (b)   Elements Required to Establish the Claim.**

1. the defendant acted under color of law;
2. the acts of the defendant's subordinates deprived the plaintiff of his particular right to reasonable security under the United States Constitution;

3.  the defendant knew, or reasonably should have known, that his subordinates were engaging in these acts and that their conduct would deprive the plaintiff of these rights; and,

4.  the defendant failed to act to prevent his subordinates from engaging in such conduct, or know about the conduct and condone it, or turn a blind eye to it.

Ninth Circuit Jury Instruction 9.3 SECTION 1983 CLAIM AGAINST SUPERVISORY DEFENDANT IN INDIVIDUAL CAPACITY—ELEMENTS AND BURDEN OF PROOF. In short, "[s]upervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates, for his acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others." *Menotti v. City of Seattle*, 409 F.3d 1113, 1149 (9th Cir.2005) (citations omitted).

**16-4.1 (c)   Key Evidence Re Failure to Supervise.**

**Sgt. Inge, Line Sergeant on Duty**

Sgt. Inge testified he was the line Sgt. on duty at the time of the attempted murder of Mr. Starr. Although he was on duty during the stabbing incident, he did not approve the incident report for accuracy- it was approved by Sgt Lam who was not on duty at time of incident. He directed the deputies speak to the inmates involved in the attack and conduct investigation, but he took no action to investigate if this was an attempted murder.

Sgt. Inge did not take any action to determine who opened the gate and testified that he would not necessarily have wanted to know who opened gates. He never saw or reviewed the report of the stabbing incident that he should have been responsible for approving from February 27, 2007, the date of the incident and reviewed it for the first time at his deposition.

Sgt. Inge stated that he has nothing to do when trustees are selected for a particular module and knew nothing about a policy that trustee should not be inside a

row when cell gates are opened. He was aware that each inmate wears a wristband which tells the deputy where in the jail an inmate belongs and deputies can compare a wristband to computer or log. He confirmed that if a deputy allows a person who is not a trustee to go into row where he is not living, that would be against the LASD rules, policies and procedures.

Sgt. Inge claims he was not told of Starr's accusation that Dep. Bugarin had kicked him in the face and he did not know if anybody ever questioned Starr about this incident. Starr states then Sgt Inge was present when he was kicked. He stated that it was his duty to investigate a deputy who is accused of kicking an inmate in the face and nose while handcuffed, a serious charge as it is a crime and it would be dereliction of duty not to investigate. He also knew of ongoing concern at LASD about problems with deputies not reporting things so that their other deputy friends do not get into trouble.

### Lt. Gonzalez, Watch Commander on Duty

Lt. Gonzalez the Watch Commander (W/C) was present at the jail when Plaintiff was attacked. As W/C he reviewed reports of inmate violence as they came in to make sure that the Sgts. and deputies were doing their jobs, to hold his subordinates accountable he would require witness/deputies to document their observations and properly fill out the reports involving inmate attacks.

Lt. Gonzalez testified he reviewed and signed the incident report of the attack on Starr. However he did not assure that Garibay reported the attempted murder in the Title 15 log, he did not enquire into Sgt. Inge's failure to discuss the incident with Dep. Garivay and the opening the gates or Sgt. Inge's failure monitor or supervise the security lapses of Dep. Garivay that allowed the armed attackers to enter the row and Plaintiff's cell. Nor did Lt. Gonzalez determine if Sgt. Inge had approved the selection of trustees. When he approved the incident report, he knew Mr. Starr had been stabbed on multiple occasions and was desirous of prosecution and had identified the perpetrator, but Lt. Gonzalez did not follow up with the Jail

1  Investigative Unit nor request an interview of Mr. Starr to determining if the crime
2  of attempted murder should be prosecuted.

**Captain John Clark, Facility Commander**

Captain John Clark was the Facility Commander at the jail when Plaintiff was attacked.  His duties included to know of problems in the facility and to ensure that his subordinate lieutenants and sergeants are taking appropriate corrective action in situations caused by lapses in security.  In this case of the attempted murder of Starr, Capt Clark not recall what he did regarding the supervisory performance of Lt. Gonzalez and Sgt. Inge or the security lapses caused by Garibay, although he signed the incident report and the injury report prepared by Christina Martinez.  He testified that the Title 15 logs must identify significant incidents within module such as an attempted murder with significant injuries or an inmate taken to the hospital.  He should be called/advised by Lt. Gonzalez and he would have to report the incident to his commander.  See also his testimony above regarding the custom of lax discipline and failure to train.

**16-4.4     Jury Trial.**

A timely request for a jury trial has been made, and Plaintiff is unaware of any issue that should be tried to the court separately.

**16-4.5     Attorney's Fees.**

By virtue of the provisions of 42 U.S.C.§ 1988, Plaintiff seeks an award of reasonable attorneys' fees and costs according to proof.

16-4.6     Abandonment of Issues.

Plaintiff does not abandon any issues at this time.  **16-4.4**

Respectfully submitted,
**SONIA MERCADO & ASSOCIATES**

/S/Sonia M. Mercado

Dated: November 10, 2009        By: _____
                                Sonia M. Mercado